1  James C. Bastian, Jr. - Bar No. 175415
   **SHULMAN HODGES & BASTIAN LLP**
2  8105 Irvine Center Drive, Suite 600
   Irvine, California 92618
3  Telephone:    (949) 340-3400
   Facsimile:    (949) 340-3000
4  Email: jbastian@shbllp.com

5
   Insolvency Counsel for the Debtors and
6  Debtors in Possession, Trade Union International, Inc. and
   Duck House, Inc.
7

8              **UNITED STATES BANKRUPTCY COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA, RIVERSIDE DIVISION**

10

| 11 | In re | Case No.  6:11-bk-13071-DS |
|----|-------|----------------------------|
| 12 | **TRADE UNION INTERNATIONAL, INC., a California corporation,** | Chapter  11 |
| 13 | Debtor. | Jointly Administered With Case No.  6:11-bk-13072-DS |
| 14 | | |
| 15 | In re | **DEBTORS AND DEBTORS IN POSSESSION'S MOTION FOR ORDER APPROVING SETTLEMENT AND COMPROMISE OF DISPUTES WITH THE BANK GROUP LENDERS (CATHAY BANK FOR ITSELF AND AS AGENT FOR CHINATRUST CAPITAL CORPORATION) AND APPROVING ANCILLARY LOAN MODIFICATION DOCUMENTS; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF WEN PIN CHANG IN SUPPORT** |
| 16 | **DUCK HOUSE, INC., a California corporation,** | |
| 17 | | |
| 18 | Debtor. | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | Date:    September 2, 2011 |
| 23 | | Time:    10:00 A.M. Place:   Courtroom 304 |
| 24 | | 3420 Twelfth Street Riverside, California |
| 25 | | |

26

27

28

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

1

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

Page 1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................5

II.   MOTION..........................................................................................................6

      A.    Background Information................................................................6

      B.    The Prepetition Loan Documents with the Lenders .................................7

      C.    Events Leading to the Debtors' Bankruptcy Filings................................8

      D.    The Disputes With the Lenders...................................................10

      E.    The Settlement and Compromise and Modification of the Debtors'
            Obligations to the Lenders .......................................................11

      F.    Good Cause Exists to Approve the Settlement and Compromise and
            Ancillary Loan Modification Agreement......................................18

III.  AUTHORITIES .............................................................................................20

      A.    Entry of an Order Approving the Settlement is Proper.........................20

      B.    The Court May Approve a Settlement and Compromise Which is Fair and
            Equitable ................................................................................21

            1.    The Probability of Success in Litigation..................................21

            2.    The Complexity, Expense, Inconvenience and Delay of Litigation ..........22

            3.    The Interests of Creditors....................................................22

      C.    The Debtors have Satisfied the Bankruptcy Requirements Regarding
            Authority to Obtain Credit ........................................................23

      D.    Debtors Cannot Obtain Better Financing on Either Unsecured or Secured
            Basis Unless the Lenders Are Granted a First Priority Lien.................25

      E.    The Financing Proposed Herein is Consistent With and Necessary for the
            Debtor's Continued Operations ...................................................27

      F.    The Debtors have Satisfied the Procedural Requirements Regarding
            Authority to Obtain Credit ........................................................27

IV.   CONCLUSION..............................................................................................29

DECLARATION OF WEN PIN CHANG .........................................................31

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

**Page 2**

1

## <u>TABLE OF AUTHORITIES</u>

2

3

### <u>CASES</u>

4     <u>In re Ames Dept. Stores</u>,
          115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) ......................................................... 23, 24

5     <u>In re Carla Leather, Inc.</u>,
          50 B.R. 764, 775 (S.D.N.Y. 1985) ......................................................................... 21
6
      <u>In re Defender Drug Stores, Inc.</u>,
7         45 B.R. 312 (B.A.P. 9th Cir. 1992) ....................................................................... 24

8     <u>In re Dynaco</u>, 162 B.R. 389 (Bankr. D.N.H. 1993 ............................................... 26

9     <u>In re Energy Cooperative, Inc.</u>,
          886 F.2d 921, 927 (7th Cir. 1989) .......................................................................... 21
10
      <u>In re Reading Tube Industry</u>, 72 B.R. 329, 332 (Bankr. E.D. Ps. 1987) .............. 26
11
      <u>In re Saint Mary Hospital</u>, 86 B.R. 393, 402 (Bankr. E.D. Pa. 1988).................. 26
12
      <u>In re Simasko Production Co.</u>,
13        47 B.R. 444, 448-49 (D. Colo. 1985) ................................................................. 23, 25

14    <u>In re Sky Valley, Inc.</u>, 100 B.R. 107 (Bankr. N.D. Ga. 1988)................................. 25

15    <u>In re Tenney Village Co.</u>, 104 B.R. 562 (Bankr. D.N.H. 1989) ................................ 26

16    <u>In re Walsh Construction, Inc.</u>,
          669 F.2d 1325, 1328 (9th Cir. 1982) ...................................................................... 21
17
      <u>Martin v. Kale (In re A & C Properties)</u>,
18        784 F.2d 1377, 1380-81 (9th Cir. 1986) ................................................................. 21

19    <u>Martin v. Robinson</u>,
          479 U.S. 854 (1986).................................................................................................. 21
20
      <u>NLRB v. Bildisco & Bildisco</u>, 465 U.S. 513, 527, 104 S.Ct. 1188 (1984) ................................. 27
21
      <u>United States v. Whiting Pools, Inc.</u>, 462 U.S. 198, 203, 103 S.Ct. 2309 (1983) ....................... 27
22
      <u>Woodson v. Fireman's Fund Ins. Co. (In re Woodson)</u>,
23        839 F.2d 610, 620 (9th Cir. 1988) ........................................................................... 21

24

### <u>STATUTES</u>

25

26    28 U.S.C. §157(b)(2)(A) and (O)............................................................................. 20

27    Bankruptcy Code Section 1107 ............................................................................... 23

28    Bankruptcy Code Section 364(c) ............................................................................. 23

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

1

**<u>RULES</u>**

2

Federal Rule of Bankruptcy Procedure 4001(d) ........................................................................... 27

3

Federal Rule of Bankruptcy Procedure 9019(a) ........................................................................... 20

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

# I.    <u>INTRODUCTION</u>

**TO THE HONORABLE DEBORAH J. SALTZMAN, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND OTHER PARTIES-IN-INTEREST:**

Trade Union International, Inc., a California corporation ("Trade Union") and Duck House, Inc., a California corporation ("Duck House") (Trade Union and Duck House are collectively referred to herein as the "Debtors"), each a debtor and debtor in possession in these jointly administered bankruptcy cases, bring this Motion for Order Approving Settlement and Compromise of Disputes with the Bank Group Lenders (Cathay Bank for Itself and as Agent for Chinatrust Capital Corporation) and Approving Ancillary Loan Modification Documents ("Motion").

Through the Motion, the Debtors requests approval of a settlement and compromise of disputes with their principal lenders pursuant to and consistent with the terms and conditions of a certain Settlement Agreement, a true and correct copy of which is attached to the Declaration Wen Pin Chang ("Chang Declaration") as **Exhibit 1**.  The parties to the Settlement Agreement are the Debtors, Wen Pin Chang, an individual ("W. Chang"), Mei Lien Chang, an individual ("M. Chang"), and Wen Pin Chang And Mei Lien Chang as Trustees of the Chang Revocable Trust u/t/a September 20, 1996 (the "Trust", and together with W. Chang and M. Chang, individually and collectively, the "Guarantor") on the one hand, and Cathay Bank, a California banking corporation ("Cathay"), as Agent ("Agent") for itself and Chinatrust Capital Corporation, successor in interest to ChinaTrust Bank U.S.A. ("Chinatrust") as a Lender, (and together with Cathay, the "Lenders"), and Cathay as L/C Issuer ("L/C Issuer").

**Attached as Exhibit A to the Settlement Agreement are copies of the proposed loan modification documents consisting of the Tenth Modification and Extension Agreement and Annex A thereto ("Loan Modification Agreement").    The Loan Modification Agreement provides for a new revolving line of credit capped at $5,000,000 (with the initial advance to be determined at the time of closing), and three term loans, Term A in the principal amount of $1,370,000, Term B in the amount of $1,620,000 and Term C in the**

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

5

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

Page 5

1   amount of $5,900,000.  **The line of credit will bear interest at the floating rate of prime plus**

2   **1.75% with a floor of 5% and a cap of 9% per annum and the term loans will each bear**

3   **interest at the rate of 5% per annum and mature on the third anniversary of the date of a**

4   **final order approving the Settlement Agreement.** As set forth below, the proposed Settlement

5   Agreement and ancillary Loan Modification Agreement essentially pave the way for a smooth

6   and consensual reorganization as the litigation and disputes with the Lenders were one of the

7   primary precipitating events which resulted in the Debtor's chapter 11 case.   Further, the

8   expenses to be incurred through continued litigation of the disputes among the parties would

9   most likely exceed any additional benefit that might be achieved.  The settlement and proposed

10  loan modification will also minimize the disruption and expense to the Debtors' business

11  operations and is the best means for the Lenders to be paid while preserving cash resources.  The

12  Debtors have investigated other sources of funds and do not believe that they will be able to

13  obtain sufficient immediate cash on terms more favorable than those provided for by the Loan

14  Modification Agreement.  As such, the Debtors believes that the interests of the creditors and the

15  interest of their bankruptcy estate ("Estate(s)") would best be served if this Court approves the

16  Motion.

17         In summary, given the significant benefit to be obtained from the relief sought herein, an

18  order should be entered approving the Motion, the Settlement Agreement and the Loan

19  Modification Agreement the without delay.    Attached hereto as **Exhibit 2** is a copy of the

20  proposed form of the Order approving this Motion, the Settlement Agreement and the Loan

21  Modification Agreement.

22

23                          **II.    MOTION**

24         In support of the Motion, the Debtors respectfully represent as follows:

25  **A.    Background Information**

26         The Debtors each filed a voluntary petition for relief under Chapter 11 of the United

27  States Bankruptcy Code on January 31, 2011.  Trade Union and Duck House are each continuing

28

**SHULMAN HODGES &
BASTIAN LLP**
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

6

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

Page 6

1  in possession of their property, and operating and managing their respective business, as debtors-

2  in-possession pursuant to Bankruptcy Code Sections 1107 and 1108.

3     Pursuant to Court Order entered February 10, 2011, the Chapter 11 case of Trade Union is

4  being jointly administered with the Chapter 11 case of Duck House.

5     Trade Union and Duck House are each owned one-half by Wen Pin Chang and one-half

6  by Mei Lien Chang (the "Changs").

7     Mr. Chang formed Trade Union in 1981 and officially incorporated it in 1984 in order to

8  supply top quality aftermarket aluminum alloy wheels and wheel and truck accessories.  Trade

9  Union's products are manufactured in Taiwan and China and are shipped to the United States for

10  distribution to wholesalers and retailers.  Trade Union is known for product lines which include

11  Verde Custom Wheels, Black Ice Alloys, and Topline Products.

12     Duck House was established in 1981 and officially incorporated in 1986.  Duck House

13  specializes in designing products for sports enthusiasts.  In order to offer the most competitive

14  prices, the products are manufactured in factories in China and in Taiwan and then distributed by

15  Duck House in the United States.

16  **B.**     **The Prepetition Loan Documents with the Lenders**

17     Trade Union and Duck House are the makers of the following:  (i) a Line A Note in the

18  original principal amount of $10,400,000 in favor of Cathay; (ii) a Line A Note in the original

19  principal amount of $5,600,000 in favor of Chinatrust; (iii) a Line B Note in the original

20  principal amount of $3,380,000 in favor of Cathay; (iv) a Line B Note in the principal amount of

21  $1,820,000.00 in favor of Chinatrust (collectively, the "Notes"), which are secured by that

22  certain Amended and Restated Security Agreement dated June 29, 2007 (as amended, the

23  "Security Agreement") and by a Deed of Trust and Assignment of Rents and Leases dated

24  January 15, 2002, executed by the Trust which was recorded on February 8, 2002 in the Official

25  Records of San Bernardino County, California as Document No. 20020063955 (the "Montclair

26  Deed of Trust").

27     The Notes evidence various loans made by Lenders to the Debtors in the aggregate

28  principal amount of $21,200,000.00 (collectively, the "Loans").  Agent and Debtors are also

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

7

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

Page 7

1  parties to an Amended and Restated Credit Agreement dated June 29, 2007 (as amended, the

2  "Credit Agreement").  As used herein, "Loan Documents" shall have the meaning set forth in the

3  Loan Modification Agreement (defined below).

4      As used herein, the term "Collateral" shall have the meaning set forth in the Credit

5  Agreement and shall include any assets in which the borrowers granted Lenders a security

6  interest pursuant to the Loan Modification Agreement or otherwise.

7      To preserve its Collateral, the Lenders maintained a lockbox account into which all of the

8  Debtors' receivables were placed.

9  **C.**   **Events Leading to the Debtors' Bankruptcy Filings**

10      In May 2010, the Debtors began discussions with the Lenders relating to a forbearance

11  agreement and restructuring of the Loans.  Through this period up until December 2010, the

12  Debtors paid more than $3.5 million of principal on the Loans while also keeping current on the

13  interest payments.

14      In addition to the liens against the Debtors' assets, the Lenders were provided with the

15  following additional collateral:

16  •    A second priority deed of trust against the real property located at #1 Topline

17  Plaza, 4651 State Street, in Montclair, California.  The State Street Property is where the

18  Debtors' businesses are located and is owned separately by the Trust. Based on purchase offers,

19  the value of the State Street Property was believed to be $5.8  to $6.2 million.  Prior to the

20  Petition Date, the State Street Property was in escrow to a buyer whose offer was contingent on

21  the Debtors entering into a long term lease of the State Street Property, which would have

22  required the Debtors to reach some restructuring of the debt obligations to the Lenders.  The

23  Lenders were was made aware of this but refused to provide any assurance to the buyer of such

24  an extension. As such, escrow was canceled and the buyer was lost. A sale of the State Street

25  Property was estimated to have netted the Lenders in excess of $2 million toward the principal of

26  its outstanding loan, which was lost when the buyer withdrew its offer.

27  •    A second priority deed of trust against the personal residence of W. Chang and M.

28  Chang located 2819 Crystal Ridge Road, Diamond Bar, California.  The value of the Crystal

**SHULMAN HODGES &**
**BASTIAN LLP**
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

8

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

**Page 8**

Ridge Property is believed to be in excess of $3 million, which provides the Lenders with over $2 million in collateral protection.

On October 27, 2010, in consideration of assurances by the Lenders that it would agree to a restructuring of the Loans, the W. Chang and M. Chang granted the Lenders a deed of trust on a previously unencumbered unimproved parcel zoned for residential real estate located at 22840 Ridgeline Road, Diamond Bar, CA ("Ridgeline Property").  Rather than agree to any restructure, the Lenders only extended the forbearance agreement four days (from October 27, 2010 to October 31, 2010).  A sale of the Ridgeline Property closed on January 28, 2011 at which time the Lenders were paid in excess of $1.1 million which was applied toward the principal balance of the outstanding balance of the Loans.

Negotiations between the Debtors and the Lenders broke down in early January.  On January 4, 2011, the Lenders terminated all discussions and terminated all Debtors' access to their cash, yet made it clear to the Debtors that they were not enforcing its legal remedies.  As a direct result of the Lenders' actions, the Debtors were unable to operate.  The Debtors had no access to funds with which to pay necessary operating expenses, including payroll.  In addition, the Debtors had almost $300,000 in outstanding checks that bounced because of the actions of the Lenders.

As a result of the Lenders' actions, Debtors had no choice but to open a new bank account and direct their customers to make payments to that bank account to try and cover issued checks, payroll and other necessary expenses of the business.  As such, on January 10, 2011, the Debtors contacted their customers and directed them to forward any payments to a new account at U.S. Bank.  The Lenders asserted that these actions were improper.

On January 10, 2011, the Lenders notified the Debtors that the Lenders applied $463,271 from the accounts maintained at Cathay Bank toward the Debtors' outstanding revolving Loans. This action caused forty-five checks to bounce for non-sufficient funds.  The Lenders also shut down all on-line banking for both Trade Union and Duck House.  The Debtors were unable to access funds in their checking accounts and the lock box accounts and there was no visibility regarding banking activities in the Debtors' accounts held at the Lenders' banks.   The Debtors

**SHULMAN HODGES &
BASTIAN LLP**
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

9

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

**Page 9**

1  are advised that the Lenders continued to sweep the Debtors' lockbox accounts and applied the

2  additional cash towards the principal of the Debtors' outstanding loan balance.  At this time, the

3  Debtors have not agreed with the accounting provided by the Lenders with respect to the current

4  unsettled balance and do not agree to the  total amount by which the principal balance of the

5  Loans has been reduced on account of the Lenders' sweeping of the Debtors' accounts.

6       On January 12, 2011, the Lenders and the Debtors, along with their counsel, met to

7  discuss a possible resolution.  The Lenders informed the Debtors that it would be seeking the

8  appointment of a receiver to liquidate the Debtors.  After further negotiations did not result in a

9  resolution, the Lenders provided ex parte notice of its motion to have a receiver appointed and

10  scheduled a hearing in state court for the morning of January 28, 2011, which was continued to

11  January 31, 2011.  The Debtors' believed that the appointment of a receiver would be to the

12  detriment of the unsecured creditors and equity holders, and result in a possibly huge deficiency

13  claim to the Lenders.  As a  result, the Debtors commenced these Chapter 11 cases.

14  **D.**     **The Disputes With the Lenders**

15       The Debtors are investigating whether or not the Lenders' claims are secured and to what

16  extent.

17       Debtors are also investigating whether or not the Lenders are liable for, among other

18  things, exercising excess control over Debtors, Debtors' financial structure and affairs and for

19  directing Debtors and Debtors' principals to liquidate various assets to their great detriment

20  through the false promise of (1) extensions of the then existing loan maturity and terms and (2)

21  promises to work with Debtors to preserve its key business operations, while at all times

22  intending to force the liquidation of the Debtors' business.

23       Based on the foregoing and events leading to the bankruptcy filings, the Debtors believe

24  they may have claims against the Lenders for declaratory relief, accounting, lender liability,

25  equitable subordination and other theories.

26       The Lenders deny the Debtors' assertions and deny that they have any liability to the

27  Debtors under any legal theory.

28

**SHULMAN HODGES &
BASTIAN LLP**
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

10

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

**Page 10**

**E.    The Settlement and Compromise and Modification of the Debtors' Obligations to the Lenders**

The Debtors and the Lenders agree that it is in their best interest to resolve their disputes by way of settlement, rather than through litigation, and therefore it is their intention and desire at this time to settle their disputes in the manner and upon the terms and conditions set forth in a certain Settlement Agreement. Although more fully set forth in the Settlement Agreement, a true and correct copy of which is attached to the Chang Declaration as **Exhibit 1**, the principal terms of settlement are as follows:

1.    Loan Modification Agreement and Confirmation of Guaranty.    Trade Union, Duck House, Guarantor, Agent and Lenders shall enter into a modification agreement substantially conforming to the "Tenth Modification and Extension Agreement" and Annex A thereto, attached as Exhibit "A" to the Settlement Agreement (the "Loan Modification Agreement") and incorporated herein by this reference.    **The Loan Modification Agreement provides for a new revolving line of credit capped at $5,000,000 (with the initial advance to be determined at the time of closing), and three term loans, Term A in the principal amount of $1,370,000, Term B in the amount of $1,620,000 and Term C in the amount of $5,900,000.  The line of credit will bear interest at the floating rate of prime plus 1.75% with a floor of 5% and a cap of 9% per annum and the term loans will each bear interest at the rate of 5% per annum and mature on the third anniversary of the date of a final order approving the Settlement Agreement.**

2.    Bankruptcy Court Approval.  The Parties agree that their obligations under this Settlement Agreement and the Loan Modification Agreement are subject to, and conditioned upon, entry of an order by the Bankruptcy Court (the "Approval Order") approving the terms of this Settlement Agreement, which the Debtors shall seek as soon as practicable following execution of this Settlement Agreement by the Parties.  For purposes of this Settlement Agreement, "Effective Date" shall  be defined as in the Loan Modification Agreement and be subject to the same requirement as to by when it shall occur or this Agreement may be terminated by Agent. Effective Date shall be the same as the term "Approval Date" as used herein. The provisions of this Settlement Agreement and those contained within the Loan Modification Agreement are intended by the Parties to be effective at all material times after the Approval Date, including during the pendency of the Bankruptcy Case and after the effective date of any plan of reorganization proposed by the Debtors and confirmed by the Bankruptcy Court ("Plan").

3.    Consent to Restructure.  Agent and Lenders have agreed to restructure the Outstanding Indebtedness and the Loan Documents (as defined in the Loan Modification Agreement).  Notwithstanding Agent's consents as set forth in this paragraph, such consents by Agent shall not and do not restrict Agent's rights under the Loan Modification Agreement, this Settlement Agreement, or applicable law in the event of any future defaults in payment or

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

performance by Trade Union and/or Duck House under the Loan Documents as revised by the Loan Modification Agreement or hereunder.

4.    <u>Limited Mutual Releases</u>.

(a)    Upon the Effective Date, Borrower, each Guarantor, Agent, each Lender and L/C Issuer (for purposes of this Section 5, individually and collectively referred to herein as "Releasor"), and each of them, for themselves, and each Releasor's successors and assigns, and each of them, shall and do hereby forever relieve, release and discharge (i) Borrower and each Guarantor by Agent, each Lender and L/C Issuer, (ii) Agent, each Lender and L/C Issuer by Borrower and each Guarantor, and (iii) their respective successors, assigns, past and present attorneys, accountants, representatives, affiliates, parents, partners, officers, directors, employees and stockholders, jointly and severally, from (iv) any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions and causes of actions, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, based upon, arising out of, appertaining to, or in connection with any of the matters or facts alleged or set forth in the Recitals of this Agreement, the Recitals of the Loan Modification Agreement, the lending relationship between Agent and Lenders on the one hand, and Borrower and Guarantor, on the other hand, the Loans, the Loan Documents, the Bankruptcy Cases, the facts pertinent to this Agreement, and any and all real and personal property collateral, jointly and severally, and further including, without limitation, all claims relating to or arising out of the Allegations as that term is defined in the Loan Modification Agreement ("Released Claims"); provided, however, that the term Released Claims does not and shall not include any claim based on this Settlement Agreement or on any obligation arising under the Loan Documents or any order entered prior to the Effective Date in the Bankruptcy Cases.

(b)    As to the Released Claims, Releasor, and each of them, expressly waive any and all rights under section 1542 of the Civil Code of the State of California, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

(c)    As to the Released Claims, Releasor, and each of them, expressly waive and release any right or benefit which they have or may have under section 1542 of the Civil Code of the State of California, and any similar statute, code, law and/or regulation of the United States, or any state thereof, to the full extent that they may waive all such rights and benefits pertaining to the matters released herein.  In connection with such waiver and relinquishment, Releasor, and each of them, acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true.  Nevertheless, it is the intention of Releasor, and each of them, through this Agreement, to fully, finally and forever release all such matters, and all claims relative thereto, which now exist, may exist, or heretofore have existed.  In furtherance of such intention, the releases herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

(d)    In entering into the release provided for in this Agreement, Releasor, and each of them, recognize that no facts or representations are ever absolutely certain; accordingly, they assume the risk of any mistake, and if they should subsequently discover that any understanding of the facts or of the law was incorrect, said party shall not be entitled to set aside this release by reason thereof, regardless of any mistake of fact or law.

(e)    Releasor, and each of them, are the sole and lawful owners of all right,

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

12

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

title and interest in and to every claim and other matter which they purport to release herein, and they have not assigned or transferred, or purported to assign or transfer to any person or entity any claims or other matters herein released.  Releasor, each individually and jointly, shall and hereby do indemnify, defend and hold each party released hereby harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, damages, costs, and expenses (including, but not limited to, attorneys' fees), based upon or arising in connection with any such prior assignment or transfer, or any such purported assignment or transfer, or any claims or other matters released herein.

     5.    <u>Consent to Treatment Under Chapter 11 Plan</u>.

     (a)    The Parties acknowledge that (i) this Settlement Agreement is entered into in contemplation of the proposal and confirmation of a Chapter 11 Plan by the Debtors; but (ii) confirmation of any such Plan is not a condition to the effectiveness of the settlement or of the modification to the Loan Documents.

     (b)    The treatment of Agent, Lenders, and L/C Issuer under any Plan proposed by the Debtors shall be consistent with, and the Debtors shall not in any way seek to alter, modify, challenge or contradict, the terms of the Loan Documents, as modified by the Loan Modification Agreement, or this Settlement Agreement, including, without limitation, the releases contained herein.  With respect to the Loans, the entirety of Agent's, Lenders', and L/C Issuer's claims against the Debtors' estates shall comprise a single class of secured claims, and that class shall consist solely of Agent's, Lenders' and L/C Issuer's claims.  The class consisting of such secured claim against the Debtors' estates shall be deemed to be "impaired" under 11 U.S.C. § 1124.  Provided that the Plan complies with the terms hereof, (i) the Debtors shall use their collective best efforts to obtain confirmation of the Plan, (ii) Lenders will not object to such Plan, and (iii) Lenders will not support or participate in the formulation of any other plan.

     (c)    Nothing herein shall be deemed to prohibit the proposal and confirmation of a joint or consolidated Plan.  In the event that such a Plan is proposed, the terms of the Plan shall contain provisions complying with both subparagraphs 6(b) and 6(c) hereof.

     (d)    Nothing herein shall be deemed to require confirmation of a Plan as a condition to the effectiveness and enforceability of this Settlement Agreement or of the Loan Modification Agreement.

     6.    <u>Relief from Stay Prior to Plan Effective Date</u>.  Notwithstanding anything to the contrary in the Loan Documents, as modified by the Loan Modification Agreement, the following shall apply after the Approval Date and prior to the effective date of any confirmed Plan:

     (a)    If an Event of Default (as defined in the Loan Documents, the Loan Modification Agreement, herein, or in any agreement between or among the Parties with respect to an obligation secured by the Collateral) occurs prior to the effective date of the Plan where Trade Union and/or Duck House fail to perform an obligation under the Loan Documents, as modified by the Loan Modification Agreement or under any other agreement between or among the Parties with respect to an obligation secured by the Collateral (a "Default"), Agent shall provide notice of such Default in writing (the "Notice of Default"), and deliver such notice to the Debtors and the Debtors' counsel at the addresses identified in this paragraph.

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

13

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

Page 13

(b)     Trade Union and/or Duck House shall have five (5) business days from the date of delivery of the Notice of Default (the "Cure Period") to cure the Default identified in the Notice of Default. During such Cure Period, all sweeps of funds under the Loan Documents shall continue.

(c)     On the Effective Date, and under the entered Approval Order approving this Settlement Agreement, Agent and Lenders shall, and Borrower hereby stipulates that Agent and Lenders shall,  be granted immediate relief from the automatic stay of 11 U.S.C. § 362 in the Bankruptcy Cases, effective as of the Approval Date for any Defaults in any obligation for the payment of money to Lenders ("Payment Default").  If any such Payment Default is not cured within the Cure Period, Agent and Lenders shall be entitled immediately upon expiration of the Cure Period to enforce all of their rights under the Loan Documents, the Loan Modification Agreement, hereunder, or applicable law, as against Debtors and property of Debtors' estates. The automatic stay of 11 U.S.C. §362 shall not apply to, and shall be deemed modified, amended, annulled, and terminated in the Bankruptcy Cases as to Payment Defaults to Agent and Lenders and with respect to Agent's and Lenders' enforcement of any and all rights and remedies granted to Agent and Lenders under the Loan Documents as modified by the Loan Modification Agreement, under this Settlement Agreement, and under applicable state and federal law, with respect to such Payment Defaults, including without limitation enforcement by Agent of any and all liens granted to Agent and Lenders to secure payment and performance of the obligations of Debtors under the Loan Documents as modified by the Loan Modification Agreement, all without further order of the Bankruptcy Court.

(d)     If any Default (other than a Payment Default) is susceptible to being cured by Trade Union and/or Duck House within the Cure Period but has not been cured prior to expiration of the Cure Period, or a Default (other than a Payment Default) is not capable of being cured, Agent shall be authorized to request entry of an order terminating or modifying the automatic stay, to which request the Debtors may object only on the grounds set forth below, as follows:

(i)     Agent shall file a *Motion for Relief from the Automatic Stay under 11 U.S.C. § 362* (the "Stay Motion") in accordance with Local Bankruptcy Rule 4001-1, except that the Stay Motion shall be filed and served not later than 14 calendar days before the hearing. The Debtors shall file and serve any opposition to the Stay Motion not later than 7 calendar days before the hearing.

(ii)     The sole basis upon which the Bankruptcy Court may grant relief from stay is cause found by the Bankruptcy Court to exist under 11 U.S.C. § 362(d)(1) as a result of a material Default that was susceptible to being cured by the Debtors within the Cure Period but was not cured by the Debtors prior to expiration of the Cure Period.  The Stay Motion shall be denied if the Debtors establish that:  (a) no Default occurred; (b) the Default identified in the Notice of Default was timely cured; (c) the Default identified in the Notice of Default was not susceptible to being cured by the Debtors within the Cure Period, (d) the Default identified in the Notice of Default was not a material default under applicable nonbankruptcy law; or (e)  Agent or Lenders failed to comply with any of their respective duties and obligations under this Settlement Agreement.

(iii)     If the Bankruptcy Court finds that cause exists to grant relief from the automatic stay, the Bankruptcy Court shall terminate or modify the automatic stay as against

**SHULMAN HODGES &
BASTIAN LLP**
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

14

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

**Page 14**

Debtors and Debtors' estates, such that Agent shall be authorized to proceed under applicable nonbankruptcy law to enforce its remedies including without limitation to foreclose upon and obtain possession of the collateral.

7.    <u>Default</u>.  In addition to any defaults under the Loan Documents as modified by the Loan Modification Agreement, if any of the following events (each an "Event of Default") occurs prior to the effective date of a Plan proposed by the Debtors, and the Debtors do not cure such Event of Default within the Cure Period (as defined in Section 7(b) above), Agent may do one or more of the following:  declare each of the Debtors in default, require Debtors to repay the entire debt immediately and without prior notice, and/or enforce any other remedy available under the Loan Documents as modified by the Loan Modification Agreement or under applicable law, and subject to Section 8 hereof.

(a)    Any order shall be entered in the Trade Union Case or the Duck House Case converting the Trade Union Case or the Duck House Case to a proceeding under any provision of the Bankruptcy Code other than Chapter 11.

(b)    Any of the Debtors or the Guarantor shall propose any plan of reorganization that seeks to vary, amend, modify, or change in any respect the terms, covenants, and conditions of the Loan Documents, as modified by the Loan Modification Agreement, or this Settlement Agreement, without the prior written consent of Agent.

(c)    Any of the Debtors or Guarantor shall file or commence any proceeding in any court of competent jurisdiction to challenge the validity, priority, or extent of any lien granted to Lenders under the Loan Documents, as modified by the Loan Modification Agreement, or under this Settlement Agreement, including, without limitation, any adversary proceeding in the Bankruptcy Cases or with respect to the terms, covenants, and conditions contained in any proposed Plan of reorganization.

(d)    Either of the Debtors files in the Bankruptcy Cases any motion or contested proceeding that seeks to surcharge Agent or Lenders for any reason, or to "prime" any lien or the debt held by Lenders or Agent, or to provide any lien to any third party on collateral of Agent or Lenders with a senior lien priority, equal lien priority, or junior lien priority, which motion or proceeding is not dismissed within sixty (60) days; provided, however, that it shall not constitute an event of default if the Debtors file a motion seeking entry of an order or orders (i) authorizing the Debtor finance insurance premiums and grant to the premium finance lender a lien on unearned premiums or proceeds of such insurance to secure payment of only such premium financings, consistent with ordinary business terms, or (ii) authorizing the Debtors to purchase equipment or fixtures for the State Street property or such substitute therefor approved by Agent, in the ordinary course of business pursuant to a transaction in which the seller is afforded a properly created and perfected security interest in the equipment and/or fixtures purchased by the Debtors.

(e)    Any default occurs in any term or covenant contained in this Settlement Agreement.

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

15

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

Page 15

8.    <u>Bankruptcy Case Administration</u>.

In addition to the other bankruptcy-related provisions contained herein, the following additional provisions shall apply to each of the Debtors.

(a)    <u>Preservation of Credit Bid Rights</u>.  All credit bidding rights of Agent, including, but not limited to, under 11 U.S.C. §363(k), shall be preserved at all times in addition to all other rights and remedies of Agent under the Loan Documents as modified by the Modification Agreement, this Settlement Agreement, and applicable state and/or federal law.

(b)    <u>No Surcharge Claim</u>.  No surcharge claim, including without limitation, under 11 U.S.C. §506(c), shall be asserted against Agent or Lenders by either of the Debtors.

(c)    <u>Post-Petition Financing Requests</u>.  Neither of the Debtors shall file any motion or contested proceeding that seeks the approval of the Bankruptcy Court for permission for either of the Debtors to obtain post-petition financing that would result in any liens on the Collateral that are either senior to, of equal priority with, or junior to the lien interests of Agent, including without limitation, seeking any financing under 11 U.S.C. §364, unless the same is to pay Agent in full as a condition to any such financing; provided, however, that nothing in this sub-paragraph shall (i) impair or prejudice the Debtors with respect to the waivers and consents by Agent as set forth in paragraph 4 above concerning use of cash collateral, (ii) preclude the Debtors from seeking authority to finance insurance premiums and grant to the premium finance lender a lien on unearned premiums or proceeds of such insurance consistent with ordinary business terms, following written consent from Agent and Lenders, which shall not be unreasonably withheld, or (iii) preclude the Debtors from seeking authority to purchase equipment and/or fixtures in the ordinary course of business pursuant to a transaction in which the seller is afforded a purchase money security interest in the equipment and/or fixtures sold, following written consent from Agent and Lenders, which shall not be unreasonably withheld.

(d)    <u>Chapter 11 Administrative Expense Claims of Professionals</u>.  So long as (i) Debtors remain in compliance with the Borrowing Base (as such term is defined in the Loan Documents being amended concurrently herewith) and all other terms, covenants and conditions of the Loan Documents, including, without limitation, Sections 4.2.6 and 4.2.7 of Annex A to the Loan Modification Agreement and (ii) such payments are allowed by the Bankruptcy Court, Debtors shall be permitted to use cash collateral to pay the allowed administrative expense claims of professionals employed by the Debtors in their Chapter 11 cases which have not otherwise been paid from any retainers paid to such professionals.

(e)    <u>Cash Collateral Consents</u>.  From and after the Effective Date, and on condition that there are no uncured events of default hereunder, or under any of the Loan Documents, the Debtors shall be permitted to continue to use the cash collateral of Lenders pursuant to approved budgets through confirmation of the Plan, on the further condition that such confirmation shall occur by no later than October 31, 2011.

(f)    No confirmation or plan injunction shall apply to Agent or Lenders in the administration or enforcement of the Loan Documents.

9.    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of Agent, Lenders, L/C Issuer, Guarantors and the Debtors, and, as to their respective

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

16

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

Page 16

successors and assigns, as may be limited or permitted by the transfer provisions of the Loan Modification Agreement, provided, however, that neither Debtors nor Guarantors may assign their interests in this Agreement without the prior written consent of Agent.

10.    <u>Governing Law and Jurisdiction</u>.  This Settlement Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to choice of law principles of the State of California.  The Bankruptcy Court shall retain exclusive jurisdiction to resolve any and all disputes pertaining to this Settlement Agreement, including without limitation the enforcement and interpretation of any of its terms, and the Parties agree to submit to the jurisdiction of the Bankruptcy Court for the purpose of resolving such disputes. Notwithstanding the foregoing, the Loan Documents shall be governed by and construed in accordance with the choice of law provisions contained therein, and jurisdiction over disputes arising under or related to the Loan Documents and not pertaining particularly to the terms of this Settlement Agreement shall be as set forth therein.

11.    <u>Further Assurances</u>.  Each Party to this Settlement Agreement shall execute all instruments and documents and take all actions as may be reasonably required, necessary or convenient to effectuate this Settlement Agreement.

12.    <u>Complete Agreement</u>.    This Settlement Agreement and all exhibits attached hereto contain the entire integrated agreement between the Parties with respect to the matters covered herein.  No variations, modifications or changes herein or hereof shall be binding upon any Party unless set forth in a writing duly executed by such Party.

13.    <u>Modification</u>.  This Settlement Agreement may be modified only by a writing executed by the Party to this Settlement Agreement against whom enforcement of such modification is sought.

14.    <u>Rules Of Construction</u>.  The Parties, including their counsel, have participated in the preparation of this Settlement Agreement, and this Settlement Agreement is the result of the joint efforts of the Parties.  This Settlement Agreement has been accepted and approved as to its final form by all Parties and upon the advice of their respective counsel.  Accordingly, any uncertainty or ambiguity existing in this Settlement Agreement shall not be interpreted against any Party as a result of the manner of the preparation of this Settlement Agreement.  Each Party to this Settlement Agreement agrees that any statute or rule of construction providing that ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Settlement Agreement and are hereby waived.

15.    <u>Attorneys' Fees and Expenses</u>.  Each Party's responsibility for attorneys' fees, court costs and related expenses by or on behalf of said Party in connection with this Settlement Agreement shall be as set forth in the Loan Modification Agreement, provided, however, that should legal action be necessary to enforce the terms of this Settlement Agreement, the party declared to be the prevailing party in such proceedings shall be entitled to recover from the non-prevailing party its reasonable attorneys' fees and costs incurred in enforcing this Settlement Agreement.

16.    <u>Severability</u>.  If any provision of this Settlement Agreement is disapproved by the Bankruptcy Court, such provision shall be fully severable; in such event, each Party shall have the option of approving or rejecting this Settlement Agreement as a result thereof.  In the event

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

17

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

Page 17

1   that any Party elects to accept the remainder of the Settlement Agreement after any provision has
2   been so disapproved, the remaining provisions of this Settlement Agreement shall remain in full
    force and effect and shall not be affected by the disapproved provisions or by severance thereof
3   from this Settlement Agreement.

4   **F.      Good Cause Exists to Approve the Settlement and Compromise and Ancillary Loan**
5           **Modification Agreement**

6           The Debtors believe that good cause exists to approve the Motion based on the following:

7           •       Although the Debtors believe in the arguments in support of the claims asserted
8   against the Lenders, the Debtors understand the risks inherent in any litigation.   The issues
9   involved are complex and would require substantial time and money to resolve. The Debtors
10  would have to file lawsuits and litigate the disputes with Lenders and perhaps respond to appeals.
11  Settlement eliminates these risky activities.

12          •       Furthermore, litigation is expensive generally.  Since no complaint has been filed,
13  the parties are far from resolution of the matters by trial (and possible appeals).  Rather than
14  delay the matter and incur expenses and resources filing the complaints, litigating and preparing
15  for trials, the parties have determined that the settlement reached is fair and reasonable.  Based
16  thereon, the Debtors believe the proposed settlement and compromise is the most expedient and
17  cost effective method for resolving the disputes.

18          •       The costs of the Estate to litigate the issues will reduce the amount of funds
19  available at the end of this case to pay claims because substantial administrative costs will be
20  incurred.   The Debtors estimates that as much as $500,000, if not more, could be incurred in the
21  litigation disputes with the Lenders.    Approval of the settlement will aid the Debtors in
22  preserving assets of the Estate.

23          •       The expenses incurred for continued litigation of the disputes would most likely
24  exceed any additional benefit that might be achieved.  The settlement the Debtors have reached
25  provides certainty, reduces claims against in the Estate, and provides for means for realistic
26  payment of the debt owing to the Lenders.

27          •       The settlement should be approved as a means of preserving assets and enhancing
28  the value of the Estates.  The proposed settlement essentially paves the way for a smooth and

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

18

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

Page 18

1  consensual reorganization as the litigation and disputes with the Lenders were one of the primary

2  precipitating events which resulted in the Debtors' chapter 11 case.  The settlement will also

3  minimize the disruption and expense to the Debtors' business operations and is the best means

4  for the Lenders to be paid while preserving cash resources.

5        •        The Loan Modification Agreement has been negotiated in good faith and at arms'

6  length by and between the parties.  The Debtors have investigated other sources of financing and

7  do not believe that they will be able to obtain financing on terms more favorable than those

8  provided under the Loan Modification Agreement, especially within the time frame that Lenders

9  are able to perform.   The hearing on confirmation of the Debtors' reorganization plan is

10  scheduled for September 2, 2011 and the financing needs to be approved so that the proposed

11  plan may go effective.  The proposed financing is essential to the Debtors' ability to confirm a

12  plan of reorganization.  Moreover, the Debtors' credit is such that they likely do not qualify for a

13  loan with another lender at this time.  As such, the Debtors do not believe they can obtain a

14  similar loan on terms better than those offered by the Lenders, especially given that the Debtors

15  are now in a bankruptcy proceeding.  Based on the foregoing, it is improbable that the Debtors

16  would be able to obtain from any other lender financing in an amount sufficient to provide for

17  the Debtors' current and anticipated needs on more favorable terms.  Based thereon, the Debtors

18  believe that granting the Motion would serve the best interests of the Estates and creditors.

19        •        The terms and conditions of the Loan Modification Agreement are fair, just, and

20  reasonable under the circumstances and reflect the Debtors' prudent business judgment

21  consistent within their fiduciary duties, and are supported by reasonably equivalent value and fair

22  consideration.  The Estates' value will increase as a result of the financing and will decrease

23  without it.  Moreover, none of the Estates' creditors will be worse off as a result of the financing

24  than they would be without it.

25        •        Further, if the Debtors do not enter into the Loan Modification Agreement, the

26  only alternative will be to attempt to cram down the Bank Group through a contested Plan

27  confirmation.  This would be risky for all parties but especially for the Debtors.  One of the most

28  beneficial aspects of the Loan Modification Agreement is the interest rate provided (opening

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

19

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

Page 19

floating rate of prime plus 1.75% for the line of credit and a fixed rate of 5% for the term loans).
In a cram down, the interest rate would be determined based on expert testimony and an ultimate
court ruling. There is a risk that a higher rate may be imposed which will greatly impact the
Debtors' cash flow and ability to meet other obligations under the Plan, including payments to
unsecured creditors.

- The Lenders are not an insider of the Debtors and the Debtors' and their principals have no ownership interest in or control over the Lenders.

- The Debtors have talked with other potential lenders, but no one is willing to perform on the same or similar terms as the Lenders, including the timing for funding. Moreover, the Debtors' credit is such that they do not currently qualify for a loan on terms close to that proposed under the Loan Modification Agreement. As such, the Debtors do not believe they can obtain a similar loan on terms better than those offered by the Lenders, especially given that the Debtors are now in a bankruptcy proceeding. Based on the foregoing, it is improbable that the Debtors would be able to obtain from any other lender financing in an amount sufficient to provide for the Debtors' current and anticipated needs on more favorable terms.

In summary, the settlement is based on good business judgment that will benefit the Estates and creditors and therefore approval of the Motion is proper.

## III.    AUTHORITIES

### A.    Entry of an Order Approving the Settlement is Proper

The power of the Court to review and approve settlements is expressly recognized in Federal Rule of Bankruptcy Procedure 9019(a), which provides:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct

Thus, upon notice to a debtor's creditors, the United States Trustee, debtors, and indenture trustees, settlement of a claim of the estate is appropriate. The approval of a compromise is a core proceeding under 28 U.S.C. §157(b)(2)(A) and (O). In re Carla Leather,

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

20

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

Page 20

Inc., 50 B.R. 764, 775 (S.D.N.Y. 1985).

**B.**     **The Court May Approve a Settlement and Compromise Which is Fair and**

**Equitable**

The purpose of a compromise agreement between a debtor and a creditor is to allow the parties to avoid the expenses and burdens associated with litigation.  Martin v. Kale (In re A & C Properties), 784 F.2d 1377, 1380-81 (9th Cir. 1986), cert. denied sub nom, Martin v. Robinson, 479 U.S. 854 (1986).   The bankruptcy court has great latitude in approving compromise agreements as long as it finds that the compromise is fair and equitable.  Id. at 1382; see also, Woodson v. Fireman's Fund Ins. Co. (In re Woodson), 839 F.2d 610, 620 (9th Cir. 1988). Generally, the benchmark in determining the propriety of a settlement is whether the settlement is in the best interests of the estate and its creditors.   In re Energy Cooperative, Inc., 886 F.2d 921, 927 (7th Cir. 1989).  To be approved, the settlement need not represent the highest possible return to the estate, but merely must fall within the "range of reasonableness."   In re Walsh Construction, Inc., 669 F.2d 1325, 1328 (9th Cir. 1982).   In making this determination, the bankruptcy court need not conduct a trial or even a "mini trial" on the merits.  Id.

In determining the fairness, reasonableness and adequacy of a proposed settlement agreement, the Court must consider the following factors:

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; (d) the paramount interests of the creditors and a proper deference to their reasonable views in the premises.

A & C Properties, 784 F.2d at 1381; Woodson, 839 F.2d at 620.  In other words, the Court must weigh certain factors in order to determine whether the compromise is in the best interests of the bankrupt estate.   A & C Properties, 784 F.2d at 1382.

**1.**     **The Probability of Success in Litigation**

Although the Debtors believe in the arguments in support of the claims asserted against the Lenders, the Debtors understands the risks inherent in any litigation.  The issues involved are

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

1   complex and would require substantial time and money to resolve. The Debtors would have to

2   file a lawsuit and litigate the disputes, including Plan confirmation.   Litigating the disputes

3   would also require the Debtors to respond to all defenses raised, to prevail at trial and a contested

4   confirmation hearing and perhaps respond to appeals.     The Debtor understands that any

5   litigation matter has inherent risks including not prevailing at trial.  Settlement, however, avoids

6   these costly and risky activities and results in substantial benefit to the Estate.

7         **2.**      **The Complexity, Expense, Inconvenience and Delay of Litigation**

8         Litigation is expensive generally.  Since no complaint has been filed, the parties are far

9   from resolution of the matters by trial (and possible appeals).  Rather than delay the matter and

10  incur expenses and resources filing a complaint, litigating and preparing for trial and perhaps

11  appeals, the parties have determined that the settlement reached is fair and reasonable.  Based

12  thereon, the Debtors believe the proposed settlement and compromise is the most expedient and

13  cost effective method for resolving the disputes with the Lenders.

14        **3.**      **The Interests of Creditors**

15        The settlement should be approved as a means of preserving assets and enhancing the

16  value of the Estates.   The proposed settlement essentially paves the way for a smooth and

17  consensual reorganization as the litigation and disputes with the Lenders were one of the primary

18  precipitating events which resulted in the Debtors' chapter 11 case.  The settlement will also

19  minimize the disruption and expense to the Debtors' business operations and is the best means

20  for the Lenders to be paid while preserving cash resources.  As such, the Debtors believe that the

21  interests of the creditors and their Estates would best be served if this Court approves the

22  Motion.

23        Furthermore, the expenses incurred for litigating the disputes would most likely exceed

24  any additional benefit that might be achieved.  The settlement reached provides certainty and

25  ceases the accrual of potential litigation costs for the Estates.  The outcome of the disputes would

26  impact the Estate through increased litigation costs while approval of the settlement will aid the

27  Debtor in preserving assets of their Estates and at the same time enhancing the value of the

28  Estates.

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

22

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

Page 22

1    In summary, the settlement is based on good business judgment that will benefit the

2  Estate and creditors and therefore approval of the Settlement Motion is proper.

3  **C.    The Debtors have Satisfied the Bankruptcy Requirements Regarding Authority to**

4      **Obtain Credit**

5      Pursuant to Bankruptcy Code Section 364(c), a trustee [debtor] may, in the exercise of

6  business judgment, incur secured debt if the trustee [debtor] has been unable to obtain unsecured

7  credit and the borrowing is in the best interest of the estate. See, e.g., In re Simasko Production

8  Co., 47 B.R. 444, 448-49 (D. Colo. 1985) (authorizing interim financing agreement where

9  debtor's best business judgment indicated financing was necessary and reasonable for benefit of

10 estate); In re Ames Dept. Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-

11 petition credit, courts "permit debtors-in-possession to exercise their basic business judgment

12 consistent with their fiduciary duties").

13     Bankruptcy Code Section 364(c) provides:

14         [i]f the trustee is unable to obtain unsecured credit allowable under
           section 503(b)(1) of this title as an administrative expense, the
15         court, after notice and a hearing, may authorize the obtaining of
           credit or the incurring of debt --
16
17             (1) with priority over any or all administrative expenses of
           the kind specified in section 503(b) or 507(b) of this title;

18             (2) secured by a lien on property of the estate that is not
           otherwise subject to a lien; or
19
20             (3) secured by a junior lien on property of the estate that is
           subject to a lien.

21 Bankruptcy Code Section 1107 provides:

22         [s]ubject to any limitations on a trustee serving in a case under this
           chapter, and to such limitations or conditions as the court
23         prescribes, a debtor in possession shall have all the rights, other
           than the right to compensation under section 330 of this title, and
24         powers, and shall perform all the functions and duties, except the
           duties specified in sections 1106(a)(2), (3), and (4) of this title, of a
25         trustee serving in a case under this chapter.

26

27     In this case, the proposed financing is essential to (1) the Debtors' resolution of disputes

28 with the Lenders and (2) the Debtors' ability to reorganize their financial affairs, continue

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

23

1    operations during the Chapter 11 case and confirm their plan of reorganization.  Furthermore,

2    due to the additional funds that will be available from financing, the Debtors believe that the

3    Loan Modification Agreement will enhance the Debtors' financial reorganization.  The Debtors

4    have investigated other sources of financing and do not believe that they will be able to obtain a

5    loan on terms more favorable than those offered by the Lenders especially within the time frame

6    that Lenders are able to perform.  The hearing on confirmation of the Debtors' reorganization

7    plan is scheduled for September 2, 2011 and the financing needs to be approved so that the

8    proposed plan may go effective.  The proposed financing is essential to the Debtor's ability to

9    continue operations during the Chapter 11 case and to confirm a plan of reorganization.  Based

10   thereon, the Debtor believes that granting the Motion would serve the best interests of the Estates

11   and creditors.

12       One consideration for authorization under Bankruptcy Code Section 364(c) to incur

13   secured post-petition debt is whether a reasonable effort is made to seek credit upon more

14   favorable terms.  Ames Department Stores, 115 B.R. at 37.  These efforts need not be exhaustive,

15   and the standard is flexible depending upon the debtor's specific situation and the likelihood that

16   potential and more favorable lenders exist.

17       In this case, the Debtors have talked with other potential lenders, but no one is willing to

18   perform on the same or similar terms as the Lenders, including the timing for funding.

19   Moreover, the Debtors' credit is such that they do not currently qualify for a loan package on

20   terms close to or much less better than offered under the Loan Modification Agreement.  As

21   such, the Debtors do not believe they can obtain a similar loan on terms better than those offered

22   by the Lenders, especially given that the Debtors are now in a bankruptcy proceeding.  Based on

23   the foregoing, it is improbable that the Debtors would be able to obtain from any other lender

24   financing in an amount sufficient to provide for the Debtors' current and anticipated needs on

25   more favorable terms.

26       In In re Defender Drug Stores, Inc., 145 B.R. 312 (B.A.P. 9th Cir. 1992), the debtor was

27   authorized to obtain additional secured financing from its prepetition lender, upon terms which

28   were very favorable to the creditor, including an enhancement fee and superior lien upon

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

24

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

Page 24

encumbered assets.  Id. at 317.  The court specifically recognized that:

> [d]ebtors in possession generally enjoy little negotiating power with a proposed lender, particularly when the lender has a pre-petition lien on cash collateral.

Id.

The court in Defender Drug Stores acknowledged that it must, to some extent, defer to the "reasonable exercise of the debtor's business judgment", so long as an "unwarranted benefit of the post-petition lender" does not result.  Id. See, also, In re Simasko Production Co., 47 B.R. 444 (D. Colo. 1985).

The Debtors are unable to obtain financing on an unsecured basis from other sources and believe that the Lenders' financing will serve the bests interests of the Estate and its creditors. The Loan Modification Agreement will enhance the Debtors' business operations and pave the way to a successful reorganization.  Accordingly, the Debtors is entitled to enter into the Loan Modification Agreement under Bankruptcy Code Section 364(c) and (f).

If the Debtors are not authorized to obtain the financing from the Lenders, the Debtors will suffer immediate and irreparable harm which could jeopardize their reorganization efforts and ability to repay creditors.  Accordingly, upon Court approval, the Debtors should be entitled to obtain the financing offered by the Lenders under the Loan Modification Agreement pursuant to Bankruptcy Code Section 364(c).

**D.    Debtors Cannot Obtain Better Financing on Either Unsecured or Secured Basis Unless the Lenders Are Granted a First Priority Lien**

If unsecured credit allowable as an administrative expense under Bankruptcy Code Section 364(a) or (b) cannot be obtained, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt with special priority.  In In re Sky Valley, Inc., 100 B.R. 107 (Bankr. N.D. Ga. 1988), the court duly considered the nature of the debtor's ski resort operation and its location in determining the extent to which the debtor had to search for alternative and more favorable financing.  In Sky Valley, the court recognized that there was a limited pool of potential creditors, in that they would be likely either:

> (a)    to hold a pre-petition security interest in Debtor's property and thus, is already at risk; or (b) to do business in the community

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

25

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

**Page 25**

1    surrounding the resort and, thus, is interested in preserving
       community land valued by preserving Debtor's resort.

2

3    Id. at 113.

4    The bankruptcy court recognized that in circumstances such as these, "it would be

5    unrealistic and unnecessary to require the debtor to conduct such an exhaustive search for

6    financing." Id.

7    As discussed herein, these considerations are equally applicable in this case. The Debtors

8    are unable to procure financing in the form of unsecured credit allowable under Section

9    503(b)(1) as an administrative expense or solely in exchange for the grant of an administrative

10   expense priority pursuant to Section 364(c)(1). The proceeds from the Loan Modification

11   Agreement will immediately be used to the Debtors' ongoing business operations and smooth the

12   way towards the Debtors' successful reorganization. The Debtors have investigated other

13   sources of financing and do not believe that they will be able to obtain a loan on terms more

14   favorable than those offered by Lenders under the Loan Modification Agreement.

15   A requirement in the granting of priority financing is that the debtor has sought, and was

16   unable to obtain, alternate financing without disruption of the preexisting priority amongst the

17   secured creditors. Relevant cases indicate that a debtor need not contact every potential lender,

18   but the debtor must demonstrate a significant effort that is fair, reasonable, and adequate to carry

19   the burden required by Bankruptcy Code Section 364(d). In re Tenney Village Co., 104 B.R.

20   562 (Bankr. D.N.H. 1989); In re Reading Tube Industry, 72 B.R. 329, 332 (Bankr. E.D. Ps.

21   1987); In re Saint Mary Hospital, 86 B.R. 393, 402 (Bankr. E.D. Pa. 1988).

22   When a post-petition creditor is granted a secured priority interest over an existing pre-

23   petition creditor's interest in collateral, the "primed" creditor must be given adequate protection

24   of its interest. This requires an analysis of the "value" of the debtor's collateral to ensure that the

25   primed creditor receives the benefit of its bargain. [See, 11 U.S.C. §§ 364(d), 361. See, also, In

26   re Dynaco, 162 B.R. 389 (Bankr. D.N.H. 1993.]

27   In the Debtors' case, the Lenders hold the existing pre-petition lien on the Debtors' assets

28   and the Debtors' obligations to the Lenders are merely being modified.

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

26

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

Page 26

1  **E.      The Financing Proposed Herein is Consistent With and Necessary for the Debtor's**

2  **Continued Operations**

3      A principal goal of Chapter 11 is preserving and increasing the pool of assets available

4  for distribution to the creditors of the estate.  <u>NLRB v. Bildisco & Bildisco</u>, 465 U.S. 513, 527,

5  104 S.Ct. 1188 (1984); <u>United States v. Whiting Pools, Inc.</u>, 462 U.S. 198, 203, 103 S.Ct. 2309

6  (1983).   In addition to representing the best terms presently available to the Debtors, the

7  financing under the Loan Modification Agreement is also in the best interests of the Estates.  The

8  terms and conditions of the Loan Modification Agreement are fair, just, and reasonable under the

9  circumstances and reflect the Debtors' prudent business judgment consistent within their

10  fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The

11  Estates' value will increase as a result of the financing and will decrease without it.  Moreover,

12  none of the Estates' creditors will be worse off as a result of the financing than they would be

13  without it.  The Debtors respectfully submit that the proposed Loan Modification Agreement

14  satisfies the Bankruptcy Code Section 364(c) standards.  As indicated above, the best financing

15  arrangement currently available to the Debtors is that offered by the Lenders.  Thus, the Debtors

16  believe that it is fair, reasonable and necessary to procure the financing under the Loan

17  Modification Agreement.

18  **F.      The Debtors have Satisfied the Procedural Requirements Regarding Authority to**

19  **Obtain Credit**

20      Federal Rule of Bankruptcy Procedure 4001(d) sets forth procedural requirements for

21  obtaining Court approval of the Loan Modification Agreement.  Federal Rule of Bankruptcy

22  Procedure 4001(d):

23      Pursuant to Federal Rule of Bankruptcy Procedure 4001(d), the Debtor may seek

24  approval of the insurance premium financing agreement upon notice to certain parties and

25  opportunity for hearing.  Specifically, Federal Rule of Bankruptcy Procedure 4001(d), provides

26  that:

27      (d) <u>Agreement Related to Relief from the Automatic Stay,</u>
<u>Prohibiting or Conditioning the Use, Sale, or Lease of Property,</u>

28

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

27

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

**Page 27**

Providing Adequate Protection, Use of Cash Collateral, and Obtaining Credit.

(1) Motion; Service.

(A)  A motion for approval of any of the following shall be accompanied by a a copy of the agreement and proposed form of order:

(i)  an agreement to provide adequate protection;

(ii)  an agreement to prohibit or condition the use, sale or lease of property;

(iii)  an agreement to modify or terminate the say provided for § 32;

(iv)  an agreement to use cash collateral; or

(v)  an agreement between the debtor and an entity that has a lien or interest in property of the estate pursuant to which the entity consents to the creation of a lien senior or equal to the entity's lien or interest in such property.

(B)  Contents.  The motion shall consist of or (if the motion is more than five pages in length) begin with a concise statement of the relief requested, not to exceed five pages, that lists or summarizes, and sets out the location within the relevant documents of, all material provisions of the agreement.  In addition, the concise statement shall briefly list or summarize, and identify the specific location of, each provision in the proposed form order, agreement, or other document of the type listed in subdivision (c)(1)(B).  The motion shall also describe the nature and extent of each such provision.

(C)  Service.  The motion shall be served on any (1) committee elected pursuant to § 705 or appointed pursuant to § 1102 of the Code or its authorized agent, or if the case is a Chapter 9 municipality case or a chapter 11 reorganization case and no committee of unsecured creditors has been appointed under § 1102, on the creditors included on the list filed under Rule 1007(d), and (2) on any other entities as the court directs.

(2)  Objection.  Notice of the motion and the time within which objections may be filed and served on the debtor in possession or trustee shall be mailed to the parties to whom service is required by paragraph (1) of this subdivision and to such other entities as the court may direct.  Unless the court fixes a different time, objections may be filed within 14 days of the mailing of the notice.

(3)  Disposition; Hearing; If no objection is filed, the court may enter an order approving or disapproving the agreement without conducting a hearing.  If an objection is filed or if the court determines a hearing is appropriate, the court shall hold a hearing

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

28

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

Page 28

on no less than five days' notice to the objector, the movant, the parties on whom service is required by paragraph (1) of this subdivision and such other entities as the court may direct.

(4) <u>Agreement in Settlement of Motion</u>. The court may direct that the procedures prescribed in paragraphs (1), (2) and (3) of this subdivision shall not apply and the agreement may be approved without further notice if the court determines that a motion made pursuant to subdivisions (a), (b) or (c) of this rule was sufficient to afford reasonable notice of the material provisions of the agreement and opportunity for hearing.

Concurrent with the filing of this Motion, a copy of Motion, the Settlement Agreement attached to which is the Loan Modification Agreement, and the proposed Order approving the Settlement Agreement and Loan Modification Agreement will be served in accordance with the procedures under Federal Rule of Bankruptcy Procedure 4001(d). The Debtors believe that under the circumstances of this case, such notice of this Motion is appropriate and given the significant benefit to be obtained from the relief sought herein, an order should be entered approving the Motion, the Settlement Agreement and the Loan Modification Agreement the without delay.

## IV.    <u>CONCLUSION</u>

**WHEREFORE**, based upon the foregoing, the Debtors respectfully submit that good cause exists for granting the Motion and request that the Court enter an order as follows:

1.    Approving the settlement with the Lenders under the terms and conditions that are consistent with the Settlement Agreement as shown on **Exhibit** 1 to the Chang Declaration and any ancillary loan modification documents, including the Loan Modification Agreement annexed as Exhibit A to the Settlement Agreement.

////

////

////

**SHULMAN HODGES &
BASTIAN LLP**
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

29

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

**Page 29**

2.     In order to implement the terms of the settlement with the Lenders authorizing the Debtors to execute any and all documents in order to carry out the terms of the settlement and compromise, including but not limited to the Settlement Agreement and any ancillary loan modification documents which are consistent with and incorporate the terms and provisions described in the Settlement Agreement, including the Tenth Modification and Extension Agreement and Annex A thereto attached as Exhibit A to the Settlement Agreement.

3.     And for such other and further relief as the Court deems just and proper.

Dated: August 5, 2011                    Respectfully submitted,

**SHULMAN HODGES & BASTIAN LLP**

/s/ James C. Bastian, Jr.

_____

James. C. Bastian, Jr.
Insolvency Counsel for
Trade Union International, Inc., and
Duck House, Inc.,
the Debtors and Debtors in Possession

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

30

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

**Page 30**

# DECLARATION

## DECLARATION OF WEN PIN CHANG

I, Wen Pin Chang, declare:

1.    I am the President of Trade Union International, Inc., a California corporation ("Trade Union"), and Duck House, Inc., a California corporation ("Duck House"), each a debtor and debtor in possession (collectively the "Debtors"), and am one of the persons responsible for the administration of the Debtors. I have personal knowledge of the facts set forth herein and could, if called as a witness, competently testify thereto. I am also personally familiar with, and am custodian of, the records of the Debtors as they pertain to the financial records set forth herein. The records of the Debtors are made by employees or agents of the Debtors who report to me and who have a business duty to enter the records of the Debtors accurately and at or near the time of the event which they record.

2.    I make this Declaration in support of the Motion for Order Approving Settlement and Compromise of Disputes with the Bank Group Lenders (Cathay Bank for Itself and as Agent for Chinatrust Capital Corporation) and Approving Ancillary Loan Modification Documents ("Motion"). Unless otherwise noted, capitalized terms herein have the meaning as set forth in the Motion.

3.    The Debtors each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on January 31, 2011. Trade Union and Duck House are each continuing in possession of their property, and operating and managing their respective business, as debtors-in-possession pursuant to Bankruptcy Code Sections 1107 and 1108.

4.    Pursuant to Court Order entered February 10, 2011, the Chapter 11 case of Trade Union is being jointly administered with the Chapter 11 case of Duck House.

5.    I formed Trade Union in 1981 and officially incorporated it in 1984 in order to supply top quality aftermarket aluminum alloy wheels and wheel and truck accessories. Trade Union's products are manufactured in Taiwan and China and are shipped to the United States for distribution to wholesalers and retailers. Trade Union is known for product lines which include Verde Custom Wheels, Black Ice Alloys, and Topline Products.

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

31

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

Page 32

6.      Duck House was established in 1981 and officially incorporated in 1986.  Duck House specializes in designing products for sports enthusiasts.  In order to offer the most competitive prices, the products are manufactured in factories in China and in Taiwan and then distributed by Duck House in the United States.

7.      Trade Union and Duck House are the makers of the following:  (i) a Line A Note in the original principal amount of $10,400,000 in favor of Cathay; (ii) a Line A Note in the original principal amount of $5,600,000 in favor of Chinatrust; (iii) a Line B Note in the original principal amount of $3,380,000 in favor of Cathay; (iv) a Line B Note in the principal amount of $1,820,000.00 in favor of Chinatrust (collectively, the "Notes"), which are secured by that certain Amended and Restated Security Agreement dated June 29, 2007 (as amended, the "Security Agreement") and by a Deed of Trust and Assignment of Rents and Leases dated January 15, 2002, executed by the Trust which was recorded on February 8, 2002 in the Official Records of San Bernardino County, California as Document No. 20020063955 (the "Montclair Deed of Trust").

8.      The Notes evidence various loans made by Lenders to the Debtors in the aggregate principal amount of $21,200,000.00 (collectively, the "Loans").  Agent and Debtors are also parties to an Amended and Restated Credit Agreement dated June 29, 2007 (as amended, the "Credit Agreement").  As used herein, "Loan Documents" shall have the meaning set forth in the Loan Modification Agreement (defined below).

9.      As used herein, the term "Collateral" shall have the meaning set forth in the Credit Agreement and shall include any assets in which the borrowers granted Lenders a security interest pursuant to the Loan Modification Agreement or otherwise.

10.      To preserve its Collateral, the Lenders maintained a lockbox account into which all of the Debtors' receivables were placed.

11.      In May 2010, the Debtors began discussions with the Lenders relating to a forbearance agreement and restructuring of the Loans.  Through this period up until December 2010, the Debtors paid more than $3.5 million of principal on the Loans while also keeping current on the interest payments.

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

32

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

Page 33

12.    In addition to the liens against the Debtors' assets, the Lenders were provided with the following additional collateral:

- A second priority deed of trust against the real property located at #1 Topline Plaza, 4651 State Street, in Montclair, California. The State Street Property is where the Debtors' businesses are located and is owned separately by the Trust. Based on purchase offers, the value of the State Street Property was believed to be $5.8 to $6.2 million. Prior to the Petition Date, the State Street Property was in escrow to a buyer whose offer was contingent on the Debtors entering into a long term lease of the State Street Property, which would have required the Debtors to reach some restructuring of the debt obligations to the Lenders. The Lenders were was made aware of this but refused to provide any assurance to the buyer of such an extension. As such, escrow was canceled and the buyer was lost. A sale of the State Street Property was estimated to have netted the Lenders in excess of $2 million toward the principal of its outstanding loan, which was lost when the buyer withdrew its offer.

- A second priority deed of trust against the personal residence of W. Chang and M. Chang located 2819 Crystal Ridge Road, Diamond Bar, California. The value of the Crystal Ridge Property is believed to be in excess of $3 million, which provides the Lenders with over $2 million in collateral protection.

13.    On October 27, 2010, in consideration of assurances by the Lenders that it would agree to a restructuring of the Loans, my wife and I granted the Lenders a deed of trust on a previously unencumbered unimproved parcel zoned for residential real estate located at 22840 Ridgeline Road, Diamond Bar, CA ("Ridgeline Property"). Rather than agree to any restructure, the Lenders only extended the forbearance agreement four days (from October 27, 2010 to October 31, 2010). A sale of the Ridgeline Property closed on January 28, 2011 at which time the Lenders were paid in excess of $1.1 million which was applied toward the principal balance of the outstanding balance of the Loans.

14.    Negotiations between the Debtors and the Lenders broke down in early January. On January 4, 2011, the Lenders terminated all discussions and terminated all Debtors' access to their cash, yet made it clear to the Debtors that they were not enforcing its legal remedies. As a

**SHULMAN HODGES &**
**BASTIAN LLP**
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

33

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

**Page 34**

direct result of the Lenders' actions, the Debtors were unable to operate.  The Debtors had no access to funds with which to pay necessary operating expenses, including payroll.  In addition, the Debtors had almost $300,000 in outstanding checks that bounced because of the actions of the Lenders.

15.     As a result of the Lenders' actions, Debtors had no choice but to open a new bank account and direct their customers to make payments to that bank account to try and cover issued checks, payroll and other necessary expenses of the business.  As such, on January 10, 2011, the Debtors contacted their customers and directed them to forward any payments to a new account at U.S. Bank.  The Lenders asserted that these actions were improper.

16.     On January 10, 2011, the Lenders notified the Debtors that the Lenders applied $463,271 from the accounts maintained at Cathay Bank toward the Debtors' outstanding revolving Loans.  This action caused forty-five checks to bounce for non-sufficient funds.  The Lenders also shut down all on-line banking for both Trade Union and Duck House.  The Debtors were unable to access funds in their checking accounts and the lock box accounts and there was no visibility regarding banking activities in the Debtors' accounts held at the Lenders' banks. The Debtors are advised that the Lenders continued to sweep the Debtors' lockbox accounts and applied the additional cash towards the principal of the Debtors' outstanding loan balance.  At this time, the Debtors have not agreed with the accounting provided by the Lenders with respect to the current unsettled balance and do not agree to the  total amount by which the principal balance of the Loans has been reduced on account of the Lenders' sweeping of the Debtors' accounts.

17.     On January 12, 2011, the Lenders and the Debtors, along with their counsel, met to discuss a possible resolution.  The Lenders informed the Debtors that it would be seeking the appointment of a receiver to liquidate the Debtors.  After further negotiations did not result in a resolution, the Lenders provided ex parte notice of its motion to have a receiver appointed and scheduled a hearing in state court for the morning of January 28, 2011, which was continued to January 31, 2011.  The Debtors' believed that the appointment of a receiver would be to the

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

34

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

Page 35

1    detriment of the unsecured creditors and equity holders, and result in a possibly huge deficiency

2    claim to the Lenders.  As a  result, the Debtors commenced these Chapter 11 cases.

3        18.    The Debtors are investigating whether or not the Lenders' claims are secured and

4    to what extent.

5        19.    Debtors are also investigating whether or not the Lenders are liable for, among

6    other things, exercising excess control over Debtors, Debtors' financial structure and affairs and

7    for directing Debtors and Debtors' principals to liquidate various assets to their great detriment

8    through the false promise of (1) extensions of the then existing loan maturity and terms and (2)

9    promises to work with Debtor to preserve its key business operations, while at all times intending

10    to force the liquidation of the Debtors' business.

11        20.    Based on the foregoing and events leading to the bankruptcy filings, the Debtors

12    believe they may have claims against the Lenders for declaratory relief, accounting, lender

13    liability, equitable subordination and other theories.

14        21.    The Lenders deny the Debtors' assertions and deny that they have any liability to

15    the Debtors under any legal theory.

16        22.    Through the Motion, the Debtors request approval of a certain Settlement

17    Agreement ("Agreement"), a true and correct copy of which is attached hereto as **Exhibit 1**.

18        23.    Before agreeing to enter into the settlement that is the subject of the Motion, the

19    Debtors consulted with counsel about the risks and benefits of continuing with the litigation.

20    The Debtors consulted with counsel about the benefits to the Estates which would result from the

21    settlement.  For the reasons stated in the Motion and the accompanying Points and Authorities,

22    and based on my years of business experience, as well as my consultation with the Debtors'

23    attorneys, I believe it is in the best interest of the Estates to enter into the Settlement Agreement.

24    Moreover, the Debtors believe that good cause exists to approve the proposed settlement based

25    on the following:

26        a.    Although the Debtors believe in the arguments in support of the claims

27    asserted against the Lenders, the Debtors understand the risks inherent in any litigation.  The

28    issues involved are complex and would require substantial time and money to resolve. The

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

35

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

Page 36

1  Debtors would have to file lawsuits and litigate the disputes with Lenders and perhaps respond to

2  appeals.  Settlement eliminates these risky activities.

3          b.   Furthermore, litigation is expensive generally.  Since no complaint has been

4  filed, the parties are far from resolution of the matters by trial (and possible appeals).  Rather

5  than delay the matter and incur expenses and resources filing the complaints, litigating and

6  preparing for trials, the parties have determined that the settlement reached is fair and reasonable.

7  Based thereon, the Debtors believe the proposed settlement and compromise is the most

8  expedient and cost effective method for resolving the disputes.

9          c.   The costs of the Estate to litigate the issues will reduce the amount of funds

10  available at the end of this case to pay claims because substantial administrative costs will be

11  incurred.   The Debtor estimates that as much as $500,000, if not more, could be incurred in the

12  litigation disputes with the Lenders.    Approval of the settlement will aid the Debtors in

13  preserving assets of the Estate.

14          d.   The expenses incurred for continued litigation of the disputes would most

15  likely exceed any additional benefit that might be achieved.  The settlement the Debtors have

16  reached provides certainty, reduces claims against in the Estate, and provides for means for

17  realistic payment of the debt owing to the Lenders.

18          e.   The settlement should be approved as a means of preserving assets and

19  enhancing the value of the Estates.  The proposed settlement essentially paves the way for a

20  smooth and consensual reorganization as the litigation and disputes with the Lenders were one of

21  the primary precipitating events which resulted in the Debtors' chapter 11 case.

22  ////

23  ////

24  ////

25

26

27

28

**SHULMAN HODGES &
BASTIAN LLP**
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

36

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

**Page 37**

1        f.   The settlement will also minimize the disruption and expense to the Debtors'

2   business operations and is the best means for the Lenders to be paid while preserving cash

3   resources.

4        g.   The Loan Modification Agreement has been negotiated in good faith and at

5   arms' length by and between the parties.   The Debtors have investigated other sources of

6   financing and do not believe that they will be able to obtain financing on terms more favorable

7   than those provided under the Loan Modification Agreement, especially within the time frame

8   that Lenders are able to perform.   The hearing on confirmation of the Debtors' reorganization

9   plan is scheduled for September 2, 2011 and the financing needs to be approved so that the

10   proposed plan may go effective.   The proposed financing is essential to the Debtors' ability to

11   confirm a plan of reorganization.   Moreover, the Debtors' credit is such that they likely do not

12   qualify for a loan with another lender at this time.   As such, the Debtors do not believe they can

13   obtain a similar loan on terms better than those offered by the Lenders, especially given that the

14   Debtors are now in a bankruptcy proceeding.   Based on the foregoing, it is improbable that the

15   Debtors would be able to obtain from any other lender financing in an amount sufficient to

16   provide for the Debtors' current and anticipated needs on more favorable terms.   Based thereon,

17   the Debtors believe that granting the Motion would serve the best interests of the Estates and

18   creditors

19        h.   The terms and conditions of the Loan Modification Agreement are fair, just,

20   and reasonable under the circumstances and reflect the Debtors' prudent business judgment

21   consistent within their fiduciary duties, and are supported by reasonably equivalent value and fair

22   consideration.   The Estates' value will increase as a result of the financing and will decrease

23   without it.   Moreover, none of the Estates' creditors will be worse off as a result of the financing

24   than they would be without it.

25        i.   Further, if the Debtors do not enter into the Loan Modification Agreement, the

26   only alternative will be to attempt to cram down the Bank Group through a contested Plan

27   confirmation.   This would be risky for all parties but especially for the Debtors.   One of the most

28   beneficial aspects of the Loan Modification Agreement is the interest rate provided (opening

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

37

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

Page 38

1  floating rate of prime plus 1.75% for the line of credit and a fixed rate of 5% for the term loans).

2  In a cram down, the interest rate would be determined based on expert testimony and an ultimate

3  court ruling.  There is a risk that a higher rate may be imposed which will greatly impact the

4  Debtors' cash flow and ability to meet other obligations under the Plan, including payments to

5  unsecured creditors.

6          j.   The Lenders are not an insider of the Debtors and the Debtors' and their

7  principals have no ownership interest in or control over the Lenders.

8          k.   The Debtors have talked with other potential lenders, but no one is willing to

9  perform on the same or similar terms as the Lenders, including the timing for funding.

10  Moreover, the Debtors' credit is such that they do not currently qualify for a loan on terms close

11  to that proposed under the Loan Modification Agreement.  As such, the Debtors do not believe

12  they can obtain a similar loan on terms better than those offered by the Lenders, especially given

13  that the Debtors are now in a bankruptcy proceeding.  Based on the foregoing, it is improbable

14  that the Debtors would be able to obtain from any other lender financing in an amount sufficient

15  to provide for the Debtors' current and anticipated needs on more favorable terms.

16          I declare under penalty of perjury under the laws of the State of California that the

17  foregoing is true and correct.

18          Executed at Montclair, California on August 5, 2011.

19

20

21

22  Wen Pin Chang

23

24

25

26

27

28

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

38

4265-000
\Z:\S-T\Trade Union International\Pld\Settlement Mtn Bank Group.doc

# Exhibit 1

# Settlement Agreement
# (Loan Modifcation Agreement annexed as
# Exhibit A to the Settlement Agreement)

**NOTE TO THIS EXHIBIT:**

**The parties are working to finalize the final form of the Settlement Agreement and the ancillary Tenth Modification and Extension Agreement and Annex A thereto ("Loan Modification Agreement") attached hereto and intend to file the final form of the Settlement Agreement and ancillary Loan Modification Agreement prior to the Court hearing.**

# EXHIBIT 1, PAGE 1

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Settlement Agreement") is entered into as of this ___ day of August, 2011, by and among TRADE UNION INTERNATIONAL, INC., a California corporation ("Trade Union"), and DUCK HOUSE, INC., a California corporation ("Duck House" and together with Trade Union, the "Debtors"), WEN PIN CHANG, an individual ("W. Chang"), MEI LIEN CHANG, an individual ("M. Chang"), and WEN PIN CHANG AND MEI LIEN CHANG as Trustees of the CHANG REVOCABLE TRUST u/t/a September 20, 1996 (the "Trust", and together with W. Chang and M. Chang, individually and collectively, the "Guarantor") on the one hand, and CATHAY BANK, a California banking corporation ("Cathay"), as Agent ("Agent") for itself and CHINATRUST CAPITAL CORPORATION, successor in interest to ChinaTrust Bank U.S.A. ("Chinatrust") as a Lender, (and together with Cathay, the "Lenders"), and Cathay as L/C Issuer ("L/C Issuer") on the other hand, with respect to the following facts:

## RECITALS

A.      Trade Union and Duck House are the makers of the following:  (i) a Line A Note in the original principal amount of $10,400,000.00 in favor of Cathay; (ii) a Line A Note in the original principal amount of $5,600,000.00 in favor of Chinatrust; (iii) a Line B Note in the original principal amount of $3,380,000.00 in favor of Cathay; (iv) a Line B Note in the principal amount of $1,820,000.00 in favor of Chinatrust (collectively, the "Notes"), which are secured by that certain Amended and Restated Security Agreement dated June 29, 2007 (as amended, the "Security Agreement") and by a Deed of Trust and Assignment of Rents and Leases dated January 15, 2002, executed by the Chang Revocable Trust u/t/a September 20, 1996 ("Trust") which was recorded on February 8, 2002 in the Official Records of San Bernardino County, California as Document No. 20020063955 (the "Montclair Deed of Trust").  The Notes evidence various loans made by Lenders to Debtors in the aggregate principal amount of $21,200,000.00 (collectively, the "Loans").  Agent and Debtors are also parties to an Amended and Restated Credit Agreement dated June 29, 2007 (as amended, the "Credit Agreement").  As used herein, "Loan Documents" shall have the meaning set forth in the Loan Modification Agreement (defined below).  As used herein, the term "Collateral" shall have the meaning set forth in the Credit Agreement and shall include any assets in which Borrower has granted Lenders a security interest pursuant to the Loan Modification Agreement or otherwise.

B.      On January 31, 2011 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code with the United States Bankruptcy Court for the Central District of California, Riverside Division (the "Bankruptcy Court").  The case number for Trade Union's case (the "Trade Union Case") is 6:11-bk-13071-DS; the case number for Duck House's case is 6:11-bk-13072-DS (the "Duck House Case", and together with the Trade Union Case, individually and collectively, the "Bankruptcy Cases").  The Bankruptcy Cases, among others, are being jointly administered under the lead case, Trade Union.  Since the filing of their petitions for relief, the Debtors have and are continuing to operate their business as debtors-in-possession under 11 U.S.C. §§ 1107 and 1108.

C.     Trade Union, Duck House and Guarantor, on the one hand, and Agent, and Lenders on the other hand (collectively the "Parties"), hereby memorialize their settlement of any disputes arising out of or relating to the Debtors' use of cash collateral, the Loan Documents, and the treatment of Agent's claims under a Chapter 11 plan or plans of reorganization, in accordance with the terms and conditions set forth below.

NOW, THEREFORE, based on the mutual promises contained herein and for other good and valuable consideration, the receipt of which is acknowledged, the Parties agree as follows:

1.     Recitals Acknowledged.  The foregoing Recitals are true and correct to the best of the Parties' knowledge, and are hereby adopted by the Parties.

2.     Loan Modification Agreement and Confirmation of Guaranty.  Trade Union, Duck House, Guarantor, Agent and Lenders shall enter into a modification agreement substantially conforming to the "Tenth Modification and Extension Agreement" and Annex A thereto, attached as Exhibit "A" hereto (the "Loan Modification Agreement") and incorporated herein by this reference.

3.     Bankruptcy Court Approval.  The Parties agree that their obligations under this Settlement Agreement and the Loan Modification Agreement are subject to, and conditioned upon, entry of an order by the Bankruptcy Court (the "Approval Order") approving the terms of this Settlement Agreement, which the Debtors shall seek as soon as practicable following execution of this Settlement Agreement by the Parties.  For purposes of this Settlement Agreement, "Effective Date" shall  be defined as in the Loan Modification Agreement and be subject to the same requirement as to by when it shall occur or this Agreement may be terminated by Agent. Effective Date shall be the same as the term "Approval Date" as used herein. The provisions of this Settlement Agreement and those contained within the Loan Modification Agreement are intended by the Parties to be effective at all material times after the Approval Date, including during the pendency of the Bankruptcy Case and after the effective date of any plan of reorganization proposed by the Debtors and confirmed by the Bankruptcy Court ("Plan").

4.     Consent to Restructure.  Agent and Lenders have agreed to restructure the Outstanding Indebtedness and the Loan Documents (as defined in the Loan Modification Agreement).  Notwithstanding Agent's consents as set forth in this paragraph, such consents by Agent shall not and do not restrict Agent's rights under the Loan Modification Agreement, this Settlement Agreement, or applicable law in the event of any future defaults in payment or performance by Trade Union and/or Duck House under the Loan Documents as revised by the Loan Modification Agreement or hereunder.

5.     Limited Mutual Releases .

(a)     Upon the Effective Date, Borrower, each Guarantor, Agent, each Lender and L/C Issuer (for purposes of this Section 5, individually and collectively referred to herein as "Releasor"), and each of them, for themselves, and each Releasor's successors and assigns, and each of them, shall and do hereby forever relieve, release and discharge (i) Borrower and each Guarantor by Agent, each Lender and L/C Issuer, (ii) Agent, each Lender and L/C Issuer by

Borrower and each Guarantor, and (iii) their respective successors, assigns, past and present attorneys, accountants, representatives, affiliates, parents, partners, officers, directors, employees and stockholders, jointly and severally, from (iv) any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions and causes of actions, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, based upon, arising out of, appertaining to, or in connection with any of the matters or facts alleged or set forth in the Recitals of this Agreement, the Recitals of the Loan Modification Agreement, the lending relationship between Agent and Lenders on the one hand, and Borrower and Guarantor, on the other hand, the Loans, the Loan Documents, the Bankruptcy Cases, the facts pertinent to this Agreement, and any and all real and personal property collateral, jointly and severally, and further including, without limitation, all claims relating to or arising out of the Allegations as that term is defined in the Loan Modification Agreement ("Released Claims"); provided, however, that the term Released Claims does not and shall not include any claim based on this Settlement Agreement or on any obligation arising under the Loan Documents or any order entered prior to the Effective Date in the Bankruptcy Cases.

(b)     As to the Released Claims, Releasor, and each of them, expressly waive any and all rights under section 1542 of the Civil Code of the State of California, which provides as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

(c)     As to the Released Claims, Releasor, and each of them, expressly waive and release any right or benefit which they have or may have under section 1542 of the Civil Code of the State of California, and any similar statute, code, law and/or regulation of the United States, or any state thereof, to the full extent that they may waive all such rights and benefits pertaining to the matters released herein.  In connection with such waiver and relinquishment, Releasor, and each of them, acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true.  Nevertheless, it is the intention of Releasor, and each of them, through this Agreement, to fully, finally and forever release all such matters, and all claims relative thereto, which now exist, may exist, or heretofore have existed.  In furtherance of such intention, the releases herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

(d)     In entering into the release provided for in this Agreement, Releasor, and each of them, recognize that no facts or representations are ever absolutely certain; accordingly, they assume the risk of any mistake, and if they should subsequently discover that any understanding of the facts or of the law was incorrect, said party shall not be entitled to set aside this release by reason thereof, regardless of any mistake of fact or law.

838287.7

**EXHIBIT 1, PAGE 4**

(e)      Releasor, and each of them, are the sole and lawful owners of all right, title and interest in and to every claim and other matter which they purport to release herein, and they have not assigned or transferred, or purported to assign or transfer to any person or entity any claims or other matters herein released.  Releasor, each individually and jointly, shall and hereby do indemnify, defend and hold each party released hereby harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, damages, costs, and expenses (including, but not limited to, attorneys' fees), based upon or arising in connection with any such prior assignment or transfer, or any such purported assignment or transfer, or any claims or other matters released herein.

1.      Consent to Treatment Under Chapter 11 Plan.

(a)      The Parties acknowledge that (i) this Settlement Agreement is entered into in contemplation of the proposal and confirmation of a Chapter 11 Plan by the Debtors; but (ii) confirmation of any such Plan is not a condition to the effectiveness of the settlement or of the modification to the Loan Documents.

(a)      The treatment of Agent, Lenders, and L/C Issuer under any Plan proposed by the Debtors shall be consistent with, and the Debtors shall not in any way seek to alter, modify, challenge or contradict, the terms of the Loan Documents, as modified by the Loan Modification Agreement herein, or this Settlement Agreement, including, without limitation, the releases contained herein.  With respect to the Loans, the entirety of Agent's, Lenders', and L/C Issuer's claims against the Debtors' estates shall comprise a single class of secured claims, and that class shall consist solely of Agent's, Lenders' and L/C Issuer's claims.  The class consisting of such secured claim against the Debtors' estates shall be deemed to be "impaired" under 11 U.S.C. § 1124.  Provided that the Plan complies with the terms hereof, (i) the Debtors shall use their collective best efforts to obtain confirmation of the Plan, (ii) Lenders will not object to such Plan, and (iii) Lenders will not support or participate in the formulation of any other plan.

(a)      Nothing herein shall be deemed to prohibit the proposal and confirmation of a joint or consolidated Plan.  In the event that such a Plan is proposed, the terms of the Plan shall contain provisions complying with both subparagraphs 6(b) and 6(c) hereof.

(a)      Nothing herein shall be deemed to require confirmation of a Plan as a condition to the effectiveness and enforceability of this Settlement Agreement or of the Loan Modification Agreement.

1.      <u>Relief from Stay Prior to Plan Effective Date</u>.  Notwithstanding anything to the contrary in the Loan Documents, as modified by the Loan Modification Agreement, the following shall apply after the Approval Date and prior to the effective date of any confirmed Plan:

(a)      If an Event of Default (as defined in the Loan Documents, the Loan Modification Agreement, herein, or in any agreement between or among the Parties with respect to an obligation secured by the Collateral) occurs prior to the effective date of the Plan where Trade Union and/or Duck House fail to perform an obligation under the Loan Documents, as modified by the Loan Modification Agreement or under any other agreement between or among

838287.7

**EXHIBIT 1, PAGE 5**

the Parties with respect to an obligation secured by the Collateral (a "Default"), Agent shall provide notice of such Default in writing (the "Notice of Default"), and deliver such notice to the Debtors and the Debtors' counsel at the addresses identified in this paragraph.

(b)     Trade Union and/or Duck House shall have five (5) business days from the date of delivery of the Notice of Default (the "Cure Period") to cure the Default identified in the Notice of Default. During such Cure Period, all sweeps of funds under the Loan Documents shall continue.

(c)     On the Effective Date, and under the entered Approval Order approving this Settlement Agreement, Agent and Lenders shall, and Borrower hereby stipulates that Agent and Lenders shall,  be granted immediate relief from the automatic stay of 11 U.S.C. § 362 in the Bankruptcy Cases, effective as of the Approval Date for any Defaults in any obligation for the payment of money to Lenders ("Payment Default").  If any such Payment Default is not cured within the Cure Period, Agent and Lenders shall be entitled immediately upon expiration of the Cure Period to enforce all of their rights under the Loan Documents, the Loan Modification Agreement, hereunder, or applicable law, as against Debtors and property of Debtors' estates. The automatic stay of 11 U.S.C. §362 shall not apply to, and shall be deemed modified, amended, annulled, and terminated in the Bankruptcy Cases as to Payment Defaults to Agent and Lenders and with respect to Agent's and Lenders' enforcement of any and all rights and remedies granted to Agent and Lenders under the Loan Documents as modified by the Loan Modification Agreement, under this Settlement Agreement, and under applicable state and federal law, with respect to such Payment Defaults, including without limitation enforcement by Agent of any and all liens granted to Agent and Lenders to secure payment and performance of the obligations of Debtors under the Loan Documents as modified by the Loan Modification Agreement, all without further order of the Bankruptcy Court.

(d)     If any Default (other than a Payment Default) is susceptible to being cured by Trade Union and/or Duck House within the Cure Period but has not been cured prior to expiration of the Cure Period, or a Default (other than a Payment Default) is not capable of being cured, Agent shall be authorized to request entry of an order terminating or modifying the automatic stay, to which request the Debtors may object only on the grounds set forth below, as follows:

(i)     Agent shall file a *Motion for Relief from the Automatic Stay under 11 U.S.C. § 362* (the "Stay Motion") in accordance with Local Bankruptcy Rule 4001-1, except that the Stay Motion shall be filed and served not later than 14 calendar days before the hearing. The Debtors shall file and serve any opposition to the Stay Motion not later than 7 calendar days before the hearing.

(i)     The sole basis upon which the Bankruptcy Court may grant relief from stay is cause found by the Bankruptcy Court to exist under 11 U.S.C. § 362(d)(1) as a result of a material Default that was susceptible to being cured by the Debtors within the Cure Period but was not cured by the Debtors prior to expiration of the Cure Period.  The Stay Motion shall be denied if the Debtors establish that:  (a) no Default occurred; (b) the Default identified in the Notice of Default was timely cured; (c) the Default identified in the Notice of Default was not susceptible to being cured by the Debtors within the Cure Period, (d) the Default identified in the

Notice of Default was not a material default under applicable nonbankruptcy law; or (e) Agent or Lenders failed to comply with any of their respective duties and obligations under this Settlement Agreement.

        (i)      If the Bankruptcy Court finds that cause exists to grant relief from the automatic stay, the Bankruptcy Court shall terminate or modify the automatic stay as against Debtors and Debtors' estates, such that Agent shall be authorized to proceed under applicable nonbankruptcy law to enforce its remedies including without limitation to foreclose upon and obtain possession of the collateral.

        (e)      Any Notice of Default to be delivered pursuant to this paragraph shall be served by personal delivery and facsimile as follows:

| | | |
|---|---|---|
| (i) | Debtors: | Trade Union International, Inc. |
| | | Duck House, Inc. |
| | | Wen Chang |
| | | No. 1 Topline Plaza |
| | | 4651 State Street |
| | | Montclair, CA 92763 |
| | | Facsimile no. 909-628-7580 |
| | | |
| (ii) | Debtors' counsel: | James C. Bastian, Jr. |
| | | Shulman Hodges & Bastian LLP |
| | | 8105 Irvine Center Drive, Suite 600 |
| | | Irvine, California 92618 |
| | | Facsimile no. (949) 340-3000 |
| | | Email: jbastian@shbllp.com |

        1.    <u>Default</u>.  In addition to any defaults under the Loan Documents as modified by the Loan Modification Agreement, if any of the following events (each an "Event of Default") occurs prior to the effective date of a Plan proposed by the Debtors, and the Debtors do not cure such Event of Default within the Cure Period (as defined in Section 7(b) above), Agent may do one or more of the following:  declare each of the Debtors in default, require Debtors to repay the entire debt immediately and without prior notice, and/or enforce any other remedy available under the Loan Documents as modified by the Loan Modification Agreement or under applicable law, and subject to Section 8 hereof.

        (a)      Any order shall be entered in the Trade Union Case or the Duck House Case converting the Trade Union Case or the Duck House Case to a proceeding under any provision of the Bankruptcy Code other than Chapter 11.

        (b)      Any of the Debtors or the Guarantor shall propose any plan of reorganization that seeks to vary, amend, modify, or change in any respect the terms, covenants, and conditions of the Loan Documents, as modified by the Loan Modification Agreement, or this Settlement Agreement, without the prior written consent of Agent.

(c)     Any of the Debtors or Guarantor shall file or commence any proceeding in any court of competent jurisdiction to challenge the validity, priority, or extent of any lien granted to Lenders under the Loan Documents, as modified by the Loan Modification Agreement, or under this Settlement Agreement, including, without limitation, any adversary proceeding in the Bankruptcy Cases or with respect to the terms, covenants, and conditions contained in any proposed Plan of reorganization.

(d)     Either of the Debtors files in the Bankruptcy Cases any motion or contested proceeding that seeks to surcharge Agent or Lenders for any reason, or to "prime" any lien or the debt held by Lenders or Agent, or to provide any lien to any third party on collateral of Agent or Lenders with a senior lien priority, equal lien priority, or junior lien priority, which motion or proceeding is not dismissed within sixty (60) days; provided, however, that it shall not constitute an event of default if the Debtors file a motion seeking entry of an order or orders (i) authorizing the Debtor finance insurance premiums and grant to the premium finance lender a lien on unearned premiums or proceeds of such insurance to secure payment of only such premium financings, consistent with ordinary business terms, or (ii) authorizing the Debtors to purchase equipment or fixtures for the State Street property or such substitute therefor approved by Agent, in the ordinary course of business pursuant to a transaction in which the seller is afforded a properly created and perfected security interest in the equipment and/or fixtures purchased by the Debtors.

(e)     Any default occurs in any term or covenant contained in this Settlement Agreement.

1.     <u>Bankruptcy Case Administration</u>.

In addition to the other bankruptcy-related provisions contained herein, the following additional provisions shall apply to each of the Debtors.

(a)     <u>Preservation of Credit Bid Rights</u>.  All credit bidding rights of Agent, including, but not limited to, under 11 U.S.C. §363(k), shall be preserved at all times in addition to all other rights and remedies of Agent under the Loan Documents as modified by the Modification Agreement, this Settlement Agreement, and applicable state and/or federal law.

(b)     <u>No Surcharge Claim</u>.  No surcharge claim, including without limitation, under 11 U.S.C. §506(c), shall be asserted against Agent or Lenders by either of the Debtors.

(c)     <u>Post-Petition Financing Requests</u>.  Neither of the Debtors shall file any motion or contested proceeding that seeks the approval of the Bankruptcy Court for permission for either of the Debtors to obtain post-petition financing that would result in any liens on the Collateral that are either senior to, of equal priority with, or junior to the lien interests of Agent, including without limitation, seeking any financing under 11 U.S.C. §364, unless the same is to pay Agent in full as a condition to any such financing; provided, however, that nothing in this sub-paragraph shall (i) impair or prejudice the Debtors with respect to the waivers and consents by Agent as set forth in paragraph 4 above concerning use of cash collateral, (ii) preclude the Debtors from seeking authority to finance insurance premiums and grant to the premium finance lender a lien on unearned premiums or proceeds of such insurance consistent with ordinary

business terms, following written consent from Agent and Lenders, which shall not be unreasonably withheld, or (iii) preclude the Debtors from seeking authority to purchase equipment and/or fixtures in the ordinary course of business pursuant to a transaction in which the seller is afforded a purchase money security interest in the equipment and/or fixtures sold, following written consent from Agent and Lenders, which shall not be unreasonably withheld.

(d)    Chapter 11 Administrative Expense Claims of Professionals.  So long as (i) Debtors remain in compliance with the Borrowing Base (as such term is defined in the Loan Documents being amended concurrently herewith) and all other terms, covenants and conditions of the Loan Documents, including, without limitation, Sections 4.2.6 and 4.2.7 of Annex A to the Loan Modification Agreement and (ii) such payments are allowed by the Bankruptcy Court, Debtors shall be permitted to use cash collateral to pay the allowed administrative expense claims of professionals employed by the Debtors in their Chapter 11 cases which have not otherwise been paid from any retainers paid to such professionals.

(e)    Cash Collateral Consents.  From and after the Effective Date, and on condition that there are no uncured events of default hereunder, or under any of the Loan Documents, the Debtors shall be permitted to continue to use the cash collateral of Lenders pursuant to approved budgets through confirmation of the Plan, on the further condition that such confirmation shall occur by no later than October 31, 2011.

(f)    No confirmation or plan injunction shall apply to Agent or Lenders in the administration or enforcement of the Loan Documents.

1.    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of Agent, Lenders, L/C Issuer, Guarantors and the Debtors, and, as to their respective successors and assigns, as may be limited or permitted by the transfer provisions of the Loan Modification Agreement, provided, however, that neither Debtors nor Guarantors may assign their interests in this Agreement without the prior written consent of Agent.

1.    Governing Law and Jurisdiction.  This Settlement Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to choice of law principles of the State of California.  The Bankruptcy Court shall retain exclusive jurisdiction to resolve any and all disputes pertaining to this Settlement Agreement, including without limitation the enforcement and interpretation of any of its terms, and the Parties agree to submit to the jurisdiction of the Bankruptcy Court for the purpose of resolving such disputes. Notwithstanding the foregoing, the Loan Documents shall be governed by and construed in accordance with the choice of law provisions contained therein, and jurisdiction over disputes arising under or related to the Loan Documents and not pertaining particularly to the terms of this Settlement Agreement shall be as set forth therein.

1.    Further Assurances.  Each Party to this Settlement Agreement shall execute all instruments and documents and take all actions as may be reasonably required, necessary or convenient to effectuate this Settlement Agreement.

1.    Complete Agreement.  This Settlement Agreement and all exhibits attached hereto contain the entire integrated agreement between the Parties with respect to the matters

covered herein.  No variations, modifications or changes herein or hereof shall be binding upon any Party unless set forth in a writing duly executed by such Party.

1. <u>Modification</u>.  This Settlement Agreement may be modified only by a writing executed by the Party to this Settlement Agreement against whom enforcement of such modification is sought.

1. <u>Rules Of Construction</u>.  The Parties, including their counsel, have participated in the preparation of this Settlement Agreement, and this Settlement Agreement is the result of the joint efforts of the Parties.  This Settlement Agreement has been accepted and approved as to its final form by all Parties and upon the advice of their respective counsel.  Accordingly, any uncertainty or ambiguity existing in this Settlement Agreement shall not be interpreted against any Party as a result of the manner of the preparation of this Settlement Agreement.  Each Party to this Settlement Agreement agrees that any statute or rule of construction providing that ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Settlement Agreement and are hereby waived.

1. <u>Attorneys' Fees and Expenses</u>.  Each Party's responsibility for attorneys' fees, court costs and related expenses by or on behalf of said Party in connection with this Settlement Agreement shall be as set forth in the Loan Modification Agreement, provided, however, that should legal action be necessary to enforce the terms of this Settlement Agreement, the party declared to be the prevailing party in such proceedings shall be entitled to recover from the non-prevailing party its reasonable attorneys' fees and costs incurred in enforcing this Settlement Agreement.

1. <u>Severability</u>.  If any provision of this Settlement Agreement is disapproved by the Bankruptcy Court, such provision shall be fully severable; in such event, each Party shall have the option of approving or rejecting this Settlement Agreement as a result thereof.  In the event that any Party elects to accept the remainder of the Settlement Agreement after any provision has been so disapproved, the remaining provisions of this Settlement Agreement shall remain in full force and effect and shall not be affected by the disapproved provisions or by severance thereof from this Settlement Agreement.

3. <u>Counterparts</u>.  Each Party may sign a facsimile copy of this Settlement Agreement, in counterparts, with the same effect as if each Party had signed an original of the same document, but this Settlement Agreement shall not be effective until each party for whom a signature block is provided below has executed and delivered a signature page. Within five (5) business days of the execution hereof, each party shall deliver to each other party a duplicate original signature page. The failure to make such deliveries shall not impair the enforceability hereof, but may be a ground for Agent to declare a default hereunder.

*[signatures appear on following pages]*

Dated:  August ___, 2011          TRADE UNION INTERNATIONAL, INC.
                                  a California corporation


                                  By: _____

                                  Its: _____



Dated:  August ___, 2011          DUCK HOUSE, INC.
                                  a California corporation


                                  By: _____

                                  Its: _____



Dated:  August ___, 2011          _____
                                  WEN PIN CHANG, an individual

Dated:  August ___, 2011          _____
                                  MEI LIEN CHANG, an individual

Dated:  August ___, 2011          _____
                                  WEN PIN CHANG, Trustee
                                  of The Chang Revocable Trust u/t/a September 20, 1996

Dated:  August ___, 2011          _____
                                  MEI LIEN CHANG, Trustee
                                  of The Chang Revocable Trust u/t/a September 20, 1996

                        [*signatures continue on following page*]

Dated:  August ___, 2011

CATHAY BANK,
a California banking corporation
As Agent, Lender and L/C Issuer

By: _____

Greg Badura

Its:    Senior Vice President and Manager

CHINATRUST CAPITAL CORPORATION,
a Delaware corporation

By: _____

Melvin O. Redford

Its:    Executive Vice President

Approved as to form and content:

_____
James C. Bastian, Jr.
Attorney for Debtors and Guarantor

_____
Michael G. Fletcher
Attorney for Agent

_____
Gary Owen Caris
Attorney for Cathay Bank

_____
Barry Freeman
Attorney for Chinatrust

838287.7

# EXHIBIT 1, PAGE 12

# EXHIBIT A

**EXHIBIT 1, PAGE 13**

## TENTH MODIFICATION AND EXTENSION AGREEMENT

This Tenth Modification and Extension Agreement ("Agreement") is made and entered into as of August ___, 2011, by and among TRADE UNION INTERNATIONAL INC., a California corporation ("Trade Union"), DUCK HOUSE, INC., a California corporation ("Duck House", and together with Trade Union, individually and collectively, the "Borrower"), WEN PIN CHANG, an individual ("W. Chang"), MEI LIEN CHANG, an individual ("M. Chang"), WEN PIN CHANG and MEI LIEN CHANG as Trustees of the CHANG REVOCABLE TRUST u/t/a September 20, 1996 (the "Trust", and together with W. Chang and M. Chang, individually and collectively, "Guarantor") on the one hand, and CATHAY BANK, a California banking corporation ("Cathay"), as a Lender and L/C Issuer, and as Agent ("Agent") for itself and CHINATRUST CAPITAL CORPORATION, a Delaware corporation, and successor in interest to ChinaTrust Bank (U.S.A.) ("Chinatrust"), as a Lender (together with Cathay, collectively the "Lenders"), on the other hand, with reference to the following facts:

### RECITALS

A.    Borrower, Agent and Lenders have entered into that certain Amended and Restated Credit Agreement dated June 29, 2007 (as amended from time to time, the "Credit Agreement"), pursuant to which Lenders agreed to make revolving loans, and issue or purchase letters of credit and acceptances, subject to certain sub-limits (collectively, the "Original Revolving Commitment").

B.    Pursuant to the Credit Agreement, and subject thereto, Borrower executed a Line A Note ("Line A Note") in the original maximum principal amount of $10,400,000.00 and a Line Note B in the original maximum principal amount of $3,380,000.00 (the "Line B Note") each in favor of Cathay (collectively, the "Cathay Notes"), and also executed a Line A Note in the original maximum principal amount of $5,600,000,00 and a Line B Note in the original maximum principal amount of $1,820,000.00 each in favor of Chinatrust (collectively the "Chinatrust Notes").  The Cathay Notes and the Chinatrust Notes are herein collectively, the "Existing Notes".

C.    The Obligations (as defined in the Credit Agreement) of Borrower to Lenders under the Credit Agreement are secured by, among other things, those items of property and other interests more particularly described in that certain Amended and Restated Security Agreement dated June 29, 2007 (the "Security Agreement"), including, without limitation, all of Borrower's present and future tangible and intangible personal property assets.

D.    In addition, the Obligations are secured by a second priority deed of trust on the real property and improvements thereon, commonly known as 4651 State Street, Montclair, California ("Montclair Property") and described in that certain Deed of Trust and Assignment of Rents and Leases dated January 15, 2002, executed by the Trust for the benefit of Cathay, and recorded on February 8, 2002, as Document No. 20020063955 in the Official Records of San Bernardino County, California (the "Montclair Deed of Trust");

E.    In order to induce Cathay to extend credit accommodations, Borrower, Guarantor, and each of them, executed and delivered to and in favor of Lenders, a Commercial Guaranty

dated as of July 17, 2006 (as amended from time to time, hereafter referred to individually and collectively as the "Original Guarantees").

F.     The Guaranty of W. Chang and M. Chang is secured by a second priority deed of trust in the real property and improvements thereon commonly known as 2819 Crystal Ridge Drive, Diamond Bar, California ("Crystal Ridge Property") and described in that certain Deed of Trust dated January 10, 2003 executed by W. Chang and M. Chang, and recorded on January 27, 2003 as Document No. 03 0236445 in the Official Records of Los Angeles County, California ("Crystal Ridge Deed of Trust");

G.     On or about June 29, 2007, Guarantor executed and delivered to Agent an Amended and Restated Guaranty ("Amended and Restated Guaranty") which states that it augments the Original Guarantees.

H.     In connection with the Original Revolving Commitment, on or about July 28, 2008, Global Elite Company Overseas Limited, a company incorporated under the laws of the People's Republic of China ("Global"), Great Vision International Limited, a company incorporated under the laws of the People's Republic of China ("Vision") and Trade Union International Inc. Taipei, Taiwan, a corporation incorporated under the laws of Taiwan ("International") (collectively, the "Subordinators") each executed a Second Amended and Restated Subordination Agreement in favor of Lenders (collectively, the "Subordination Agreements").

I.     On or about November 14, 2007, Agent, Lenders and Borrower entered into that certain First Amendment to Amended and Restated Credit Agreement ("First Amendment");

J.     On or about May 14, 2008, Agent, Lenders and Borrower entered into that certain Waiver and Second Amendment to Amended and Restated Credit Agreement ("Second Amendment");

K.     On or about July 31, 2008, Agent, Lenders and Borrower entered into that certain Waiver and Third Amendment to Amended and Restated Credit Agreement ("Third Amendment") pursuant to which the Subordination Agreements were obtained;

L.     On or about October 31, 2008, Agent, Lenders and Borrower entered into that certain Fourth Amendment to Amended and Restated Credit Agreement ("Fourth Amendment");

M.     On or about June 2, 2009, Agent, Lenders and Borrower entered into that certain Fifth Amendment to Amended and Restated Credit Agreement ("Fifth Amendment");

N.     On or about July 31, 2009, Agent, Lenders and Borrower entered into that certain Sixth Amendment to Amended and Restated Credit Agreement ("Sixth Amendment");

O.     On or about December 31, 2009, Agent, Lenders and Borrower entered into that certain Waiver and Seventh Amendment to Amended and Restated Credit Agreement ("Seventh Amendment");

2

**EXHIBIT 1, PAGE 15**

P.      On or about April 10, 2010, Agent, Lenders and Borrower entered into that certain Forbearance and Reservation of Rights Agreement ("Forbearance Agreement");

Q.      On or about May 11, 2010, Agent, Lenders and Borrower entered into that certain Extension of Forbearance Agreement ("First Extension");

R.      On or about June 30, 2010, Agent, Lenders and Borrower entered into that certain Eighth Amendment to Amended and Restated Credit Agreement ("Eighth Amendment") pursuant to which, among other things, Borrower and Agent executed a Cash Control Agreement requiring Borrower to establish lock boxes with Agent ("Cash Control Agreement");

S.      On or about August 31, 2010, Agent, Lenders and Borrower entered into that certain Ninth Amendment to Amended and Restated Credit Agreement ("Ninth Amendment");

T.      The Credit Agreement, Existing Notes, Security Agreement, Subordination Agreements, Original Guarantees, Amended and Restated Guaranty, Montclair Deed of Trust, Crystal Ridge Deed of Trust, First Amendment, Second Amendment, Third Amendment, Fourth Amendment, Fifth Amendment, Sixth Amendment, Seventh Amendment, Forbearance Agreement, First Extension, Eighth Amendment, Ninth Amendment and Cash Control Agreement, and any and all other agreements, instruments or documents executed or given to or in favor of Agent and/or Lenders in connection therewith (including, without limitation, after the effectiveness hereof, this Agreement), and all amendments, modifications, substitutions, renewals and extensions thereof shall at times hereinafter be referred to as the "Loan Documents".

U.      Borrower defaulted under the Credit Agreement and the other Loan Documents by virtue of, without limitation, each of the following (collectively, the "Existing Defaults"):

      1.      Failing to pay the Obligations in full at maturity on September 30, 2010; and

      2.      Instructing its customers to make payments of Accounts other than to the lockbox(es) as required under the Security Agreement and the Cash Control Agreement.

V.      On or about January 31, 2011, Borrower filed voluntary petitions in the U. S. Bankruptcy Court for the Central District of California, Riverside Division, the Honorable Deborah J. Salzman presiding (the "BK Court"), as Case No. 6:11-bk-13071-DS as to Trade Union, and Case No. 6:11-bk-13072-DS as to Duck House (collectively, the "BK Cases").

W.      Borrower and Guarantor have alleged various claims of lender liability and other theories of liability and have alleged that all or part of the Obligations may be unsecured or subordinated, including without limitation those claims as disclosed in section ___ of the Disclosure Statement filed by Borrower in the BK Cases (the "Allegations"), which Allegations have been denied by Agent and Lenders.

X.      Notwithstanding the Existing Defaults, the BK Cases, and the Allegations, Borrower, Guarantor, Agent., L/C Issuer and Lenders have agreed to enter into a Settlement Agreement of even date herewith (the "Settlement Agreement") and in furtherance thereof, have

# EXHIBIT 1, PAGE 16

agreed to amend the Loan Documents as set forth below in this Agreement, subject to the terms, covenants, and conditions of this Agreement. The Settlement Agreement shall also be a Loan Document.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

AGREEMENT

    1.    <u>Definitions</u>.  As used herein, the following terms shall have the following meanings:

"<u>Additional Loan Documents</u>" shall have the meaning set forth in Section 6 hereof.

"<u>Allegations</u>" shall have the meaning set forth in Recital W hereof.

"<u>Amended and Restated Guaranty</u>" shall have the meaning set forth in Recital G hereof.

"<u>Berendo Property</u>" shall have the meaning set forth in Section 8.a hereof.

"<u>BK Cases</u>" shall have the meaning set forth in Recital V hereof.

"<u>BK Compensation Amount</u>" shall have the meaning set forth in Section 8.c hereof.

"<u>BK Court</u>" shall have the meaning set forth in Recital V hereof.

"<u>Cash Control Agreement</u>" shall have the meaning set forth in Recital R hereof.

"<u>Cathay Notes</u>" shall have the meaning set forth in Recital B hereof.

"<u>Chinatrust Notes</u>" shall have the meaning set forth in Recital B hereof.

"<u>Credit Agreement</u>" shall have the meaning set forth in Recital A hereof.

"<u>Crystal Ridge Deed of Trust</u>" shall have the meaning set forth in Recital F hereof.

"<u>Crystal Ridge Property</u>" shall have the meaning set forth in Recital F hereof.

"<u>Eighth Amendment</u>" shall have the meaning set forth in Recital R hereof.

"<u>Effective Date</u>" shall mean the date that is fifteen (15) calendar days after the entry of the Order, assuming that all conditions precedent to this Agreement have been satisfied and that no appeal of the Order has been filed or lodged and no stay pending appeal of the Order shall have been granted during the fourteen (14) days following entry of the Order. The Effective Date shall occur by no later than August __, 2011, or this Agreement may be terminated by Agent.

"<u>Existing Defaults</u>" shall have the meaning set forth in Recital U hereof.

"<u>Existing Notes</u>" shall have the meaning set forth in Recital B hereof.

**EXHIBIT 1, PAGE 17**

"Fifth Amendment" shall have the meaning set forth in Recital M hereof.

"First Amendment" shall have the meaning set forth in Recital I hereof.

"First Extension" shall have the meaning set forth in Recital Q hereof.

"Forbearance Agreement" shall have the meaning set forth in Recital P hereof.

"Foreign Affiliate" shall have the meaning set forth in Section 5.b(4) hereof.

"Fourth Amendment" shall have the meaning set forth in Recital L hereof.

"Identified Persons" shall have the meaning set forth in Section 8.c hereof.

"Indebtedness" shall have the meaning set forth in Section 3 hereof.

"Ju Rong Company" shall have the meaning set forth in Section 5.b(4) hereof.

"Ju Rong Land" shall have the meaning set forth in Section 5.b(4) hereof.

"Line A Note" shall have the meaning set forth in Recital B hereof.

"Line B Note" shall have the meaning set forth in Recital B hereof.

"Loan Documents"  shall have the meaning set forth in Recital T hereof.

"Montclair Deed of Trust" shall have the meaning set forth in Recital D hereof.

"Montclair Property" shall have the meaning set forth in Recital D hereof.

"Net Proceeds" shall have the meaning set forth in Section 8.a hereof.

"New Notes" shall have the meaning set forth in Section 6.a hereof.

"New Revolving Commitment" shall have the meaning set forth in Section 5.a hereof.

"New Revolving Note" shall have the meaning set forth in Section 5.a  hereof.

"New Secured Guaranties" shall have the meaning set forth in Section 6.d hereof.

"New Term Notes" shall have the meaning set forth in Section 6.a hereof.

"Ninth Amendment" shall have the meaning set forth in Recital S hereof.

"Obligations"  shall have the meaning set forth in the Credit Agreement.

"Order" shall have the meaning set forth in Section 6.l hereof.

"Original Guarantees" shall have the meaning set forth in Recital E hereof.

# EXHIBIT 1, PAGE 18

"Original Revolving Commitment" shall have the meaning set forth in Recital A hereof.

"Other Obligations" shall have the meaning set forth in Section 11 hereof.

"Profitability Benchmark" shall have the meaning set forth in Section 8.c hereof.

"Second Amended and Restated Unsecured Guaranty" shall have the meaning set forth in Section 5.d hereof.

"Second Amendment" shall have the meaning set forth in Recital J hereof.

"Security Agreement" shall have meaning set forth in Recital C hereof.

"Settlement Agreement" shall have the meaning set forth in Recital X hereof.

"Seventh Amendment" shall have the meaning set forth in Recital O hereof.

"Sixth Amendment" shall have the meaning set forth in Recital N hereof.

"Subordination Agreements" shall have the meaning set forth in Recital H hereof.

"Subordinators" shall have the meaning set forth in Recital H hereof.

"Term Loan A" shall have the meaning set forth in Section 5.b(1) hereof.

"Term Loan B" shall have the meaning set forth in Section 5.b(2) hereof.

"Term Loan C" shall have the meaning set forth in Section 5.b(3) hereof.

"Term Note A" shall have the meaning set forth in Section 5.b(1) hereof.

"Term Note B" shall have the meaning set forth in Section 5.b(2) hereof.

"Term Note C" shall have the meaning set forth in Section 5.b(3) hereof.

"Third Amendment" shall have the meaning set forth in Recital K hereof.

2.    Recitals.  The foregoing Recitals are incorporated herein by this reference as are all exhibits and schedules, and the parties agree that the information set forth in the Recitals is true and correct.  Except as specified herein, all of the terms and conditions of the Credit Agreement and the other Loan Documents, and each of them, shall remain in full force and effect.  In the event of any conflict or inconsistency between the terms, conditions and provisions of this Agreement and the Loan Documents, the terms, conditions and provisions of this Agreement shall prevail.  Any capitalized term not defined herein shall have the meaning ascribed to it in the Credit Agreement.

3.    Acknowledgment.  Borrower and Guarantor, and each of them, acknowledge that as of July 15, 2011 the aggregate principal balance of Borrower's Obligations outstanding to Lenders under the Loan Documents is $11,292,462.27, plus accrued and unpaid interest, and

# EXHIBIT 1, PAGE 19

unreimbursed attorneys' fees, costs, and expenses, all as detailed on <u>Schedule One</u> annexed hereto and incorporated herein by this reference. Interest, fees, costs, and expenses continue to accrue from and after July 15, 2011, until Lenders are paid in full. The indebtedness specified in this Section 3, together with any additional principal, interest and other amounts that accrue or otherwise become owing from and after July 15, 2011, under the Loan Documents, shall at times hereinafter be referred to as the "<u>Indebtedness.</u>"

4.      <u>Reaffirmation of Loan Documents</u>. This Agreement is, in part, a reaffirmation of the obligations of Borrower and Guarantor, and each of them, to Lenders under the Loan Documents and is not to be construed as a release or modification of any of the terms, conditions, warranties, waivers, or other rights set forth in any of the Loan Documents, except as expressly provided herein. Borrower and Guarantor, and each of them, acknowledge, confirm, restate, and reaffirm all of the terms, covenants, and conditions of the Loan Documents. Borrower and Guarantor, and each of them, specifically acknowledge, admit, confirm and agree that Borrower is currently in default under the Loan Documents according to their terms. Based on the terms and provisions hereof, and of the Settlement Agreement, on the Effective Date Borrower and Guarantor, and each of them, specifically acknowledge, admit, confirm, and agree that they do not have any valid offset or defense to the Indebtedness or to any of the other obligations evidenced by the Loan Documents, nor do they have any valid claim or claims against Agent or Lenders. Therefore, Borrower and Guarantor, and each of them, acknowledge, admit, confirm, and agree that they do not have any legal right or theory on which to invoke or obtain legal or equitable relief, whether injunctive relief or otherwise, in order to abate, postpone, or terminate enforcement by Agent or Lenders of any of their rights, interests, and remedies under Loan Documents, at law or in equity. Borrower and Guarantor, and each of them, specifically, expressly and forever waive and relinquish any such right to legal or equitable relief to cause any such abatement, postponement or termination of enforcement proceedings. Borrower and Guarantors, and each of them, acknowledge, admit, confirm, and agree that Agent and Lenders have a legal right to exercise and enforce all of the rights and remedies of a creditor at law or in equity. Borrower and Guarantor agree and acknowledge that this Agreement and the Settlement Agreement are a consensual restructure of their respective pre-petition obligations owing to Agent and Lenders and that the pre-petition payments of principal and interest are being restructured in this Agreement and the Settlement Agreement.

5.      <u>Modification of Loan Documents</u>.

a.      <u>Revolving Commitment Reduction; Conversion to ABL</u>. Effective upon the date of this Agreement, the aggregate maximum principal amount of Lenders' Original Revolving Commitment shall be reduced to Five Million and no/100 dollars ($5,000,000.00) ("<u>New Revolving Commitment</u>"). Effective upon the date of this Agreement, any and all advances under the New Revolving Commitment will be disbursed and otherwise administered in accordance with, and subject to, the terms of the Credit Agreement and the other Loan Documents, as the same are modified by this Agreement and Annex A hereto. Borrower shall execute and deliver to Agent a new Revolving Note in the form of <u>Exhibit "A"</u> annexed hereto (the "<u>New Revolving Note</u>"), which shall be subject to, among other things, a borrowing base, and a sublimit of up to $1,000,00.00 for letters of credit and acceptances, all as set forth in Annex A. The New Revolving Note shall amend, restate, supersede and replace the existing Line A Notes and Line B Notes issued by Borrower to the Lenders and shall have a maturity date

## EXHIBIT 1, PAGE 20

of, and be due and payable in full on, the first day of the month following the third (3rd) anniversary date of the Effective Date. The New Revolving Note shall per interest at a per annum rate equal to one and three-quarters percent (1.75%) over the Wall Street Journal Prime Rate but in no event shall the interest rate be less than five percent (5%) nor more than nine percent (9%) per annum.

   b. <u>Conversion to Term Loans</u>.  The Indebtedness, less the New Revolving Commitment, shall, concurrently with the effectiveness of this Agreement, be converted to three (3) term loans, as follows:

   (1) One Million Three Hundred Seventy Thousand and No/100 Dollars ($1,370,000.00) in principal of Indebtedness shall be converted to a new term loan ("<u>Term Loan A</u>") and shall be required to be repaid by Borrower in monthly payments of interest only, and in full on the first day of the month following the third (3rd) anniversary of the Effective Date.  Borrower shall execute and deliver to Agent for the benefit of Lenders, a Term Note A in the form of <u>Exhibit "B"</u> hereto to evidence Term Loan A ("<u>Term Note A</u>").  Term Note A shall bear interest at a fixed rate per annum equal to five percent (5.00%).

   (2) One Million Six Hundred Twenty Thousand and No/100 Dollars ($1,620,000.00) in principal of Indebtedness shall be converted to second term loan ("<u>Term Loan B</u>"), and shall be required to be repaid by Borrower in monthly payments of interest only, and in full on the first day of the month following the third (3rd) anniversary of the Effective Date. Borrower shall execute and deliver to Agent for the benefit of Lenders a Term Note B in the form of <u>Exhibit "C"</u> hereto to evidence Term Loan B ("<u>Term Note B</u>").  Term Note B shall bear interest at a per annum rate equal to five percent (5.00%).

   (3) Five Million Nine Hundred Thousand and no/100 Dollars ($5,900,000.00) in principal of Indebtedness shall be converted to a third term loan ("<u>Term Loan C</u>"), which shall be repaid by Borrower in accordance with the terms of a new term note, payable to Agent for the benefit of Lenders, in the form of <u>Exhibit "D"</u> hereto ("<u>Term Note C</u>").  Term Note C shall bear interest at a fixed rate equal to five percent per annum (5.00%), and provide for monthly payments of interest, plus a separate mandatory principal payment in the approximate amount of $1,500,000.00 on or before March 31, 2012 ("<u>Mandatory Term Note C Principal Reduction</u>"), conditioned upon Borrower's actual receipt of such payment from the purchaser ("<u>Nantong Purchaser</u>") under the Nantong Stock Purchase Agreement ("<u>Stock Purchase Agreement</u>"). The amount of the Mandatory Term Note C Principal Reduction payment is stated as being approximate in that it shall be based on the actual exchange rate for Chinese RMB to U.S. dollars in existence on the date of Borrower's receipt of the payment by the Nantong Purchaser of the Mandatory Term Note C Principal Reductions payment under the Nantong Stock Purchase Agreement. The requirement to make the Mandatory Term Note C Principal Reduction payment shall be in addition to any other payments referenced herein.  Term Note C shall mature on, and any unpaid amounts thereunder shall be all due and payable in full on,  the first day of the month following the third (3rd) anniversary of the Effective Date.  Debtors shall file a motion to obtain BK Court approval of the Stock Purchase Agreement with relief requested consistent with the provisions of this Agreement, which motion may be heard by the BK Court on a shortened time basis, and shall not be opposed by Agent or Lenders so long as (i) this Agreement is approved concurrently therewith as a compromise and as post-petition financing and (ii) Agent and Lenders receive such executed pledge agreements and related documentation,

# EXHIBIT 1, PAGE 21

in form and substance satisfactory to Agent, Lenders and their respective counsel as Agent and Lenders may require.

(4)    All of the Indebtedness shall be secured by (x) the personal property described in the Security Agreement; and (y) a pledge of thirty percent (30%) of the issued and outstanding shares of Nantong Trade Union Aluminum Company, aka Mao Lien Aluminum, a _____, and Nantong Trade Union Chrome Plating Company, a _____ ("Foreign Affiliate"), documented in accordance with the laws of the State of California and the People's Republic of China and an assignment of all rights, title, and interest in the Stock Purchase Agreement between Trade Union and Ya Huey Kuo, which may be enforced directly by Agent in the event of any defaults thereunder; and (y) a pledge of one hundred percent (100%) of the issued and outstanding shares of Ju Rong Trade Union Auto Parts Co., Ltd., a _____ ("Ju Rong Company") and the approximately 20 acres of vacant land in Ju Rong, Jiang Su Province, China ("Ju Rong Land") owned by the Ju Rong Company, documented in accordance with the laws of the State of California and the People's Republic of China; provided, however, that Agent is satisfied with the value of such shares; and further subject to Agent obtaining, in its discretion, an opinion of reputable legal counsel licensed in the People's Republic of China as to the enforceability and validity of such pledge and liens and that all actions necessary for Agent to obtain a valid, perfected, and enforceable security interest in such shares have been taken.  Agent and Lenders may elect, in their sole discretion, to close the transactions contemplated by this Agreement and the Settlement Agreement without having obtained the stock pledges contemplated above due to delay, or any other reason;  provided, however, that Agent and Lenders may require the execution and delivery of such stock pledges as a post-closing condition subsequent to the effectiveness of this Agreement.  Lenders hereby acknowledge and agree that Lenders' delay and/or inability to perfect any lien on the real and personal property described in this Section 5.b(4) shall not constitute an Event of Default under this Agreement or the Loan Documents, provided Lenders' dinability to perfect is not caused by an act, or failure to act, on the part of Borrower and Guarantor, or either of them.

(5)    As an inducement to Agent and Lenders to enter into this Agreement, each Guarantor hereby (i) consents to this Agreement, Annex A hereto, and each and every term, covenant, and condition hereof or thereof and (ii) confirms that any and all obligations of Borrower to Guarantor, and each of them, shall remain subordinate and subject to, and of lesser priority than, any and all Indebtedness and any other obligations of Borrower to Lenders, as the same may be modified by this Agreement, Annex A hereto and/or any Additional Loan Documents (as herein defined).

c.    Restrictions on Investments.  Section 7.02 of the Credit Agreement is hereby amended in full to read as follows:

"7.02  Investments.  Make any Investments without the prior written consent of the Lenders."

d.    Amendment and Restatement of Existing Guaranties.  Each of the Original Guarantees, and the Amended and Restated Guaranty, executed by the Trust and by W. Chang and M. Chang, shall be amended and restated in their respective entireties, in the form of Exhibit "E" annexed hereto (the "Second Amended and Restated Unsecured Guaranty").  The

# EXHIBIT 1, PAGE 22

Second Amended and Restated Unsecured Guaranty shall be unsecured, and shall be in addition to, and not in lieu of, the New Secured Guaranties described in Section 6.d hereof.

  e. <u>Modification of the Montclair Deed of Trust</u>.  The Montclair Deed of Trust is hereby modified as follows:

  1. The description of the obligations secured by the Montclair Deed of Trust, appearing on page one of the Montclair Deed of Trust, is hereby amended in full to read as follows:

    "THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PERFORMANCE OF A GUARANTY DATED AUGUST __, 2011 FROM TRUSTOR TO LENDER AND DOES NOT DIRECTLY SECURE THE OBLIGATIONS DUE LENDER UNDER THE NOTE, AND (B) PERFORMANCE OF ALL OBLIGATIONS UNDER THE DEED OF TRUST.  THIS DEED OF TRUST IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:"

  2. The definition of "Note" is hereby amended in full to read as follows:

    "Note.  The word 'Note' means that  certain Term Note A in the original principal amount of $1,370,000.00 and that certain Term Note B in the original principal amount of $1,620,000.00, each dated August __, 2011 and executed by Borrower, together with all renewals, extensions, modifications refinancings and substitutions of the Note."

  f. <u>Modification of the Crystal Ridge Deed of Trust</u>.  The Crystal Ridge Deed of Trust is hereby modified as follows:

  1. The description of the obligations secured by the Crystal Ridge Deed of Trust, appearing at the bottom of page one of the Crystal Ridge Deed of Trust is hereby amended by deleting clause (B) therefrom.

  2. The definition of "Note" is hereby amended in full to read as follows:

    "Note.  The word 'Note' means that  certain Term Note A in the original principal amount of $1,370,000.00, and that certain Term Note B in the original principal amount of $1,620,000.00, each dated August __, 2011 and executed by Borrower, together with all renewals, extensions, modifications refinancings and substitutions of the Note."

 5. <u>Conditions Precedent</u>.  Any and all obligations of Agent and Lenders hereunder are subject to the full and timely satisfaction of each of the following express and continuing conditions, to the satisfaction of Agent in the exercise of its sole and absolute opinion and judgment:

**EXHIBIT 1, PAGE 23**

a.      Borrower shall execute to and in favor of Agent the New Revolving Note, Term Note A, Term Note B and Term Note C, each in form and content identical to that attached hereto as Exhibits "A", "B", "C" and "D", respectively, and deliver the same to Agent concurrently herewith (Term Note A, Term Note B and Term Note C are herein collectively the "New Term Notes", and the New Term Notes together with the New Revolving Note are herein collectively, the "New Notes").

b.      Borrower shall pay to Agent for the benefit of Lenders the sum of Two Million Four Hundred Twenty Seven Thousand and no/100 Dollars ($2,427,000.00) immediately available good funds, which shall be applied to the Indebtedness, as determined by Lenders, in their sole discretion and judgment.

c.      Guarantor shall execute and deliver to Agent, for the benefit of Agent, L/C Issuer and Lenders, the Second Amended and Restated Unsecured Guaranty.

d.      Each Guarantor shall execute and deliver to Agent, for the benefit of Agent, L/C Issuer and Lenders, new guaranties of Term Note A and Term Note B, which guaranties shall be secured by the existing Montclair Deed of Trust and the Crystal Ridge Deed of Trust, respectively, as modified herein (the "New Secured Guaranties").  The New Secured Guaranties shall be in the form of Exhibits "F-1" and "F-2" annexed hereto.

e.      Pledge agreements pursuant to which the Guarantors shall pledge their interest in the entity described in Section 5 b(4) hereof, together with stock powers executed in blank, the original stock certificates (if in certificated form), and, in Agent's discretion, an opinion of legal counsel licensed to practice in California and an opinion of reputable legal counsel licensed in the People's Republic of China confirming that the pledges of such stock are valid and enforceable, and such other documents relating to the pledges as Agent, or Agent's counsel may require.

f.      Borrower shall furnish to Agent  one or more agreements duly executed by the Subordinators, reaffirming the subordinate nature of the obligations of Borrower to such Subordinator, and evidencing such Subordinator's consent to the extension and modifications contained herein, which reaffirmation and consent shall be in form and content satisfactory to Agent, in its sole opinion and judgment.

g.      Borrower shall pay all interest accrued on the Loans (together with payments of outstanding principal, if applicable), pursuant to and in accordance with the Term Note A, Term Note B, Term Note C and the New Revolving Note.

h.      A Memorandum of Modification executed by the Trust with respect to the Montclair Property, in the form of Exhibit "G" annexed hereto, and a Memorandum of Modification executed by W. Chang and M. Chang with respect to the Crystal Ridge Property, in the form of Exhibit "H" annexed hereto, referencing the modifications to the Montclair Deed of Trust and the Crystal Ridge Deed of Trust, respectively, made in Sections 5. e and f hereof.

i.      At Borrower's or Guarantor's expense, such new policies or endorsements to Lenders' policy of title insurance insuring the lien(s) of the Montclair Deed of Trust, the Crystal Ridge Deed of Trust, which endorsements will provide, in substance, that the priority of

**EXHIBIT 1, PAGE 24**

such Deeds of Trust are unaffected by this Agreement, and such other endorsements as Agent deems appropriate, in its sole and absolute opinion and judgment;

j.      Borrower shall pay to Agent all of amounts owed under the provisions of Section 14.h(1), which amounts shall be added to the principal balance of Term Loan C and Term Note C;

k.      Borrower and/or Guarantor shall, prior to the execution of this Agreement have provided Agent such resolutions and/or other authorizations of Borrower and/or Guarantor and/or their authorized officers, managers, members or partners, as applicable, evidencing approval and authorization of the transactions contemplated hereunder and the documents and instruments to be executed by Borrower in connection herewith, including, without limitation, (1) a Trust Certificate for the Trust, and (2) such documents and agreements to establish, maintain and administer the Dominion Account (as defined in Annex A) as Agent may require.

l.      The United States Bankruptcy Court in the BK Cases shall have entered its order ("Order"), which Order shall be in a form and substance satisfactory to Agent and Lenders in the exercise of their sole opinion and judgment, approving this Agreement and the companion Settlement Agreement as compromises of controversies and as cash collateral agreements under 11 U.S.C. Section 363, and Federal Rules of Bankruptcy Procedure 4001 and 9019, and fourteen (14) days shall have elapsed since the entry of the Order without it being subject of a stay pending appeal. Borrower shall immediately file their motions for approval of this Agreement and the Settlement Agreement and to modify the existing cash collateral orders.

m.      In addition to the opinions described in Section 5.b (4), such opinion(s) of counsel as Agent may require, in form and substance reasonably satisfactory to Agent.

n.      A reaffirmation of the Subordination Agreements referenced in Recital H.

o.      Guarantor shall have delivered to Agent and Lenders: (i) current (i.e., no more than 6 months old) personal financial statements and (ii) signed federal income tax returns (including all schedules and attachments thereto) for the two (2) prior tax years. If Guarantor has obtained an extension for filing either or both such tax years, Guarantor shall provide copies of such extension(s).

p.      Borrower shall execute and deliver to Agent Annex A attached hereto and shall initial each page thereof.

The documents described in subsections a, c, d, e, f, h, k, n and p are herein the "Additional Loan Documents". Upon the effectiveness of this Agreement, the Additional Loan Documents and the Loan Documents shall collectively be the "Loan Documents".

6.      Representations and Warranties. Borrower and Guarantor, and each of them, represent and warrant to Agent and Lenders, and acknowledge that Agent and Lenders are relying thereon, as follows:

a.      This Agreement constitutes legal, valid, and binding obligations of Borrower and Guarantor, and each of them, to Lenders;

# EXHIBIT 1, PAGE 25

b.    Except for the BK Cases, there are no actions, suits, or proceedings pending or, to the knowledge of Borrower or Guarantor, threatened against or affecting Borrower and Guarantor, in relation to their obligations to Lenders, or involving the validity or enforceability of this Agreement, the Loan Documents, the ability of any of them to perform their obligations to Lenders under the Loan Documents or this Agreement or the priority of any liens thereof, at law or in equity, or before or by any governmental entity;

c.    This Agreement and the releases contained herein are intended to be final and binding among the parties hereto, and Agent and Lenders may expressly rely on the finality of this Agreement as a substantial, material factor inducing that party's execution of this Agreement;

d.    Except as acknowledged by Borrower or Guarantor herein, no event has occurred or is continuing that constitutes a default of this Agreement or a further default under the Loan Documents or that would constitute a default but for the requirement that notice be given or time elapse, or both;

e.    Each Borrower is a California corporation, in good standing and duly organized and existing under the laws of the State of California.  Each person executing this Agreement and the documents and instruments executed in connection with the Agreement in a representative capacity has been duly authorized to execute said documents and instruments by all appropriate action and is empowered to do so;

f.    Agent's and Lenders' liens upon and security interests in all of the security for the obligations evidenced by the Loan Documents are valid, perfected and are not subject to avoidance, elimination or reduction in any manner whatsoever;

g.    All of the obligations under the Loan Documents were, are, and shall remain secured by all of the Borrower' personal property, which such liens are valid and perfected, including, without limitation, all such security interests as created, modified or amended herein or by any of the Additional Loan Documents; and

h.    The representations, warranties and agreements set forth herein shall be cumulative and in addition to any and all other representations, warranties and agreements which Borrower or Guarantor gives or causes to be given to Agent and Lenders, either now or hereafter.

7.    <u>Additional Covenants</u>.

a.    <u>Sale of Berendo Property</u>.  Guarantor agrees that by December 31, 2011, (i) Guarantor shall sell the real property located at 684 and 690 S. Berendo Street, Los Angeles, California (collectively, the "<u>Berendo Property</u>") and (ii) Guarantor shall pay over to Agent for the benefit of Lenders, the Net Proceeds of the sale of and hereby irrevocably assigns all Net Proceeds to Agent of the benefit of Lenders, to be applied to reduce the balance of Term Note C (in addition to any other payments to be made to reduce the amounts owed under such obligation).  As used herein, "<u>Net Proceeds</u>" shall mean the gross sales price less normal and customary closing costs including commissions, property taxes and deeds of trust to third party lenders existing as of the date of this Agreement (but in no event shall any commission be paid to the Guarantor or any affiliate or relative of any Guarantor).  Upon Agent's request, Guarantor

# EXHIBIT 1, PAGE 26

shall execute and deliver such instructions into any escrow opened in connection with the sale of the Berendo Property to ensure that the Net Proceeds shall be paid directly to Agent and such other documents as may be necessary to effectuate such payment to Agent.  The Net Proceeds shall be applied to the Indebtedness, as determined by Agent, in its sole discretion and judgment.

      b.    <u>Existing Financial Covenants</u>.  It is further agreed that the financial covenants contained in Section 6.12 of the Credit Agreement shall be of no force and effect.

      c.    <u>Salaries and Benefits</u>.  Borrower covenants and agrees that they and any and all affiliated companies and other entities shall not pay salaries (including benefits) or any other form of compensation, whether in the form of distributions, bonuses or otherwise, in excess of the amount of insider compensation previously approved by the BK Court (the "<u>BK Compensation Amount</u>") per annum in the aggregate for the following directors, shareholders, employees, officers and the members of their respective families: Guarantor (collectively, the "<u>Identified Persons</u>");  provided, however, that the annual compensation for Guarantors and their two (2) children employed by Borrower may be increased by the aggregate sum of $70,000.00 per fiscal year for the prior fiscal year, when and if the Borrower's net profit before taxes resulting from operations exceeds the sum of $150,000.000 on a fiscal year end basis, calculated in accordance with accrual accounting methods under GAAP ("<u>Profitability Benchmark</u>").  Agent and Lenders agree that following any year in which the Profitability Benchmark is achieved, Agent and Lenders will consider increasing the BK Compensation Amount, but any such increase shall be in Agent's and Lenders' sole and absolute discretion.  It is agreed that in calculating the Profitability Benchmark, only net profits before taxes that are derived from Borrower's operations may be included, and the proceeds of extraordinary events shall not be included.

      d.    <u>No Payment of Excess Compensation or Personal Expenses</u>.  Borrower covenants and agrees that no compensation in excess of the amount  set forth above shall be paid to the Identified Persons and further agrees and covenants that Borrower shall not pay or reimburse any personal or household expenses of any Identified Persons, including without limitation any amounts paid or loaned by Identified Persons previously with regard to the BK Cases.

     8.    <u>This Agreement One of the Loan Documents</u>.  From and after the Effective Date, this Agreement, the New Revolving Note, the New Term Notes, and any other documents and instruments executed in connection herewith shall each constitute one of the "Loan Documents."

     9.    <u>No Further Commitments; Assumption of Risks</u>.  Borrower and Guarantor, and each of them, agree and acknowledge that, except as expressly set forth herein,  Lenders have no obligation to advance, provide or loan any further or additional monies or credit to Borrower and Guarantor, or any of them, in excess of the amounts set forth in the New Term Notes and New Revolving Note, or to increase such amounts for any reason, or to extend the respective maturity dates thereof.  Borrower and Guarantor, and each of them, further agree and acknowledge that Lenders have no obligation to further extend the time for payment of any obligations owing to or arising in favor of Lenders by Borrower and Guarantor, and each of them, under the Loan Documents.  Borrower and Guarantor acknowledge and assume the risk that no further extensions, modifications, concessions or other indulgences will be made or granted by Agent or Lenders.

# EXHIBIT 1, PAGE 27

10.    <u>Cross-default</u>.

a.    Borrower and Guarantor each agree that the following shall be deemed an "<u>Event of Default</u>" under the Loan Documents, as amended hereby:

(i)    Failure of Borrower or Guarantor, or any of them, to pay when due any payment required to be paid pursuant to this Agreement, the Loan Documents, or the Additional Loan Documents or any other document or agreement between Agent or any Lender and Borrower or Guarantor, regardless of whether relating to the credit facilities described herein (collectively, the "<u>Other Obligations</u>");  and/or

(ii)    Any failure or default by Borrower or Guarantor, or any of them, in the performance of any term, condition, covenant, or agreement contained in this Agreement, the Loan Documents, any Additional Loan Document or the Other Obligations; and/or

(iii)    Any default under the Settlement Agreement.

b.    Upon the occurrence of any Event of Default, Borrower shall have five (5) business days from the date of a written notice by Agent to Borrower of the existence thereof to cure such Event of Default before Agent or Lenders exercise any rights or remedies; <u>provided, however</u>, that any and all sweeps and/or applications of funds from any all accounts shall continue to occur during such periods, and Agent and Lenders shall be under no obligation to advance any funds under the Revolving Loan during such periods in the event of any default in any obligation to make any payment.

c.    In addition to each and every other remedy available to Agent under Loan Documents and pursuant to applicable law, if an Event of Default exists, Agent may in its discretion do any one or more of the following from time to time:

(i)    declare any Obligations immediately due and payable, whereupon they shall be due and payable without diligence, presentment, demand, protest or notice of any kind, all of which are hereby waived by Borrowers to the fullest extent permitted by law;

(ii)    terminate, reduce, or condition any Commitment, and/or make any adjustment to the Borrowing Base; and

(iii)    require Borrower to Cash Collateralize LC Obligations and other Obligations that are contingent or not yet due and payable, and, if Borrower fails promptly to deposit such Cash Collateral, Agent may (but is not obligated to) advance the required Cash Collateral as Revolving Loans (whether or not an Overadvance exists or is created thereby, or the conditions in Section 3 are satisfied).

11.    <u>No Joint Venture, Management and Control</u>.  Notwithstanding any provision of this Agreement, any Additional Loan Documents, and/or of any of the Loan Documents:

a.    Lenders and Agent are not and shall not be construed to be a partner, joint venturer, alter ego, manager, controlling person or other business associate or participant of any kind of Borrower and Guarantor, or any of them, or any other person;

**EXHIBIT 1, PAGE 28**

b.      Lenders and Agent shall not be deemed responsible to perform or participate in any acts, omissions, or decisions of Borrower and Guarantor, or any of them; and

c.      With respect to the Allegations, Borrower and Guarantor, and each of them, agree and acknowledge that any and all such claims arising from, in connection with or relating to the Allegations shall, in accordance with Section 13, be released upon the execution of this Agreement.

12.     Release of Lenders, Agent and L/C Issuer.  Borrower and Guarantor, and each of them, hereby confirm and reaffirm the releases set forth in Section 5 of the Settlement Agreement of even date herewith.

13.     Miscellaneous.

a.      This Agreement is not a novation, nor is it to be construed as a release or modification of any of the terms, conditions, warranties, waivers, or rights set forth in the Loan Documents, except as set forth herein.

b.      The execution and delivery by Borrower and Guarantor of this Agreement and the performance by Borrower and Guarantor of all of their obligations hereunder and thereunder have been duly authorized by all necessary action and do not and will not:

(1)      Require any consent or approval not heretofore obtained of any other person holding any interest or entitled to receive any interest issued or to be issued by Borrower, or otherwise (other than such approvals as are required by the Court in the BK Cases);

(2)      Result in or require the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest, claim, charge, right of others or any encumbrance of any nature (other than under this Agreement or the Loan Documents) upon or with respect to any property now owned or leased or hereafter acquired by Borrower or Guarantor;

(3)      Violate any provision of any laws, or of any order, writ, judgment, injunction, decree, determination or award; and

(4)      Result in a breach of or constitute a default under, cause or permit the acceleration of any obligation owed under, or require any consent under any indenture or loan or credit agreement or any other agreement, lease or instrument to which Borrower or Guarantor are a party or by which any of their property is bound or affected.

c.      Borrower and Guarantor, and each of them, further represent and warrant as follows:

(1)      They have received independent legal advice from attorneys of each of their choice with respect to the advisability of executing this Agreement and prior to the execution of this Agreement by Borrower and Guarantor, their attorneys reviewed this Agreement and discussed the Agreement with them and have made all desired changes;

**EXHIBIT 1, PAGE 29**

(2)    Except as expressly stated in this Agreement, neither the Lenders nor the Agent, nor any other person or entity, has made any statement or representation to Borrower or Guarantor regarding facts relied upon by any of them;

(3)    Borrower and Guarantor, and each of them, do not rely upon any statement, representation or promise of Lenders and/or Agent or any other person or entity in executing this Agreement except as expressly stated in this Agreement;

(4)    The terms of this Agreement are contractual and not a mere recital;

(5)    This Agreement has been carefully read by, the contents hereof are known and understood by, and it is signed freely by Borrower and Guarantor, and each of them; and

(6)    This Agreement and the releases contained herein are intended to be final and binding against Borrower and Guarantor, and each of them, and each of them acknowledge that Lenders and Agent are expressly relying on the finality of this Agreement as a substantial, material factor inducing Lenders' execution of this Agreement.  Borrower and Guarantor, and each of them, have the full right and authority to enter into this Agreement, and (i) the officer, agent or other representative executing this Agreement on behalf of Borrower has the full right and authority to fully commit and bind Borrower to this Agreement, and (ii) the officer, trustee, agent or other representative executing this Agreement on behalf of Guarantor has the full right and authority to fully commit and bind Guarantor to this Agreement.

d.    Survival of Warranties.  All agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement.

e.    Failure or Indulgence Not Waiver.  No failure or delay on the part of Agent and/or Lenders in the exercise of any right, power, or privilege hereunder or under the documents or instruments referred to herein shall operate as a waiver thereof, and no single or partial exercise of any such power, right, or privilege shall preclude a further exercise of any right, power, or privilege.

f.    Applicable Law.  This Agreement, any Additional Loan Documents, the Loan Documents and the rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of the State of California.  Borrower and Guarantor, and each of them, hereby submit to the jurisdiction of the courts of Los Angeles County, California, whether state or federal.

g.    Assignability.  This Agreement shall be binding upon and inure to the benefit of Lenders, Agent, L/C Issuer, Borrower and Guarantor and their respective successors and assigns, except that Borrower's and Guarantor's rights hereunder are not assignable without the prior written consent of Lenders, which consent Lenders may give or withhold in their sole and absolute opinion and judgment.

h.    Expenses and Fees.

# EXHIBIT 1, PAGE 30

(1)    Borrower and Guarantor, and each of them, shall reimburse Agent, L/C Issuer and/or Lenders for any and all fees, costs and expenses incurred by Agent, L/C Issuer and/or Lenders, including, but not limited to attorneys' fees, in connection with the negotiation, preparation and administration of this Agreement and any Additional Loan Documents as hereinbefore provided for in this Agreement, by adding the amounts thereof to the principal balance of Term Loan C and Term Note C.

(2)    In the event that Agent, L/C Issuer and/or Lenders employ attorneys to remedy, prevent, or obtain relief from a breach or default of this Agreement, any of the Additional Loan Documents, or any of the Loan Documents, arising out of a breach or default of this Agreement, any of the Additional Loan Documents, or any of the Loan Documents, or in connection with or contesting the validity of this Agreement, any of the Additional Loan Documents, any of the Loan Documents, any of the terms, covenants, provisions, and all conditions hereof or thereof, or any of the matters referred to herein or therein or in connection with any Bankruptcy or Judicial Action, Agent, L/C Issuer and/or Lenders shall be entitled to be reimbursed by Borrower and Guarantor for all of their attorneys' fees, whether or not suit is filed and including, without limitation, those incurred in each and every action, suit, or proceeding, including any and all appeals and petitions therefrom and all fees and costs incurred by Agent, L/C Issuer and/or Lenders.

i.    <u>Modifications and Amendments</u>.  This Agreement may be modified or amended only by written agreement duly executed by the parties to this Agreement.

j.    <u>Integration</u>.  This Agreement, the Loan Documents, and any Additional Loan Documents constitute a single, integrated written contract expressing the entire agreement of the parties hereto relative to the subject matter hereof.   No covenants, agreements, representations, or warranties of any kind whatsoever have been made by any party hereto with respect to the subject matter hereof, except as specifically set forth in this Agreement and the Additional Loan Documents.

k.    <u>Severability</u>.  If any provision of this Agreement is found to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Agreement, such provisions shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision never comprised a part of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by severance from this Agreement.

l.    <u>Acknowledgment of Waiver</u>.  The parties represent and warrant that all of the waivers, warranties, and promises set forth in this Agreement are made after an opportunity to consult with legal counsel of their choosing and with an understanding of their significance and consequence and that they are reasonable.

m.    <u>Time of Essence</u>.  The parties hereto expressly acknowledge and agree that time is of the essence including, without limitation, all deadlines and time periods provided for under this Agreement.

# EXHIBIT 1, PAGE 31

n.    <u>Execution in Counterpart</u>.  This Agreement may be executed and delivered in two or more counterparts, each of which when so executed and delivered, shall be either an original, or a copy of the original signature transmitted via facsimile, and such counterparts together shall constitute but one and the same instrument and agreement, and the Agreement shall not be binding on any party until all parties have executed it.  Copies of the original signatures on this Agreement which are transmitted via facsimile shall have the same force and legal effect as original signatures, and a facsimile signature shall be accepted by all parties as an original signature.  Original signatures shall be provided following submission of fax signatures, but the failure to do so shall not impact on the effectiveness of this Agreement.

o.    <u>Conflict</u>.  To the extent that any term, provision or condition of the Credit Agreement, the New Notes, and/or any of the other Loan Documents conflict with this Agreement or the New Notes, the term, provision or condition of this Agreement and the New Notes shall control.

p.    <u>Notices</u>.  Any notice required to be given hereunder shall be given at the address set forth across from the signature of each party hereto.  Any notice given by U.S. mail shall be deemed given no earlier than five (5) business days after placed in the U.S. mail and properly addressed with postage fully prepaid; any notice given by messenger or hand delivery, upon delivery; and any notice by overnight mail service such as FedEx, upon delivery.  Each party to this Agreement agrees to keep every other party advised as to such party's current address.

14.    <u>WAIVER OF RIGHT TO TRIAL BY JURY; JUDICIAL REFERENCE IN THE EVENT OF JURY TRIAL WAIVER UNENFORCEABILITY</u>.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (1) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (2) IN ANY WAY CONNECTED WITH, OR RELATED OR INCIDENTAL TO, THE DEALINGS OF THE PARTIES HERETO, OR ANY OF THEM, WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY.  NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, EACH PARTY HERETO HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE.  PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE, AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE.  IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT TO HEAR ANY DISPUTES

# EXHIBIT 1, PAGE 32

HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL.  EACH PARTY ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER AND THE AGREEMENTS CONTAINED HEREIN.  THE PARTIES HERETO HEREBY AGREE THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARM'S-LENGTH BASIS, WITH BOTH SIDES AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE THEIR RESPECTIVE LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN.  ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY AND THE AGREEMENTS CONTAINED HEREIN REGARDING THE APPLICATION OF JUDICIAL REFERENCE IN THE EVENT OF THE INVALIDITY OF SUCH JURY TRIAL WAIVER. THE PARTIES INITIAL BELOW TO ACKNOWLEDGE THEIR UNDERSTANDING AND ACCEPTANCE OF THIS SECTION.

| _____ | _____ | _____ |
|:---:|:---:|:---:|
| Trade Union | Duck House | W. Chang |
| _____ | _____ | _____ |
| M. Chang | Trust | Agent |
| _____ | _____ | |
| Cathay as Lender and LC/Issuer | Chinatrust | |

*[Signature Page Follows]*

20

**EXHIBIT 1, PAGE 33**

**IN WITNESS WHEREOF**, the parties hereto have approved and executed this Agreement as of the date and year first written above.

**BORROWER:**

TRADE UNION INTERNATIONAL, INC.,   Address:   _____
a California  corporation                        _____
                                                 _____
                                       Attn: _____
By: _____
Name: _____     Telephone No.: _____
Its: _____      Facsimile No.: _____


DUCK HOUSE, INC.,                  Address:   _____
a California corporation                       _____
                                               _____
                                       Attn: _____
By: _____
Name: _____     Telephone No.: _____
Its: _____      Facsimile No.: _____


**[Signatures continue on following pages]**

**GUARANTOR:**

Address: _____

_____ _____
WEN PIN CHANG,                          Attn: _____
an individual                               Telephone No.: _____
                                       Facsimile No.: _____


_____ Address: _____
MEI LIEN CHANG,                         _____
an individual                               Attn: _____
                                       Telephone No.: _____
                                       Facsimile No.: _____


_____ Address: _____
WEN PING CHANG, Trustee                 _____
of the Chang Revocable Trust            _____
u/t/a September 20, 1996                Attn: _____

                                       Telephone No.: _____
                                       Facsimile No.: _____


_____ Address: _____
MEI LIEN CHANG, Trustee                 _____
of the Chang Revocable Trust            _____
u/t/a September 20, 1996                Attn: _____

                                       Telephone No.: _____
                                       Facsimile No.: _____


**[Signatures continue on following page]**


838291.9                                   22

# EXHIBIT 1, PAGE 35

**LENDERS:**

CATHAY BANK,                                    Address:        9650 Flair Drive
a California banking corporation                               El Monte, CA  91731
                                               Telephone No.:  (626) 279-3288
                                               Facsimile No.:  (626) 279-3239

By: _____
        Gregory Badura
        Senior Vice President & Manager


CHINATRUST CAPITAL CORPORATION,                Address:        _____
a Delaware corporation
                                               Telephone No.:  _____
                                               Facsimile No.:  _____

By: _____
        Melvin O. Redford
        Executive Vice President


**AGENT AND L/C ISSUER**:

CATHAY BANK,                                    Address:        9650 Flair Drive
a California banking corporation                               El Monte, CA  91731
                                               Telephone No.:  (626) 279-3288
                                               Facsimile No.:  (626) 279-3239

By: _____
        Gregory Badura
        Senior Vice President

# EXHIBIT 1, PAGE 36

**DRAFT**

**7/22/11**

**EXHIBIT "A"**

NEW REVOLVING NOTE

[to be attached]

838291.9

**DRAFT**

**7/22/11**

## EXHIBIT "B"

TERM NOTE A

[to be attached]

**EXHIBIT 1, PAGE 38**

**DRAFT**

**7/22/11**

## EXHIBIT "C"

TERM NOTE B

[to be attached]

838291.9

**DRAFT**

**7/22/11**

**EXHIBIT "D"**

TERM NOTE C


[to be attached]

# EXHIBIT 1, PAGE 40

**DRAFT**

**7/22/11**

**EXHIBIT "E"**

SECOND AMENDED AND RESTATED UNSECURED GUARANTY

[to be attached]

838291.9

**EXHIBIT 1, PAGE 41**

**DRAFT**

7/22/11

**EXHIBIT "F-1"**

NEW SECURED GUARANTY

[to be attached]

838291.9

# EXHIBIT 1, PAGE 42

**DRAFT**

**7/22/11**

**EXHIBIT "F-2"**

NEW SECURED GUARANTY


[to be attached]

838291.9

**DRAFT**

**7/22/11**

**EXHIBIT "G"**

MEMORANDUM OF MODIFICATION (MONTCLAIR PROPERTY)

[to be attached]

838291.9

**EXHIBIT 1, PAGE 44**

DRAFT
7/22/11

**EXHIBIT "H"**

MEMORANDUM OF MODIFICATION (CRYSTAL RIDGE PROPERTY)


[to be attached]

838291.9

# EXHIBIT 1, PAGE 45

**DRAFT**
7/22/11

### SCHEDULE ONE

INDEBTEDNESS

(calculated as of _____, 2011)

A.    TRADE UNION INTERNATIONAL INC.

| | |
|---|---|
| Principal | $_____ |
| Interest | $_____ |
| Late Charges | $_____ |
| Fees and Costs | $_____ |
| Legal Fees and Costs (Agent) | $_____ |
| Legal Fees and Costs (Cathay) | $_____ |
| Legal Fees and Costs (Chinatrust) | $_____ |

B.    DUCK HOUSE, INC.

| | |
|---|---|
| Principal | $_____ |
| Interest | $_____ |
| Late Charges | $_____ |
| Fees and Costs | $_____ |
| Legal Fees and Costs (Agent) | $_____ |
| Legal Fees and Costs (Cathay) | $_____ |
| Legal Fees and Costs (Chinatrust) | $_____ |

838291.9

## EXHIBIT 1, PAGE 46

# ANNEX A
## TO
## <u>TENTH MODIFICATION AND EXTENSION AGREEMENT</u>

From and after the Effective Date (as defined below), the terms and conditions of this Annex A shall be applicable to the Loans, Letters of Credit and Acceptances under the Existing Credit Agreement (as defined below).  To the extent that the terms hereof conflict with the Loan Documents (defined below), the terms of this Annex A shall control.

## SECTION 1.    DEFINITIONS; RULES OF CONSTRUCTION

**1.1.    <u>Definitions</u>**.  Any and all capitalized terms not defined herein shall have the meaning ascribed to them in the Tenth Modification and Extension Agreement and in the Existing Credit Agreement.  As used in this Annex A, the following terms have the meanings set forth below:

<u>Account</u>:  as defined in the UCC, including all rights to payment for goods sold or leased, or for services rendered.

<u>Account Debtor</u>:  a Person who is obligated under an Account, Chattel Paper (as defined in the UCC) or General Intangible (as defined in the UCC).

<u>Accounts Formula Amount</u>:  80% of the Value of Eligible Accounts.

<u>Affiliate</u>:  shall have the meaning set forth in the Existing Loan Agreement.

<u>Agent</u>:  CATHAY BANK, a California banking corporation, and its successors and assigns.

<u>Availability</u>:   the Borrowing Base minus the outstanding principal balance of all Revolving Loans, and the face amount of all Letters of Credit and Acceptances then outstanding.

<u>BK Court</u>:  shall have the meaning set forth in the Tenth Modification and Extension Agreement.

<u>Borrower</u>:   TRADE UNION INTERNATIONAL, INC., a California corporation, and DUCK HOUSE, INC., a California corporation.

<u>Borrowing Base</u>:  on any date of determination, an amount equal to the lesser of (a) the Revolving Commitment, <u>minus</u> the LC Reserve; or (b) the sum of the Accounts Formula Amount, <u>plus</u> the Inventory Amount.

<u>Borrowing Base Certificate</u>:  a certificate, in the form attached hereto as Exhibit "A", signed and certified by: the Chief Financial Officer(s) of the Borrower, or by W. Chang and M. Change in their respective capacities as corporate officers of the Borrower, by which such persons each certify the calculation of the Borrowing Base.

<u>Cash Collateral</u>:  cash, and any interest or other income earned thereon, that is delivered to Agent to Cash Collateralize any Obligations.

<u>Cash Collateral Account</u>:  a demand deposit, money market or other account maintained with Agent and subject to Agent's Liens.

838289.8                                         1                          **Borrower's Initials _____**

_____

# EXHIBIT 1, PAGE 47

Cash Collateralize:  the delivery of cash to Agent, as security for the payment of Obligations, in an amount equal to (a) with respect to LC Obligations, 105% of the aggregate LC Obligations, and (b) with respect to any inchoate, contingent or other Obligations, Agent's good faith and reasonable estimate of the amount due or to become due, including all fees and other amounts relating to such Obligations.  "Cash Collateralization" has a correlative meaning.

Collateral:  all Property described in any Loan Document as security for any Obligations, and all other Property that now or hereafter secures (or is intended to secure) any Obligations, and shall include, without limitation, all proceeds and products of any Collateral, further including, without limitation, all insurance proceeds of and recoveries under any policy of insurance covering any of the Collateral, including, without limitation, credit insurance with respect to any Account or the proceeds thereof.

Commitment Termination Date:  the earliest to occur of (a) the Revolving Termination Date; (b) the date on which Borrower terminates the Revolving Commitment pursuant to Section 2; or (c) the date on which the Revolving Commitment is terminated pursuant to Section 6 hereof.

Dollar or Dollars:  lawful money of the United States.

Dominion Account:  a special account established by Borrower at Agent, in which all operating proceeds are deposited, and over which Agent has exclusive control for withdrawal purposes.

Effective Date:  shall have the meaning set forth in the Tenth Modification and Extension Agreement.

Eligible Account:  an Account owing to Borrower that arises in the Ordinary Course of Business from the sale of goods, is payable in Dollars and is deemed by Agent, in its reasonable discretion, to be an Eligible Account.  Without limiting the foregoing, no Account shall be an Eligible Account if (a) it is unpaid for more than 90 days after the original due date, or more than 90 days after the original invoice date, provided, however, that for Trade Union only, during the months of January through June, it is unpaid for more than 120 days after the original invoice date; (b) 50% or more of the Accounts owing by the Account Debtor are not Eligible Accounts under the foregoing clause; (c) when aggregated with other Accounts owing by the Account Debtor, it exceeds 25% of the aggregate Eligible Accounts; (d) it does not conform with a covenant or representation herein; (e) it is owing by a creditor or supplier, or is otherwise subject to a potential offset, counterclaim, dispute, deduction, discount, recoupment, reserve, defense, chargeback, credit or allowance (but ineligibility shall be limited to the amount thereof); (f) an insolvency proceeding has been commenced by or against the Account Debtor; or the Account Debtor has failed, has suspended or ceased doing business, is liquidating, dissolving or winding up its affairs, or is not Solvent; (g) the Account Debtor is organized or has its principal offices or assets outside the United States or Canada; (h) it is owing by a Government Authority, unless the Account Debtor is the United States or any department, agency or instrumentality thereof and the Account has been assigned to Agent in compliance with the Assignment of Claims Act; (i) it is not subject to a duly perfected, first priority Lien in favor of Agent, or is subject to any other Lien; (j) the goods giving rise to it have not been delivered to and accepted by the Account Debtor, the services giving rise to it have not been accepted by the Account Debtor, or it otherwise does not represent a final sale; (k) it is evidenced by Chattel Paper or an Instrument of any kind, or has been reduced to judgment; (l) its payment has been extended, the Account Debtor has made a partial payment, or it arises from a sale on a cash-on-delivery basis; (m) it arises from a sale to an Affiliate, or from a sale on a bill-and-hold, guaranteed sale, sale-or-return, sale-on-approval, consignment, or other repurchase or return basis; (n) it represents a progress billing or retainage; (o) it includes a billing for interest, fees or late charges, but ineligibility shall be limited to the extent thereof; or (p) it arises from a retail sale to a person who is purchasing for personal, family or

household purposes.  In calculating delinquent portions of Accounts under clauses (a) and (b), credit balances more than 90 days old will be excluded.

Eligible In-Transit Inventory:  Inventory owned by Borrower that would be Eligible Inventory if it were not subject to a Document and in transit from a foreign location to a location of Borrower within the United States, and that Agent, in its reasonable discretion, deems to be Eligible In-Transit Inventory. Without limiting the foregoing, no Inventory shall be Eligible In-Transit Inventory unless it (a) is subject to a negotiable Document showing Agent (or, with the consent of Agent, Borrower) as consignee, which Document is in the possession of Agent or such other Person as Agent shall approve; (b) is fully insured in a manner satisfactory to Agent; (c) has been identified to the applicable sales contract and title has passed to Borrower; (d) is not sold by a vendor that has a right to reclaim, divert shipment of, repossess, stop delivery, claim any reservation of title or otherwise assert Lien rights against the Inventory, or with respect to whom Borrower is in default of any obligations; (e) is subject to purchase orders and other sale documentation satisfactory to Agent; (f) is shipped by a common carrier that is not affiliated with the vendor; and (g) is being handled by a customs broker, freight-forwarder or other handler that has delivered a lien waiver in form and substance satisfactory to Agent in Agent's sole discretion.

Eligible Inventory:  Inventory owned by Borrower that Agent, in its reasonable discretion, deems to be Eligible Inventory.  Without limiting the foregoing, no Inventory shall be Eligible Inventory unless it (a) is finished goods or raw materials, and not work-in-process, packaging or shipping materials, labels, samples, display items, bags, replacement parts or manufacturing supplies; (b) is not held on consignment, nor subject to any deposit or down payment; (c) is in new and saleable condition and is not damaged, defective, shopworn or otherwise unfit for sale; (d) is aged more than 365 days from the date received by Borrower, obsolete or unmerchantable, and does not constitute unsaleable, or returned, or repossessed goods; (e) meets all standards imposed by any Governmental Authority, and does not constitute hazardous materials under any environmental law or regulation; (f) conforms with the covenants and representations herein; (g) is subject to Agent's duly perfected, first priority Lien, and no other Lien; (h) is within the continental United States or Canada, is not in transit except between locations of Borrower, and is not consigned to any Person; (i) is not subject to any warehouse receipt or negotiable Document; (j) is not subject to any License or other arrangement that restricts Borrower's or Agent's right to dispose of such Inventory, unless Agent has received a legally sufficient Lien Waiver; and (k) is not located on leased premises or in the possession of a warehouseman, processor, repairman, mechanic, shipper, freight forwarder or other Person, unless the lessor or such Person has delivered a Lien Waiver or an appropriate rent and charges reserve has been established; and (l) is reflected in the details of a current perpetual inventory report.

Existing Credit Agreement means the Amended and Restated Credit Agreement dated as of June 29, 2007 between Borrower, Agent, and Lenders as amended to date, and as the same may hereafter be amended, supplemented and otherwise modified from time to time.

FLSA:  the Fair Labor Standards Act of 1938, as amended from time to time.

GAAP:  shall mean generally accepted accounting principles consistently applied.

Guarantor:  individually and collectively, Wen Pin Chang, an individual ("W. Chang"), Mei Lien Chang, an individual ("M. Chang"), and Wen Pin Chang and Mei Lien Chang, as Trustees of The Chang Revocable Trust u/t/a September 20, 1996 ("Trust"), and each other Person who guarantees payment or performance of any Obligations.

Inventory Amount:  40% of the Value of Eligible Inventory.

838289.8                                    3                    **Borrower's Initials _____**

Inventory Reserve:  reserves reasonably established by Agent to reflect factors that may negatively impact the Value of Inventory, including change in salability, obsolescence, seasonality, theft, shrinkage, imbalance, change in composition or mix, markdowns and vendor chargebacks.  Without limiting the generality of the foregoing, the Inventory Reserve shall include (i) an amount equal to all amounts attributable to landing and storage costs associated with Inventory, (ii) a three (3) month reserve for costs of the type described in clause (g) of the definition of Eligible In-Transit Inventory, and (iii) a three (3) month reserve for costs of the types referred to in clause (k) of the definition of Eligible Inventory.

LC Application:  an application by Borrower to Agent for issuance of a Letter of Credit, in form and substance reasonably satisfactory to L/C Issuer.

LC Conditions:  the following conditions necessary for issuance of a Letter of Credit:  (a) each of the conditions set forth in Section 3; (b) after giving effect to such issuance, total LC Obligations do not exceed the Letter of Credit Sublimit, no Overadvance exists and, if no Revolving Loans are outstanding, the LC Obligations do not exceed the Borrowing Base (without giving effect to the LC Reserve for purposes of this calculation); (c) the expiration date of such Letter of Credit is (i) no more than 120 days from issuance, in the case of documentary Letters of Credit, and (ii) prior to the Revolving Termination Date; (d) the Letter of Credit and payments thereunder are denominated in Dollars; and (e) the form of the proposed Letter of Credit is satisfactory to L/C Issuer in its discretion.

LC Documents:  all documents, instruments and agreements (including LC Requests and LC Applications) delivered by Borrower or any other Person to L/C Issuer in connection with issuance, amendment or renewal of, or payment under, any Letter of Credit.

LC Obligations:  the sum (without duplication) of (a) all amounts owing by Borrower for any drawings under Letters of Credit; (b) the stated amount of all outstanding Letters of Credit; (c) all fees and other amounts owing with respect to Letters of Credit; and (d) amounts owing in connection with Acceptances.

LC Request:  a request for issuance of a Letter of Credit, to be provided by Borrower, in form reasonably satisfactory to L/C Issuer.

LC Reserve:  the aggregate of all LC Obligations, other than those, if any, that have been Cash Collateralized.

Lender:  Individually and collectively, the Lenders set forth in the Existing Credit Agreement.

Letter of Credit:  any documentary letter of credit issued by L/C Issuer for the account of Borrower, or any indemnity, guarantee, exposure transmittal memorandum or similar form of credit support issued by L/C Issuer for the benefit of Borrower.

Letter of Credit Sublimit:  One Million and No/100 Dollars ($1,000,000.00), which may be used for Letters of Credit and Acceptances.

"License Rights" shall mean any rights under a license agreement held by Borrower pursuant to which Borrower is licensed to sell products in the United States that utilize certain specified names, trademarks, service marks, trade dress, copyrights, including word mark, logos, uniform designs, mascots, images, colors and color combinations, characters, symbols designs, likenesses and visual representations associated with and/or related to various professional sports agencies, such as (by way of example only) NFL Properties, LLC, Major League Baseball Properties, Inc. and NBA Properties, Inc.

"Licensor" shall mean any person or entity that has granted License Rights to Borrower with respect to the Collateral.

Lien:  any Person's interest in Property securing an obligation owed to, or a claim by, such Person, whether such interest is based on common law, statute or contract, including liens, security interests, pledges, hypothecations, statutory trusts, reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting Property.

Lien Waiver:  an agreement, in a legally sufficient form and substance, by which (a) for any material Collateral located on leased premises, the lessor waives or subordinates any Lien it may have on the Collateral, and agrees to permit Agent to enter upon the premises and remove the Collateral or to use the premises to store or dispose of the Collateral; (b) for any Collateral held by a warehouseman, processor, shipper, customs broker or freight forwarder, such Person waives or subordinates any Lien it may have on the Collateral, agrees to hold any Documents in its possession relating to the Collateral as agent for Agent, and agrees to deliver the Collateral to Agent upon request; (c) for any Collateral held by a repairman, mechanic or bailee, such Person acknowledges Agent's Lien, waives or subordinates any Lien it may have on the Collateral, and agrees to deliver the Collateral to Agent upon request; and (d) for any Collateral subject to a Licensor's Intellectual Property rights or License Rights, the Licensor grants to Agent the right, vis-à-vis such Licensor, to enforce Agent's Liens with respect to the Collateral, including the right to dispose of or liquidate it with the benefit of the Intellectual Property, and without such Licensor's further approval or consent, whether or not a default exists under any applicable License Rights.

Loan:  a Revolving Loan or any Term Loan.

Loan Documents:  has the meaning set forth in the Tenth Modification and Extension Agreement to which this Annex A is attached and incorporated by reference therein.

Obligations:  all (a) principal of and premium, if any, on the Loans, (b) LC Obligations and other obligations of Obligors with respect to Letters of Credit, (c) interest, expenses, fees and other sums payable by Obligors under Loan Documents, (d) obligations of Obligors under any indemnity for any claims of any nature, (e) all costs, expenses or advances that Lenders and Agent may incur during a default or Event of Default, or during the pendency of an insolvency proceeding of an Obligor, and (f) all other debts, obligations and liabilities of any kind owing by any Obligor to Agent and Lenders, whether now existing or hereafter arising, whether evidenced by a note or other writing, whether allowed in any insolvency proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, or joint or several.

Obligor:  Borrower, each Guarantor, and each other Person that is liable for payment of any Obligations or that has granted a Lien in favor of Agent and Lenders on its assets to secure any Obligations.

Ordinary Course of Business:  the ordinary course of business of Borrower, consistent with customary and usual industry practices and undertaken in good faith.

Payment Item:  each check, draft or other item of payment payable to Borrower, including those constituting proceeds of any Collateral.

Person:  any individual, corporation, limited liability company, partnership, joint venture, joint stock company, land trust, business trust, unincorporated organization, Governmental Authority or other entity.

Property:  any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

Revolving Commitment:  Agent's and Lender's obligations, subject to the terms of this Annex A and the other Loan Documents, to make Revolving Loans and L/C Issuer's obligation to issue Letters of Credit and Acceptances in an amount up to Five Million and No/100 Dollars ($5,000,000.00) in the aggregate at any time outstanding.

Revolving Loan:  loans and advances outstanding under the Existing Credit Agreement and the other Loan Documents and converted to "Revolving Loans" pursuant to the Tenth Modification Agreement and all loans made pursuant to Section 2.1.

Revolving Termination Date:  means the third anniversary of the Effective Date.

Solvent:  as to any Person, such Person (a) owns Property whose fair salable value is greater than the amount required to pay all of its debts (including contingent, subordinated, unmatured and unliquidated liabilities); (b) owns Property whose present fair salable value (as defined below) is greater than the probable total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities) of such Person as they become absolute and matured; (c) is able to pay all of its debts as they mature; (d) has capital that is not unreasonably small for its business and is sufficient to carry on its business and transactions and all business and transactions in which it is about to engage; (e) is not "insolvent" within the meaning of Section 101(32) of the Bankruptcy Code; and (f) has not incurred (by way of assumption or otherwise) any obligations or liabilities (contingent or otherwise) under any Loan Documents, or made any conveyance in connection therewith, with actual intent to hinder, delay or defraud either present or future creditors of such Person or any of its Affiliates.  "Fair salable value" means the amount that could be obtained for assets within a reasonable time, either through collection or through sale under ordinary selling conditions by a capable and diligent seller to an interested buyer who is willing (but under no compulsion) to purchase.

Term Loan:  means individually and collectively, Term Loan A, Term Loan B and Term Loan C.

Tenth Modification and Extension Agreement means the Tenth Modification and Extension Agreement ("Agreement") made and entered into as of August ___, 2011, by and among Borrower and Guarantors, on the one hand, and Agent, Lenders, and L/C Issuer on the other hand.

UCC:  the Uniform Commercial Code as in effect in the State of California or, when the laws of any other jurisdiction govern the perfection or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction.

Value:  (a) for Inventory, its value determined on the basis of the lower of cost or market, calculated on a first-in, first-out basis, and excluding any portion of cost attributable to intercompany profit among Borrower and its affiliates; and (b) for an Account, its face amount, net of any returns, rebates, discounts (calculated on the shortest terms), credits, allowances or taxes (including sales, excise or other taxes) that have been or could be claimed by the Account Debtor or any other Person.

**1.2.    Uniform Commercial Code**.  As used herein, the following terms are defined in accordance with the UCC in effect in the State of California from time to time:  "Chattel Paper,"

"Commercial Tort Claim," "Deposit Account," "Document," "Equipment," "General Intangibles," "Goods," "Instrument," "Investment Property," "Letter-of-Credit Right" and "Supporting Obligation."

**1.3.    Certain Matters of Construction**.  The terms "herein," "hereof," "hereunder" and other words of similar import refer to this Annex A as a whole and not to any particular section, paragraph or subdivision.  Any pronoun used shall be deemed to cover all genders.  In the computation of periods of time from a specified date to a later specified date, "from" means "from and including," and "to" and "until" each mean "to but excluding."  The terms "including" and "include" shall mean "including, without limitation" and, for purposes of each Loan Document, the parties agree that the rule of *ejusdem generis* shall not be applicable to limit any provision.  Section titles appear as a matter of convenience only and shall not affect the interpretation of any Loan Document.  All references to (a) laws or statutes include all related rules, regulations, interpretations, amendments and successor provisions; (b) any document, instrument or agreement include any amendments, waivers and other modifications, extensions or renewals (to the extent permitted by the Loan Documents); (c) any section means, unless the context otherwise requires, a section of this Annex A; (d) any exhibits or schedules mean, unless the context otherwise requires, exhibits and schedules attached hereto, which are hereby incorporated by reference; (e) any Person include successors and assigns; (f) time of day means time of day at Agent's notice address; or (g) discretion of Agent means its reasonable discretion.  All calculations of value, fundings of Loans, issuances of Letters of Credit and payments of Obligations shall be in Dollars and, unless the context otherwise requires, all determinations (including calculations of Borrowing Base and financial covenants) made from time to time under the Loan Documents shall be made in light of the circumstances existing at such time.  Borrowing Base calculations shall be consistent with usual and customary methods of valuation and calculation, and otherwise satisfactory to Agent (and not necessarily calculated in accordance with GAAP).  Borrower shall have the burden of establishing any alleged gross negligence, willful misconduct or lack of good faith by Agent and/or Lenders under any Loan Documents.  No provision of any Loan Documents shall be construed against any party by reason of such party having, or being deemed to have, drafted the provision.  Whenever the phrase "to the best of Borrowers' knowledge" or words of similar import are used in any Loan Documents, it means actual knowledge of Wen Chang or Mei Lien Chang, or knowledge that Wen Chang or Mei Lien Chang would have obtained if he or she had engaged in good faith and diligent performance of his or her duties, including reasonably specific inquiries of employees or agents and a good faith attempt to ascertain the matter to which such phrase relates.

## SECTION 2.    CREDIT FACILITIES

### 2.1.    Revolving Commitment.

2.1.1.    Revolving Loans.    Lenders agree, on the terms set forth herein, to make Revolving Loans to Borrower from time to time through the Commitment Termination Date in an aggregate amount (together with all LC Obligations and Acceptances) at any time outstanding not to exceed the lesser of (i) the Revolving Commitment, and (ii) the Borrowing Base.  In no event shall the aggregate face amount of all outstanding Letters of Credit and Acceptances exceed the amount of the Letter of Credit Sublimit.  The Revolving Loans may be repaid and reborrowed as provided herein.  In no event shall Agent and/or Lenders have any obligation to honor a request for a Revolving Loan if the unpaid balance of Revolving Loans outstanding at such time (including the requested Loan) would exceed the Borrowing Base, except as provided in Section 2.1.4 hereof.

2.1.2.    Use of Proceeds.    The proceeds of Revolving Loans shall be used by Borrower solely (a) to satisfy existing Obligations; (b) to pay fees and transaction expenses associated with the Loan Documents; (c) to pay Obligations in accordance with this Annex A; and (d) for working capital and payment of Borrower's current operational expenses, payments due and owing under any confirmed Plan

**EXHIBIT 1, PAGE 53**

of Reorganization in Borrower's bankruptcy case and other payments permitted under the Loan Documents as modified by or provided in Tenth Modification and Extension Agreement and the Settlement Agreement of even date herewith.  The proceeds shall not be used for any (e) portion of the long term debt obligations of Borrower that are not current obligations of Borrower; or (f) for any pre-payments of obligations of Borrower or deposits; or (g) personal, family or household expenses or purposes of the officers, directors, employees and shareholders of Borrower, except for rent payment obligations owed by the Borrower to such persons, or for any advances or obligations owed by the Borrower to such persons or for payments authorized by Section 8.c of the Tenth Modification and Extension Agreement.

  **2.1.3.** <u>Termination of Revolving Commitment</u>.  The Revolving Commitment shall terminate on the Commitment Termination Date, unless sooner terminated in accordance with this Annex A.  Upon at least 30 days prior written notice to Agent at any time, Borrower may, at its option, terminate the Revolving Commitment.  Any notice of termination given by Borrower shall be irrevocable.  On the Commitment Termination date, Borrower shall make payment in full, in cash, of all Obligations.

  2.1.4. <u>Overadvances</u>.  If the sum of the aggregate Revolving Loans plus the aggregate LC Obligations exceeds the lesser of (i) Borrowing Base ("<u>Overadvance</u>") and (ii) the Revolving Commitment at any time, a principal amount of Revolving Loans equal to such excess amount shall be payable by Borrower. The amount of the Overadvance shall be paid by Borrower on demand by Agent after five (5) days written notice by Agent to Borrower, but all such Revolving Loans shall nevertheless constitute Obligations secured by the Collateral and entitled to all benefits of the Loan Documents.  Any funding or sufferance of an Overadvance is not required by Agent or Lenders, and shall not constitute a waiver of the Event of Default caused thereby.

  **2.2.** <u>**Manner of Borrowing and Funding Revolving Loans.**</u>

  **2.2.1.** <u>Notice of Borrowing</u>.

  (a) Whenever Borrower desires funding of Revolving Loans, Borrower shall give Agent a written notice of borrowing ("Notice of Borrowing") and signed by the person or persons as set forth in the most recent corporate resolution and in a form reasonably acceptable to Agent.  Such notice must be received by Agent no later than 11:00 a.m. at least one (1) Business Day prior to the requested funding date.  Notices received after 11:00 a.m. shall be deemed received on the next Business Day.  Each Notice of Borrowing shall be irrevocable and shall specify (A) the amount of Revolving Loans requested, and (B) the requested funding date (which must be a Business Day).  Agent and Lender shall rely on notice given in the manner set forth herein.

  (b) Unless payment is otherwise timely made by Borrower, the becoming due of any Obligations (including, without limitation, principal, interest, fees or other charges, LC Obligations or Cash Collateral) shall be deemed to be a request for Revolving Loans on the due date, in the amount of such Obligations.  The proceeds of such Revolving Loans shall be disbursed as direct payment of the relevant Obligation.  In addition, Agent may, at its option, charge such Obligations against any operating, investment or other account of Borrower maintained with Agent or any of its Affiliates.

  (c) Borrower shall establish a Dominion Account with Agent and the presentation for payment of any check or other item of payment drawn on such account at a time when there are insufficient funds to cover it shall be deemed to be a request for Revolving Loans on the date of such presentation, in the amount of the check and items presented for payment.  The proceeds of such Revolving Loans may be disbursed directly to the Dominion Account or other appropriate account held at Agent.

838289.8      8     **Borrower's Initials _____**

                **_____**

# EXHIBIT 1, PAGE 54

2.2.2.  <u>Fundings</u>.  Subject to the terms of the Loan Documents, Agent shall fund each Revolving Loan on the applicable funding date and shall disburse the proceeds as directed by Borrower.

2.2.3.  <u>Notices</u>.  Borrower authorizes Agent to extend Revolving Loans and transfer funds to or on behalf of Borrower based on telephonic or e-mailed instructions.  Borrower shall confirm each such request by prompt delivery to Agent of a Notice of Borrowing, if applicable, but if it differs in any material respect from the action taken by Agent, the records of Agent shall govern.  Agent shall not have any liability for any loss suffered by Borrower as a result of Agent acting upon its understanding of telephonic or e-mailed instructions from a person believed in good faith to be a person authorized to give such instructions on Borrower's behalf.

**2.3.  <u>Repayment of Revolving Loans</u>.**  The Revolving Commitment shall be repaid in accordance with the terms and conditions of the Revolving Note executed or to be executed by Borrower concurrently herewith.

**2.4.  <u>Letter of Credit Facility</u>.**

2.4.1.  <u>Issuance of Letters of Credit</u>.  L/C Issuer agrees to issue Letters of Credit from time to time until 30 days prior to the Revolving Termination Date (or until the Commitment Termination Date, if earlier), on the terms set forth herein, including the following:

(a)  Borrower acknowledges that L/C Issuer's willingness to issue any Letter of Credit is conditioned upon its receipt of a LC Application with respect to the requested Letter of Credit, as well as such other instruments and agreements as L/C Issuer may customarily require for issuance of a letter of credit of similar type and amount.  Neither Agent nor L/C Issuer shall have any obligation to issue any Letter of Credit unless (i) it receives a LC Request and LC Application at least three Business Days prior to the requested date of issuance; and (ii) each LC Condition is satisfied.  L/C Issuer's obligation to issue any Acceptance shall be subject to its receipt of such documentation and fees in connection therewith as it may require.

(b)  Letters of Credit may be requested by Borrower only (i) to support obligations of such Borrower incurred in the Ordinary Course of Business; or (ii) for other purposes as Agent may approve from time to time in writing.  The renewal or extension of any Letter of Credit shall be treated as the issuance of a new Letter of Credit, except that delivery of a new LC Application shall be required at the discretion of L/C Issuer.

(c)  Borrower assumes all risks of the acts, omissions or misuses of any Letter of Credit by the beneficiary.  In connection with the issuance of any Letter of Credit, neither L/C Issuer nor Agent shall be responsible for the existence, character, quality, quantity, condition, packing, value or delivery of any goods purported to be represented by any Documents; any differences or variation in the character, quality, quantity, condition, packing, value or delivery of any goods from that expressed in any Documents; the form, validity, sufficiency, accuracy, genuineness or legal effect of any Documents or of any endorsements thereon; the time, place, manner or order in which shipment of goods is made; partial or incomplete shipment of, or failure to ship, any goods referred to in a Letter of Credit or Documents; any deviation from instructions, delay, default or fraud by any shipper or other Person in connection with any goods, shipment or delivery; any breach of contract between a shipper or vendor and Borrower; errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex, telecopy, e-mail, telephone or otherwise; errors in interpretation of technical terms; the misapplication by a beneficiary of any Letter of Credit or the proceeds thereof; or any consequences arising from causes beyond the control of L/C Issuer or Agent, including any act or omission of a

**EXHIBIT 1, PAGE 55**

Governmental Authority.  Agent and L/C Issuer shall be fully subrogated to the rights and remedies of each beneficiary whose claims against Borrower are discharged with proceeds of any Letter of Credit.

(d)    In connection with its administration of and enforcement of rights or remedies under any Letters of Credit or LC Documents, Agent and L/C Issuer shall be entitled to act, and shall be fully protected in acting, upon any certification, documentation or communication in whatever form believed by Agent or L/C Issuer, in good faith, to be genuine and correct and to have been signed, sent or made by a proper Person.  Agent and L/C Issuer may consult with and employ legal counsel, accountants and other experts to advise it concerning its obligations, rights and remedies, and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by such experts.  Agent and L/C Issuer may employ agents and attorneys-in-fact in connection with any matter relating to Letters of Credit or LC Documents, and shall not be liable for the negligence or misconduct of agents and attorneys-in-fact selected with reasonable care.

2.4.2.  <u>Reimbursement</u>.  If Agent or L/C Issuer honors any request for payment under a Letter of Credit, Borrower shall pay to Agent or L/C Issuer, on the same day ("<u>Reimbursement Date</u>"), the amount paid under such Letter of Credit, together with interest at the interest rate for Revolving Loans from the Reimbursement Date until payment by Borrower.  The obligation of Borrower to reimburse L/C Issuer or Agent for any payment made under a Letter of Credit shall be absolute, unconditional, irrevocable, and joint and several, and shall be paid without regard to any lack of validity or enforceability of any Letter of Credit or the existence of any claim, setoff, defense or other right that Borrower may have at any time against the beneficiary.  Whether or not Borrower submits a Notice of Borrowing, Borrower shall be deemed to have requested a funding of Revolving Loans in an amount necessary to pay all amounts due on any Reimbursement Date.

2.4.3.  <u>Cash Collateral</u>.  If any LC Obligations, whether or not then due or payable, shall for any reason be outstanding at any time (a) that an Event of Default exists, (b) that Availability is less than zero, (c) after the Commitment Termination Date, or (d) within 20 Business Days prior to the Revolving Termination Date, then Borrower shall, at Agent's or L/C Issuer's request, Cash Collateralize the stated amount of all outstanding Letters of Credit and pay to Agent the amount of all other LC Obligations.  If Borrower fails to provide Cash Collateral as required herein, Agent may advance, as Revolving Loans, the amount of the Cash Collateral required.

**2.5.**    <u>Collateral Monitoring</u>.  Borrower shall furnish to Agent, with sufficient copies for each Lender, the following (which shall be in addition to any similar requirements in the Existing Credit Agreement, but shall not include requiring submission of duplicate reports), in form and substance satisfactory to Agent:

2.5.1.  <u>Financial Statements</u>.  Monthly financial statements, and comparison to financial projections (including, without limitation, cash flow position and line borrowing projections), by no later than thirty (30) days after the end of each month, commencing with the month ending with the month of the Effective Date.

2.5.2.  <u>Agings</u>.  Monthly detailed aging of Accounts by invoice date and a history of Inventory reflecting the original purchase date of each item of Inventory, together with a reconciliation to the general ledger and financial statements for each month, commencing with the month ending July 31, 2011.

**2.6.**    <u>Collateral Audits; Inventory Appraisals</u>.  Borrower shall cooperate with, and pay the costs and expenses for (i)  an audit of the Collateral, to be conducted every four (4) calendar months, commencing with the four calendar months ending November 30, 2011 and (ii) an annual appraisal of

838289.8                                    10                          **Borrower's Initials _____**

_____

Inventory by an appraiser acceptable to Agent, to be conducted no later than sixty (60) days from the date the Tenth Modification and Extension Agreement is executed and approved by the BK Court.

     **2.7.**   <u>Consultant</u>.  Borrower shall continue to engage a turnaround consultant reasonably acceptable to Agent and Lenders. David Mulder of Tatum LLC is an acceptable turnaround consultant and he may not be replaced without Lender's advance written consent, which consent shall not be unreasonably withheld.

     **2.8.**   <u>Dominion Account</u>.  Collected funds in the Dominion Account shall be swept daily by Agent and such amounts shall be applied by Agent to the New Revolving Commitment and New Revolving Note.

     **2.9.**   <u>Eligibility Variance</u>.  Notwithstanding anything to the contrary contained herein or in the Loan Documents, Borrower, Agent, and Lender may, from time to time, agree to and approve in writing variances in the amounts of Eligible Accounts and/or Eligible Inventory.

**SECTION 3.**   **CONDITIONS PRECEDENT**

     **3.1.**   **<u>Conditions Precedent to All Credit Extensions</u>**.  Agent shall not be required to fund any Loans, L/C Issuer shall not be required to issue any Letters of Credit, or grant any other accommodation to or for the benefit of Borrower, unless the following conditions are satisfied:

     (a)   No Default or Event of Default shall exist at the time of, or result from, such funding, issuance or grant, and no event has occurred, which upon the lapse of time, giving of notice, or both, would constitute an Event of Default;

     (b)   The representations and warranties of each Obligor in the Loan Documents shall be true and correct on the date of, and upon giving effect to, such funding, issuance or grant (except for representations and warranties that expressly relate to an earlier date);

     (c)   All conditions precedent in any other Loan Document shall be satisfied;

     (d)   No event shall have occurred or circumstance exist that has or could reasonably be expected to have a Material Adverse Effect;

     (e)   With respect to issuance of a Letter of Credit, the LC Conditions shall be satisfied; and

     (f)   Such Loan or Letter of Credit is in conformity with the then applicable Borrowing Base.

Each request (or deemed request) by Borrower for funding of a Revolving Loan, issuance of a Letter of Credit or grant of an accommodation shall constitute a representation by Borrower that the foregoing conditions are satisfied on the date of such request and on the date of such funding, issuance or grant.  As an additional condition to any funding, issuance or grant, Agent shall have received such other information, documents, instruments and agreements as it deems appropriate in connection therewith.

     **3.2.**   **<u>Limited Waiver of Conditions Precedent</u>.**  If Agent funds any Revolving Loans, or L/C Issuer issues any Letters of Credit or grants any other accommodation when any conditions precedent are not satisfied (regardless of whether the lack of satisfaction was known or unknown at the time), it shall not operate as a waiver of (a) the right of Agent or L/C Issuer to insist upon satisfaction of all conditions

**EXHIBIT 1, PAGE 57**

precedent with respect to any subsequent funding, issuance or grant; nor (b) any Default or Event of Default due to such failure of conditions or otherwise.

## SECTION 4.    COLLATERAL ADMINISTRATION

**4.1.    Borrowing Base Certificates.**  By 11:00 a.m. (Los Angeles time) on Wednesday of each week, Borrower shall deliver to Agent a Borrowing Base Certificate in the form attached hereto as Exhibit A, or as Agent otherwise reasonably changes after submission of such new form to Borrower, and prepared as of the close of business of the last Business Day of the previous week, and at such other times as Agent may reasonably request.  All calculations of Availability in any Borrowing Base Certificate shall originally be made by Borrower and certified by a senior officer acceptable to Agent, provided that Agent may from time to time review and adjust any such calculation (a) to reflect Agent's reasonable estimate of declines in value of any Collateral; (b) to adjust advance rates to reflect changes in dilution, quality, mix and other factors affecting Collateral; and (c) to the extent the calculation is not made in accordance with this Annex A or does not accurately reflect any applicable reserve.  Each Borrowing Base Certificate shall include a copy of a detailed weekly inventory report and shall include weekly sales, debits, credits and adjustments and application of cash proceeds.

**4.2.    Administration of Accounts.**

4.2.1.    Records and Schedules of Accounts.  Borrower shall keep accurate and complete records of its Accounts in accordance with GAAP, including all payments and collections thereon, and shall submit to Agent, on such periodic basis as Agent may reasonably request, a sales and collections report, in form satisfactory to Agent.  Borrower shall also provide to Agent, on or before the 15th day of each month, a detailed aged trial balance of all Accounts as of the end of the preceding month, specifying each Account's Account Debtor name and address, amount, invoice date and due date, showing any discount, allowance, credit, authorized return or dispute, and including such proof of delivery, copies of invoices and invoice registers, copies of related documents, repayment histories, status reports and other information as Agent may reasonably request.  If Accounts in an aggregate face amount of $1,000 or more cease to be Eligible Accounts, Borrower shall notify Agent of such occurrence promptly (and in any event within one Business Day) after Borrower has knowledge thereof.

4.2.2.    Taxes.  If an Account of Borrower includes a charge for any taxes, Agent is authorized, in its discretion, to pay the amount thereof to the proper taxing authority for the account of Borrower and to charge Borrower therefor; provided, however, that Agent shall not be liable for any taxes that may be due from Borrower or with respect to any Collateral, and shall promptly provide Borrower with written notice of any such payment.

4.2.3.    Account Verification.  Whether or not a default or Event of Default exists, Agent shall have the right at any time, in the name of Agent, any designee of Agent or Borrower, to verify the validity, amount or any other matter relating to any Accounts of Borrower by mail, telephone or otherwise.  Borrower shall cooperate fully with Agent in an effort to facilitate and promptly conclude any such verification process.

4.2.4.    Maintenance of Dominion Account.  Borrower shall establish and maintain one or more Dominion Accounts with Agent pursuant to lockbox arrangements acceptable to Agent.  Borrower shall obtain an agreement (in form and substance satisfactory to Agent) for each Dominion Account, establishing Agent's control over and Lien in the lockbox or Dominion Account, requiring immediate deposit of all remittances received in the lockbox to a Dominion Account.  Agent does not assume any responsibility to Borrower for any lockbox arrangement or any Dominion Account, including any claim of accord and satisfaction or release with respect to any Payment Items.

838289.8                                12                    **Borrower's Initials _____**

4.2.5.  <u>Proceeds of Collateral</u>.  Borrower shall instruct in writing and otherwise take all reasonably necessary steps to ensure that all payments on Accounts or otherwise relating to Collateral are made directly to a Dominion Account (or a lockbox relating to a Dominion Account).  If Borrower or Subsidiary receives cash or Payment Items with respect to any Collateral, it shall hold same in trust for Agent and promptly (not later than the next Business Day) deposit same into a Dominion Account.

4.2.6.  <u>Separate Account</u>.  Borrower may maintain one (1) and only one additional account ("Separate Account") not maintained with Agent, which shall be established based under a three-party control agreement with the institution holding such account, and containing terms reasonably acceptable to Agent, granting to Agent the senior-most perfected security interest in such account, and requiring such institution to daily sweep the amounts that may be contained in any such account above the $300,000.00 amount as set forth below and wire transfer the proceeds daily to Agent; provided, however, that Borrower may maintain up to but no more than $300,000.00 in such Separate Account for use by Borrower in its ordinary and normal business operations only, subject to the restrictions and conditions herein as to the use of the proceeds of the Revolving Loan.

4.2.6.  <u>Intentionally Deleted.</u>

**4.3.  <u>Administration of Inventory</u>.**

4.3.1.  <u>Records and Reports of Inventory</u>.  Borrower shall keep accurate and complete records of its Inventory, including costs and daily withdrawals and additions, and shall submit to Agent inventory reports in form reasonably satisfactory to Agent, on such periodic basis as Agent may reasonably request, in addition to the weekly Borrowing Base Certificates.  Borrower shall conduct periodic cycle counts consistent with historical practices, and shall provide to Agent a report based on each such inventory and count promptly upon completion thereof, together with such supporting information as Agent may request.  Agent may participate in and observe each physical and/or cycle count at Agent's cost and expense.

4.3.2.  <u>Returns of Inventory</u>.  No Borrower shall return any Inventory to a supplier, vendor or other Person, whether for cash, credit or otherwise, unless (a) such return is in the Ordinary Course of Business; (b) no default, Event of Default or Overadvance exists or would result therefrom; (c) Agent is promptly notified if the aggregate value of all Inventory returned in any month exceeds 5% of the prior month's sales; provided, however, that Borrower shall provide Agent with reports on a periodic basis as reasonably requested by Agent identifying all returned inventory items then being held on hand by Borrower; and (d) any payment received by Borrower for a return is promptly remitted to Agent for application to the Obligations.

4.3.3.  <u>Acquisition, Sale and Maintenance</u>.  No Borrower shall acquire or accept any Inventory on consignment or approval, and shall take all steps to assure that all Inventory is produced in accordance with applicable Laws, including the FLSA.  Borrower shall not sell any Inventory on consignment or approval or any other basis under which the customer may return or require Borrower to repurchase such Inventory.  Borrower shall use, store and maintain all Inventory with reasonable care and caution, in accordance with applicable standards of any insurance and in conformity with all applicable laws, and shall make current rent payments (within applicable grace periods provided for in leases) at all locations where any Collateral is located.

**4.4.  <u>General Provisions</u>.**

4.4.1.  <u>Location of Collateral</u>.  All tangible items of Collateral, other than Inventory in transit, shall at all times be kept by Borrower at business locations located within the State of California

**EXHIBIT 1, PAGE 59**

and previously disclosed to (and approved by) Agent in writing. Borrower may not maintain inventory in any location as to which there is more than Two Hundred Thousand Dollars ($200,000.00) in inventory, based on Borrower's actual cost, and for which Agent has not received a fully executed landlord's waiver in form and substance reasonably acceptable to Agent.

4.4.2.   <u>Protection of Collateral</u>.   All expenses of protecting, storing, warehousing, insuring, handling, maintaining and shipping any Collateral, all taxes payable with respect to any Collateral (including any sale thereof), and all other payments required to be made by Agent to any Person to realize upon any Collateral, shall be borne and paid by Borrower.  Agent shall not be liable or responsible in any way for the safekeeping of any Collateral, for any loss or damage thereto (except for reasonable care in its custody while Collateral is in Agent's actual possession), for any diminution in the value thereof, or for any act or default of any warehouseman, carrier, forwarding agency or other Person whatsoever, but the same shall be at Borrower's sole risk.

4.4.3.   <u>Defense of Title to Collateral</u>.   Borrower shall at all times defend its title to Collateral and Agent's and Lenders' Liens therein against all Persons, claims and demands whatsoever, except Permitted Liens.

**4.5.**   **Power of Attorney**.   Borrower hereby irrevocably constitutes and appoints Agent (and all Persons designated by Agent) as Borrower's true and lawful attorney (and agent-in-fact) for the purposes provided in this Section.  Agent, or Agent's designee, may, without notice and in either its or Borrower's name, but at the cost and expense of Borrower:

(a)   Endorse Borrower's name on any Payment Item or other proceeds of Collateral (including proceeds of insurance) that come into Agent's possession or control; and

(b)   During an Event of Default, (i) notify any Account Debtors of the assignment of their Accounts, demand and enforce payment of Accounts, by legal proceedings or otherwise, and generally exercise any rights and remedies with respect to Accounts; (ii) settle, adjust, modify, compromise, discharge or release any Accounts or other Collateral, or any legal proceedings brought to collect Accounts or Collateral; (iii) sell or assign any Accounts and other Collateral upon such terms, for such amounts and at such times as Agent deems advisable; (iv) take control, in any manner, of any proceeds of Collateral; (v) prepare, file and sign Borrower's name to a proof of claim or other document in a bankruptcy of an Account Debtor, or to any notice, assignment or satisfaction of Lien or similar document; (vi) receive, open and dispose of mail addressed to Borrower, and notify postal authorities to change the address for delivery thereof to such address as Agent may designate; (vii) endorse any Chattel Paper, Document, Instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to any Accounts, Inventory or other Collateral; (viii) use Borrower's stationery and sign its name to verifications of Accounts and notices to Account Debtors; (ix) use the information recorded on or contained in any data processing equipment and computer hardware and software relating to any Collateral; (x) make and adjust claims under policies of insurance; (xi) take any action as may be necessary or appropriate to obtain payment under any letter of credit or banker's acceptance for which Borrower is a beneficiary; and (xii) take all other actions as Agent deems appropriate to fulfill Borrower's obligations under the Loan Documents.

**EXHIBIT 1, PAGE 60**

## SECTION 5.    REPRESENTATIONS AND WARRANTIES

**5.1.    General Representations and Warranties.**  To induce Agent, Lenders and L/C Issuer to enter into this Annex A and to make available the Revolving Commitments, Term Loans, Letters of Credit and Acceptances, and in addition to the representations and warranties in the other Loan Documents, Borrower represents and warrants that:

5.1.1.    Accounts.    Agent, Lenders and L/C Issuer may rely, in determining which Accounts are Eligible Accounts, on all statements and representations made by Borrower with respect thereto.  Borrower warrants, with respect to each Account at the time it is shown as an Eligible Account in a Borrowing Base Certificate, that:

(a)    it is genuine and in all respects what it purports to be, and is not evidenced by a judgment;

(b)    it arises out of a completed, *bona fide* sale and delivery of goods in the Ordinary Course of Business, and substantially in accordance with any purchase order, contract or other document relating thereto;

(c)    it is for a sum certain, maturing as stated in the invoice covering such sale, a copy of which has been furnished or is available to Agent on request;

(d)    it is not subject to any offset, Lien (other than Agent's or Lenders' Lien), deduction, defense, dispute, counterclaim or other adverse condition except as arising in the Ordinary Course of Business and disclosed to Agent; and it is absolutely owing by the Account Debtor, without contingency in any respect;

(e)    no purchase order, agreement, document or applicable law restricts assignment of the Account to Agent and/or Lenders (regardless of whether, under the UCC, the restriction is ineffective), and the applicable Borrower is the sole payee or remittance party shown on the invoice;

(f)    no extension, compromise, settlement, modification, credit, deduction or return has been authorized with respect to the Account, except discounts or allowances granted in the Ordinary Course of Business for prompt payment that are reflected on the face of the invoice related thereto and in the reports submitted to Agent hereunder; and

(g)    to the best of Borrower's knowledge, (i) there are no facts or circumstances that are reasonably likely to impair the enforceability or collectibility of such Account; (ii) the Account Debtor had the capacity to contract when the Account arose, continues to meet the applicable Borrower's customary credit standards, is Solvent, is not contemplating or subject to an insolvency proceeding, and has not failed, or suspended or ceased doing business; and (iii) there are no proceedings or actions threatened or pending against any Account Debtor that could reasonably be expected to have a material adverse effect on the Account Debtor's financial condition.

## SECTION 6.    EVENTS OF DEFAULT; REMEDIES ON DEFAULT

**6.1.    Events of Default.**  For the avoidance of doubt, any material failure by Borrower to comply with each of its covenants, agreements, and other obligations under the terms of this Annex A shall constitute an Event of Default under the Existing Credit Agreement and the other Loan Documents in addition to any other Events of Default under any other Loan Document .

838289.8                                    15                        **Borrower's Initials _____**

**6.2.** __Remedies upon Default__. The remedies upon the occurrence of an Event of Default are as set forth in the Agreement.

**Borrower's Initials _____**

_____

# EXHIBIT 1, PAGE 62

**IN WITNESS WHEREOF**, the parties hereto have approved and executed this Annex A as of August ____, 2011.

**BORROWER:**

TRADE UNION INTERNATIONAL, INC.,
a California corporation

By: _____
Name: _____
Its: _____

Address: _____
_____
_____
Attn: _____
Telephone No.: _____
Facsimile No.: _____

DUCK HOUSE, INC.,
a California corporation

By: _____
Name: _____
Its: _____

Address: _____
_____
_____
Attn: _____
Telephone No.: _____
Facsimile No.: _____

**GUARANTOR:**

_____
WEN PIN CHANG,
an individual

Address: _____
_____
_____
Attn: _____

Telephone No.: _____
Facsimile No.: _____

_____
MEI LEIN CHANG,
an individual

Address: _____
_____
_____
Attn: _____

Telephone No.: _____
Facsimile No.: _____

_____
Wen Ping Chang, Trustee
of the Chang Revocable Trust
u/t/a September 20, 1996

Address: _____
_____
_____

838289.8

17

Borrower's Initials _____

_____

# EXHIBIT 1, PAGE 63

Telephone No.: _____
Facsimile No.: _____

_____
Mei Lien Chang, Trustee
of the Chang Revocable Trust
u/t/a September 20, 1996

Address: _____
_____
_____

Telephone No.: _____
Facsimile No.: _____

**AGENT and L/C ISSUER:**

CATHAY BANK

Address:    9650 Flair Drive
El Monte, CA  91731

By: _____
Name:  Greg Badura
Its:    Senior Vice President

Telephone No.:  (626) 279-3280
Facsimile No.:  (626) 279-3239

**LENDERS:**

CATHAY BANK

Address:    9650 Flair Drive
El Monte, CA  91731

By: _____
Name:  Greg Badura
Its:    Senior Vice President

Telephone No.:  (626) 279-3280
Facsimile No.:  (626) 279-3239

CHINATRUST CAPITAL CORPORATION,
a Delaware corporation

Address: _____
_____
_____

By: _____
Name:  Melvin O. Redford
Its:    Executive Vice President

Telephone No.: _____
Facsimile No.: _____

Address:    9650 Flair Drive
El Monte, CA  91731

Telephone No.:  (626) 279-3280
Facsimile No.:  (626) 279-3239

## EXHIBIT "A"

### Form of Borrowing Base Certificate

(to be attached)

19                     **Borrower's Initials _____**

                                                    _____

# EXHIBIT 1, PAGE 65

# Exhibit 2

# Form of Proposed Order

1  James C. Bastian, Jr. - Bar No. 175415
   **SHULMAN HODGES & BASTIAN LLP**
2  8105 Irvine Center Drive, Suite 600
   Irvine, California 92618
3  Telephone:    (949) 340-3400
   Facsimile:    (949) 340-3000
4  Email: jbastian@shbllp.com

5
   Insolvency Counsel for the Debtors and
6  Debtors in Possession, Trade Union International, Inc. and
   Duck House, Inc.
7

8

9                    **UNITED STATES BANKRUPTCY COURT**

10            **CENTRAL DISTRICT OF CALIFORNIA, RIVERSIDE DIVISION**

11

12

13 | In re | Case No.  6:11-bk-13071-DS |

14 **TRADE UNION INTERNATIONAL, INC., a California corporation,**  Chapter  11

   Jointly Administered With
15 Debtor.  Case No.  6:11-bk-13072-DS

16 In re  **ORDER APPROVING SETTLEMENT AND COMPROMISE OF DISPUTES WITH THE BANK GROUP LENDERS (CATHAY BANK FOR ITSELF AND AS AGENT FOR CHINATRUST CAPITAL CORPORATION) AND APPROVING ANCILLARY LOAN MODIFICATION DOCUMENTS**
17 **DUCK HOUSE, INC.,
   a California corporation,**
18
   Debtor.
19

20
   **Hearing Date:**
21 Date:   September 2, 2011
   Time:   10:00 A.M.
22 Place:  Courtroom 304
                United States Bankruptcy Court
23                3420 Twelfth Street
                Riverside, CA 92501
24

25        The Motion for Order Approving Settlement and Compromise of Disputes with the Bank

26 Group Lenders (Cathay Bank for Itself and as Agent for Chinatrust Capital Corporation) and

27 Approving Ancillary Loan Modification Documents (docket number ****) filed by Trade Union

28 International, Inc., a California corporation and Duck House, Inc., a California corporation, the

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

1

Z:\S-T\Trade Union International\Pld\Settlement Order Bank Group.doc
4265-000

**EXHIBIT 2, PAGE 1**

Page 107

1    debtors and debtors in possession in the above-captioned jointly administered Chapter 11

2    bankruptcy cases ("Debtors") came on for hearing on September 2, 2011, before the Honorable

3    Robert N. Kwan, United States Bankruptcy Judge.

4         The Debtor appeared through Shulman Hodges & Bastian LLP by James C. Bastian, Jr.

5    Other appearances were made as reflected in the record.

6         Having considered the Motion, the pleadings filed in support thereof, the statements of

7    counsel on the record, and finding that notice and service were proper, and good cause

8    appearing, it is hereby

9         **ORDERED** as follows**:**

10        1.    The Motion is approved.

11        2.    The Debtors settlement with the Lenders under the terms and conditions that are

12   consistent with the Settlement Agreement as shown on Exhibit 1 to the Declaration of Win Pin

13   Chang annexed to the Motion and any ancillary loan modification documents, including the Loan

14   Modification Agreement annexed as Exhibit A to the Settlement Agreement, is approved.

15        3.    The Debtors are authorized to execute any and all documents in order to carry out

16   the terms of the settlement and compromise, including but not limited to the Settlement

17   Agreement and any ancillary loan modification documents which are consistent with and

18   incorporate the terms and provisions described in the Settlement Agreement, including the Tenth

19   Modification and Extension Agreement and Annex A thereto attached as Exhibit A to the

20   Settlement Agreement.

21

22

23

24

25                                    # # #

26

27

28

**SHULMAN HODGES &
BASTIAN LLP**
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

2

Z:\S-T\Trade Union International\Pld\Settlement Order Bank Group.doc
4265-000

**EXHIBIT 2, PAGE 2**

**Page 108**

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate a NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: **8105 Irvine Center Drive, Suite 600, Irvine, California 92618.**

A true and correct copy of the foregoing document described as **DEBTORS AND DEBTORS IN POSSESSION'S MOTION FOR ORDER APPROVING SETTLEMENT AND COMPROMISE OF DISPUTES WITH THE BANK GROUP LENDERS (CATHAY BANK FOR ITSELF AND AS AGENT FOR CHINATRUST CAPITAL CORPORATION) AND APPROVING ANCILLARY LOAN MODIFICATION DOCUMENTS; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF WEN PIN CHANG IN SUPPORT** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 5, 2011**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- **James C Bastian    jbastian@shbllp.com**
- **Michael G Fletcher    mfletcher@frandzel.com, efiling@frandzel.com;shom@frandzel.com**
- **Barry V Freeman    bvf@jmbm.com, bvf@jmbm.com**
- **Allan P Leguay    leguay@pacbell.net**
- **Elizabeth A Lossing    elizabeth.lossing@usdoj.gov**
- **Nicholas A Merkin    nmerkin@frandzel.com, efiling@frandzel.com;bwilson@frandzel.com**
- **ropera@winthropcouchot.com**
- **Ramesh Singh    claims@recoverycorp.com**
- **James M Sullivan    jsullivan@mosessinger.com, ccaruso@mosessinger.com;dkick@mosessinger.com**
- **United States Trustee (RS)    ustpregion16.rs.ecf@usdoj.gov**
- **Andrew F Whatnall    awhatnall@daca4.com**

❑  Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served) - On **August 5, 2011**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

■  Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to Fed. R. Civ. P. 5 and/or controlling LBR, on **August 5, 2011**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

<u>Judge's Copy - Via Messenger</u>
**U.S. Bankruptcy Court
Hon. Deborah J. Saltzman
Bin Outside Courtroom 304
3420 Twelfth Street
Riverside, CA 92501**

❑  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| <u>August 5, 2011</u> | <u>Lorre Clapp</u> | <u>/s/ Lorre Clapp</u> |
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*    **F 9013-3.1.PROOF.SERVICE**
Page 109

# TRADE UNION - U.S. MAIL SERVICE LIST

**DEBTOR**
TRADE UNION INTERNATIONAL INC
4651 STATE STREET
MONTCLAIR, CA 91763

**INTERESTED PARTY**
OFFICE OF UNITED STATES TRUSTEE (RS)
3685 MAIN STREET SUITE 300
RIVERSIDE, CA 92501

**ATTORNEYS FOR CATHAY BANK**
MICHAEL G FLETCHER ESQ
NICHOLAS A. MERKIN ESQ
FRANDZEL ROBINS BLOOM & CSATO LC
6500 WILSHIRE BLVD
SEVENTEENTH FLOOR
LOS ANGELES, CA 90048-4920

**ATTORNEYS FOR CATHAY BANK**
GARY OWEN CARIS ESQ
MCKENNA LONG & ALDRIGE LLP
300 SOUTH GRAND AVE 14TH FLOOR
LOS ANGELES, CA 90071-3124

**ATTORNEYS FOR CHINATRUST BANK**
BARRY FREEMAN ESQ
JEFFER MANGELS BUTLER & MITCHEL LLP
1900 AVE OF THE STARS 7TH FLOOR
LOS ANGELES, CA 90067

**ATTORNEYS FOR THE COMMITTEE**
ROBERT OPERA ESQ
WINTHROP COUCHOT PC
660 NEWPORT CENTER DRIVE
FOURTH FLOOR
NEWPORT BEACH, CA 92660

**SCHEDULE E, NOTICE PURPOSES**
INTERNAL REVENUE SERVICE
PO BOX 7346
PHILADELPHIA, PA 19101-7346

**SCHEDULE E, NOTICE PURPOSES**
FRANCHISE TAX BOARD
ATTN BANKRUPTCY UNIT
BANKRUPTCY SECTION MS A340
PO BOX 2952
SACRAMENTO, CA 95812-2952

**SCHEDULE E, NOTICE PURPOSES**
CALIFORNIA EMPLOYMENT DEVELOPMENT
DEPARTMENT
ATTN BANKRUPTCY UNIT
BANKRUPTCY GROUP MIC 92E
PO BOX 826880
SACRAMENTO, CA 94280-0001

**SCHEDULE E, NOTICE PURPOSES**
STATE BOARD OF EQUALIZATION
ATTN BANKRUPTCY
ENVIRONMENTAL FEES DIVISION PO
BOX 942879
SACRAMENTO, CA 94279-6001

**SCHEDULE E, NOTICE PURPOSES**
SAN BERNARDINO COUNTY TREASURER-
TAX COLLECTOR
ATTN BANKRUPTCY
172 WEST THIRD STREET
SAN BERNARDINO, CA 92415

**SCHEDULE D, NOTICE PURPOSES**
WELLS FARGO FINANCIAL LEASING
MANUFACTURER SERVICES GROUP
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 7777
SAN FRANCISCO, CA 94120-7777

**SCHEDULE D, NOTICE PURPOSES**
WELLS FARGO BANK NA
ATTN PRESIDENT OR MANAGING AGENT
300 TRI STATE INTL SUITE 400
LINCOLNSHIRE, IL 60069-4417

**SCHEDULE D, NOTICE PURPOSES**
MICHELIN NORTH AMERICA INC
ATTN PRESIDENT OR MANAGING AGENT
1 PARKWAY S
GREENVILLE, SC 29615-5022

**SCHEDULE D, NOTICE PURPOSES**
USBANCORP
ATTN PRESIDENT OR MANAGING AGENT
1310 MADRID ST SUITE 104
MARSHALL, MN 56258-4006

**SCHEDULE D, NOTICE PURPOSES**
KEY EQUIPMENT FINANCE
ATTN PRESIDENT OR MANAGING AGENT
PAYMENT PROCESSING
CLEVELAND, OH 44194-0796

**SCHEDULE D, NOTICE PURPOSES**
KEY EQUIPMENT FINANCE
ATTN PRESIDENT OR MANAGING AGENT
601 OAKMONT LN SUITE 110
WESTMONT, IL 60559-5557

**SCHEDULE D**
CATHAY BANK
ATTN DAVID L PRICE, VICE PRESIDENT
LOAN SYNDICATIONS
777 N BROADWAY
LOS ANGELES, CA 90012

**SCHEDULE D, ADDITIONAL NOTICE**
CATHAY BANK
ATTN GREGORY BADURA
ATTN SANDRA SHA KENYON, FIRST VICE
PRESIDENT
9650 FLAIR  DR, 3RD FLOOR
EL MONTE, CA 91731

**SCHEDULE D, NOTICE PURPOSES**
CHINATRUST BANK
ATTN MELVIN O.REDFORD, EXECUTIVE
VICE PRESIDENT
22939 HAWTHORNE BLVD
TORRANCE, CA 90505

**SCHEDULE F**
A-CO TEMPORARY POWER
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 16843
NO.HOLLYWOOD, CA 91615-6843

**SCHEDULE F**
ACCELLOS
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 673922
DETROIT, MI 48267-3922

**SCHEDULE F**
ADP, INC.
ATTN PRESIDENT OR MANAGING AGENT
PHOENIX, AZ 85062-8415

**SCHEDULE F**
ADP, INC.
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 0500
CAROL STREAM, IL 60132-0500

**SCHEDULE F**
AFFORDABLE INTERNET SERVICES
ATTN PRESIDENT OR MANAGING AGENT
25655 LOUISA LANE
ROMOLAND, CA 92585

**SCHEDULE F**
AMERICAN EXPRESS
BOX 0001
LOS ANGELES, CA 90096-0001

**PROOF OF CLAIM ADDRESS**
AMERICAN EXPRESS BANK FSB
C/O BECKET AND LEE LP
POB 3001
MALVERN, PA 19355-0701

**SCHEDULE F**
ANDERSON AIR CONDITIONING
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 95000-2330
PHILADELPHIA, PA 19195-2330

**SCHEDULE F**
 PROOF OF CLAIM ADDRESS
ANDERSON AIR CONDITIONING, LP C/O AMS
ATTN TODD A. BECK, VP AND GENERAL
COUNSEL
13300 MID ATLANTIC BLVD
LAUREL, MD 20708-1432

**SCHEDULE F**
AT&T MOBILITY
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 60017
LOS ANGELES, CA 90060-0017

**SCHEDULE F**
AUTOWARE TECHNOLOGIES, LLC
ATTN PRESIDENT OR MANAGING AGENT
103 AMAR PL.
PANAMA CITY BEACH, FL 32413

**COMMITTEE MEMBER**
BULLET TRANSPORTATION SERVICES
ATTN TERRY HANDELAND
4900 S PENNSYLVANIA AVE
CUDAHY, WI 53110

**SCHEDULE F**
CENTURY COPY TECHNOLOGY
ATTN PRESIDENT OR MANAGING AGENT
18301 E. VALLEY BLVD.
CITY OF INDUSTY, CA 91744

**SCHEDULE F**
CITY OF MONTCLAIR
ATTN PRESIDENT OR MANAGING AGENT
5111 BENITO ST./P.O. BOX 2308
MONTCLAIR, CA 91763

**SCHEDULE F/20 LARGEST**
CONTINENTAL AGENCY
ATTN PRESIDENT OR MANAGING AGENT
1400 MONTEFINO AVE. SUITE 200
DIAMOND BAR, CA 91765

**SCHEDULE F**
CROWN LIFT TRUCKS
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 641173
CINCINNATI, OH 45264-1173

**SCHEDULE F**
ENVIROKLEEN
ATTN PRESIDENT OR MANAGING AGENT
5420 W. MISSION BLVD
ONTARIO, CA 91762

**PROOF OF CLAIM ADDRESS**
FEDEX FREIGHT INC
ATTN CREDIT MANAGER/BANKRUPTCY
PO BOX 840
HARRISON, AR 72602-0840

**SCHEDULE F**
IMAGE DESIGN INC.
ATTN PRESIDENT OR MANAGING AGENT
6141 CLOVER COURT
CHINO, CA 91710

**SCHEDULE F/20 LARGEST**
KAISER FOUNDATION HEALTH PLAN
ATTN PRESIDENT OR MANAGING AGENT
FILE 5915
LOS ANGELES, CA 90074-5915

**SCHEDULE F**
L.A. MACHINERY MOVING INC
ATTN PRESIDENT OR MANAGING AGENT
14901 DON JULIAN RD
CITY INDUSTRY, CA 91746

**SCHEDULE F/20 LARGEST**
BROTHER MEZA'S PALLETS
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 310506
FONTANA, CA 92331

**SCHEDULE F**
BURRTEC WASTE INDUSTRIES INC.
ATTN PRESIDENT OR MANAGING AGENT
PAYMENT PROCESSING CENTER
BUENA PARK, CA 90622-6520

**ASSIGNEE OF CLAIM OF CENTURY COPY
TECHNOLOGY**
DACA 2010L, LP
ATTN ANDREW WHATNALL
1565 HOTEL CIRCLE SOUTH, SUITE 310
SAN DIEGO, CA 92108

**SCHEDULE F/20 LARGEST**
CLARK DISTRIBUTION SYSTEMS, INC
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 85095
CHICAGO, IL 60680-0851

**SCHEDULE F**
COVERALL NORTH AMERICA, INC.
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 802825
CHICAGO, IL 60680

**SCHEDULE F**
DMV RENEWAL
ATTN ACCOUNTS RECEIVABLE
P.O. BOX 942897
SACRAMENTO, CA 94297-0897

**SCHEDULE F**
EULER HERMES ACI
ATTN PRESIDENT OR MANAGING AGENT
800 RED BROOK BLVD.
OWINGS MILLS, MD 21117

**SCHEDULE F**
GLOBE GAS CORPORATION
ATTN PRESIDENT OR MANAGING AGENT
5843 PARAMOUNT BLVD.
LONG BEACH, CA 90805

**SCHEDULE F/20 LARGEST**
JOE INTERRANTE
185 PROVIDENCE PLANTATION DR.
ALPHARETTA, GA 30004

**SCHEDULE F/20 LARGEST**
KDA PRODUCTS INC
ATTN PRESIDENT OR MANAGING AGENT
15325 BLACKBURN AVENUE
NORWALK, CA 90650

**SCHEDULE F/20 LARGEST**
LSY TRUCKING
ATTN PRESIDENT OR MANAGING AGENT
9420 MAPLE ST.
BELLFLOWER, CA 90706

**SCHEDULE F/20 LARGEST**
BULLET TRANSPORTATION SERVICES
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 809066
CHICAGO, IL 60680-9066

**SCHEDULE F**
CA STATE DISBURSEMENT UNIT
ATTN PRESIDENT OR MANAGING AGENT
PO BOX 989067
WEST SACRAMENTO, CA 95798-9067

**SCHEDULE F**
CF MANUFACTURING, INC.
ATTN PRESIDENT OR MANAGING AGENT
11867 SHELDON STREET
SUN VALLEY, CA 91352

**SCHEDULE F**
CON-WAY FREIGHT
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 5160
PORTLAND, OR 97208-5160

**SCHEDULE F**
CREATIVE DOCUMENT SOLUTIONS
ATTN PRESIDENT OR MANAGING AGENT
1629 MARION-WALDO ROAD
MARION, OH 43302

**SCHEDULE F/20 LARGEST**
DUB PUBLISHING INC.
ATTN PRESIDENT OR MANAGING AGENT
16815 JOHNSON DRIVE
CITY OF INDUSTRY, CA 91745-1819

**PROOF OF CLAIM ADDRESS**
ALTO SYSTEMS, INC. DBA
ALTO FREIGHT MANAGEMENT
C/O EULER HERMES UMA
WILLIAM A. GOHMANN, CORPORATE
AGENT
600 S. 7TH STREET
LOUISVILLE, KY 40203

**SCHEDULE F**
GREENLAND LANDSCAPE & MAINTENANCE,
INC.
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 693
CHINO, CA 91708

**SCHEDULE F/20 LARGEST**
JOSEPH C. HIGDON
18814 GREENWAY
OLATHE, KS 66062

**SCHEDULE F/20 LARGEST**
KODAI (U.S.A.) INC.
ATTN PRESIDENT OR MANAGING AGENT
2440 S. HACIENDA BLVD
HACIENDA HEIGHT, CA 91745

**SCHEDULE F**
MAILFINANCE
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 45840
SAN FRANCISCO, CA 94145-0840

MARIA VARGAS
1416 VIRGINIA AVENUE
ONTARIO, CA 91764

**SCHEDULE F**
MONTE VISTA WATER DISTRICT
ATTN PRESIDENT OR MANAGING AGENT
10575 CENTRAL AVENUE
MONTCLAIR, CA 91763

**SCHEDULE F**
NANTONG TRADE UNION ALUMINIUM
ATTN PRESIDENT OR MANAGING AGENT
ALLOY CO. LTD. WEIER ROAD
QIDONG CITY, 226200  CHINA

**SCHEDULE F**
ONTRAC
ATTN PRESIDENT OR MANAGING AGENT
274 WATTIS WAY
S. SAN FRANCISCO, CA 94080

**SCHEDULE F**
PERSONNEL CONCEPTS
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 5750
CAROL STREAM, IL 60197-5750

**SCHEDULE F**
RODOLFO RODRIGUEZ AGUILAR
8430 MISSION BLVD.
RIVERSIDE, CA 92509

**SCHEDULE F**
SOUTHERN CALIFORNIA EDISON
ATTN BANKRUPTCY UNIT
P.O. BOX 600
ROSEMEAD, CA 91771-0001

**SCHEDULE F/20 LARGEST**
SUMMIT LOGISTICS INT'L
ATTN PRESIDENT OR MANAGING AGENT
780 NOGALES STREET, BUILDING D
CITY OF INDUSTRY, CA 91748

**SCHEDULE F**
TELEPACIFIC COMMUNICATIONS
P.O. BOX 526015
SACRAMENTO, CA 95852-6015

**SCHEDULE F**
THE CHANG REVOCABLE TRUST C/O
WEN PIN CHANG, TRUSTEE
2819 CRYSTAL RIDGE ROAD
DIAMOND BAR, CA 91765

**SCHEDULE F**
TRADE UNION INT L (TAIWAN) LTD
ATTN PRESIDENT OR MANAGING AGENT
5F-5, NO.58, SHING SHAN RD. NEI HU
DIST.
TAIPEI, TAIWAN

**SCHEDULE F**
ULINE
ATTN PRESIDENT OR MANAGING AGENT
ATTN: ACCOUNTS RECEIVABLE
WAUKEGAN, IL 60085

**SCHEDULE F/20 LARGEST**
MARK BERGER SALES INC.
ATTN PRESIDENT OR MANAGING AGENT
1631 ROCK RIVER
PLACENTIA, CA 92870

**COMMITTEE MEMBER - SCHEDULE F/20
LARGEST**
MONTEREY LIGHTING SOLUTIONS, INC.
ATTN CLARK LONGHURST
2148 POMONA BLVD.
POMONA, CA 91768

**SCHEDULE F**
NEXEN TIRE
ATTN PRESIDENT OR MANAGING AGENT
21073 PATHFINDER
DIAMOND BAR, CA 91765

**SCHEDULE F/20 LARGEST**
PACIFICARE OF CALIFORNIA
ATTN PRESIDENT OR MANAGING AGENT
DEPT NO. 1346
LOS ANGELES, CA 90088-1346

**SCHEDULE F**
PRINCIPAL FINANCIAL GROUP
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 10372
DES MOINES, IA 50306-0372

**SCHEDULE F/20 LARGEST**
SHANGHAI BON VOYAGE INTERNATIONAL
TRADING CO., LTD.
ATTN PRESIDENT OR MANAGING AGENT
2F, NO.110, YAN'AN RD.(E)
SHANGHAI, 200002 CHINA

**SCHEDULE F**
SOUTHERN CALIFORNIA EDISON
ATTN BANKRUPTCY UNIT
P.O. BOX 300
ROSEMEAD, CA 91772-0001

**PROOF OF CLAIM ADDRESS**
SUMMIT LOGISTICS INT'L
ATTN PRESIDENT OR MANAGING AGENT
800 FEDERAL BLVD
CARTERET, NJ 07008

**SCHEDULE F**
THE 3 AMIGOS
ATTN PRESIDENT OR MANAGING AGENT
15406 E. ARROW HIGHWAY
BALDWIN PARK, CA 91706

**SCHEDULE F**
THE GAS COMPANY
ATTN BANKRUPTCY UNIT
P.O. BOX C
MONTEREY PARK, CA 91756

**SCHEDULE F/20 LARGEST**
TRAVELERS
ATTN PRESIDENT OR MANAGING AGENT
CL REMITTANCE CTR
HARTFORD, CT 06183-1008

**SCHEDULE F**
UNITED SECURITY SYSTEMS INC
ATTN PRESIDENT OR MANAGING AGENT
8757 LANYARD COURT, SUITE 100
RANCHO CUCAMONGA, CA 91730

**SCHEDULE F**
MEYERS PUBLISHING
ATTN PRESIDENT OR MANAGING AGENT
799 CAMARILLO SPRINGS ROAD
CAMARILLO, CA 93012-8111

**SCHEDULE F/20 LARGEST**
MOUNTAIN VIEW PACKAGING, INC.
ATTN PRESIDENT OR MANAGING AGENT
4773 BROOKS STREET UNIT G
MONTCLAIR, CA 91763

**SCHEDULE F**
OLD DOMINION FREIGHT LINE INC
ATTN PRESIDENT OR MANAGING AGENT
500 OLD DOMINION WAY
THOMASVILLE, NC 27360

**SCHEDULE F**
PARTNER'S DELIVERY INC.
ATTN PRESIDENT OR MANAGING AGENT
1927 A HARBOR BLVD
COSTA MESA, CA 92627

**SCHEDULE F/20 LARGEST**
QUARTZ LOGISTICS INC.
ATTN PRESIDENT OR MANAGING AGENT
731 S. GARFIELD AVE.
ALHAMBRA, CA 91801

**SCHEDULE F**
SHERIFF'S COURT SERVICES CENTRAL
157 W. 5TH STREET
SAN BERNARDINO, CA 92415

**SCHEDULE F**
SPRINT
ATTN BANKRUPTCY UNIT
P.O. BOX 219100
KANSAS CITY, MO 64121-9100

**SCHEDULE F**
TDW
1714 ANDERSON AVE.
COMPTON, CA 90220

**SCHEDULE F**
THE CHANG REVOCABLE TRUST C/O MEI
LIEN CHANG, TRUSTEE
2819 CRYSTAL RIDGE ROAD
DIAMOND BAR, CA 91765

**SCHEDULE F**
TIRE RACK WHOLESALE
ATTN PRESIDENT OR MANAGING AGENT
7101 VORDEN PARKWAY
SOUTH BEND, IN 46628-8422

**SCHEDULE F**
TRIPLE A POOL SERVICE
ATTN PRESIDENT OR MANAGING AGENT
1819 TINTAH DR.
DIAMOND BAR, CA 91765

**SCHEDULE F/20 LARGEST**
UPS FREIGHT
ATTN PRESIDENT OR MANAGING AGENT
28013 NETWORK PLACE
CHICAGO, IL 60673-1280

**Page 112**

**PROOF OF CLAIM ADDRESS**
UNITED PARCEL SERVICE (FREIGHT)
C/O RECEIVABLE MANAGEMENT
SERVICES
PO BOX 4396
TIMONIUM, MD 21094

**PROOF OF CLAIM ADDRESS**
VERIZON
ATTN BANKRUPTCY UNIT
404 BROCK DRIVE
BLOOMINGTON, IL 61701

RETURNED MAIL

**RETURNED 3/2/11, UNDELIVERABLE**
**SCHEDULE D, NOTICE PURPOSES**
CITICORP LEASING INC
ATTN PRESIDENT OR MANAGING AGENT
450 MAMARONECK AVE
HARRISON, NY 10528-2400

**EMAIL RECEIVED 5/22/2011**
**REQUESTING TO BE REMOVED FROM**
**THE SERVICE LIST**
**ATTORNEYS FOR CATHAY BANK**
PAULINE M STEVENS ESQ
MARC B LEH ESQ
MORRISON & FOERSTER LLP
555 W FIFTH ST
LOS ANGELES, CA 90013-1024

**PROOF OF CLAIM ADDRESS**
UNITED PARCEL SERVICE
C/O RECEIVABLE MANAGEMENT SERVICES
PO BOX 4396
TIMONIUM, MD 21094

**SCHEDULE F**
VIDAL LANDA
ATTN PRESIDENT OR MANAGING AGENT
12581 JANET LANE
GARDEN GROVE, CA 92840

**SEE PROOF OF CLAIM ADDRESS**
**SCHEDULE F**
OLD DOMINION FREIGHT LINE INC
ATTN PRESIDENT OR MANAGING AGENT
FILE 030989
SAN FRANCISCO, CA 94160

**RETURNED 4/21/2011,SEE NEW ADDRESS**
**SCHEDULE F**
VERIZON CALIFORNIA
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 9688
MISSION HILLS, CA 91346 9688

**RETURNED, UNDELIVERABLE**
**SCHEDULE F**
HOME DEPOT
ATTN BANKRUPTCY UNIT
5450 WALNUT AVE.
CHINO, CA 91710

**SCHEDULE F**
VERIZON CALIFORNIA
ATTN PRESIDENT OR MANAGING AGENT
PO BOX 920041
DALLAS, TX 75392-0041

**SCHEDULE F**
WALNUT VALLEY WATER DISTRICT
ATTN PRESIDENT OR MANAGING AGENT
271 S. BREA CANYON ROAD
WALNUT, CA 91788-0508

**RETURNED 2/22/11 AND 3/2/11,**
**UNDELIVERABLE; SEE PROOF OF CLAIM**
**ADDDRESS**
**SCHEDULE F**
VERIZON CALIFORNIA
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 30001
INGLEWOOD, CA 90313-0001

**RETURNED 5/16/2011, 5/31/2011, SEE NEW**
**ADDRESS**
**SCHEDULE D, NOTICE PURPOSES**
KEY EQUIPMENT FINANCE
ATTN PRESIDENT OR MANAGING AGENT
3075 HIGHLAND PKWY FL UCC DEPT
DOWNERS GROVE, IL 60515-1288

# DUCK HOUSE - U.S. MAIL SERVICE LIST

**DEBTOR**
DUCK HOUSE INC
4651 STATE STREET
MONTCLAIR, CA 91763

**ATTORNEYS FOR CATHAY BANK**
GARY OWEN CARIS ESQ
MCKENNA LONG & ALDRIGE LLP
300 SOUTH GRAND AVE 14TH FLOOR
LOS ANGELES, CA 90071-3124

**ATTORNEYS FOR THE COMMITTEE**
ROBERT OPERA, ESQ
WINTHROP COUCHOT PC
660 NEWPORT CENTER DRIVE
FOURTH FLOOR
NEWPORT BEACH, CA 92660

**INTERESTED PARTY**
OFFICE OF UNITED STATES TRUSTEE (RS)
3685 MAIN STREET SUITE 300
RIVERSIDE, CA 92501

**ATTORNEYS FOR CATHAY BANK**
PAULINE M. STEVENS, ESQ.
MARC B. LEH, ESQ.
MORRISON & FOERSTER LLP
555 W FIFTH ST
LOS ANGELES, CA 90013-1024

**RFSN**
JAMES D. ARONOWITZ, ASSOCIATE
GENERAL COUNSEL
IMG COLLEGE/THE COLLEGIATE LICENSING
COMPANY
290 INTERSTATE NORTH CIRCLE, SUITE 200
ATLANTA, GA 30339

**RFSN - ATTORNEYS FOR CATHAY BANK**
MICHAEL G. FLETCHER, ESQ.
NICHOLAS A. MERKIN, ESQ.
FRANDZEL ROBINS BLOOM & CSATO LC
6500 WILSHIRE BLVD
SEVENTEENTH FLOOR
LOS ANGELES, CA 90048-4920

**ATTORNEYS FOR CHINATRUST BANK**
BARRY FREEMAN, ESQ.
JEFFER MANGELS BUTLER & MITCHEL LLP
1900 AVE OF THE STARS 7TH FLOOR
LOS ANGELES, CA 90067

**RFSN**
NFL PROPERTIES LLC
ATTN MATTHEW MORGADO
280 PARK AVENUE
NEW YORK, NY 10017

**SCHEDULE E, NOTICE PURPOSES**
INTERNAL REVENUE SERVICE
PO BOX 7346
PHILADELPHIA, PA 19101-7346

**SCHEDULE E, NOTICE PURPOSES**
FRANCHISE TAX BOARD
ATTN BANKRUPTCY UNIT
BANKRUPTCY SECTION MS A340
PO BOX 2952
SACRAMENTO, CA 95812-2952

**SCHEDULE E, NOTICE PURPOSES**
CALIFORNIA EMPLOYMENT DEVELOPMENT
DEPARTMENT
ATTN BANKRUPTCY UNIT
BANKRUPTCY GROUP MIC 92E
PO BOX 826880
SACRAMENTO, CA 94280-0001

**SCHEDULE E, NOTICE PURPOSES**
STATE BOARD OF EQUALIZATION
ATTN BANKRUPTCY
P.O. BOX 942879
SACRAMENTO, CA 94279-6001

**SCHEDULE E, NOTICE PURPOSES**
SAN BERNARDINO COUNTY TREASURER-
TAX COLLECTOR
ATTN BANKRUPTCY
172 WEST THIRD STREET
SAN BERNARDINO, CA 92415

**SCHEDULE D**
CATHAY BANK
ATTN DAVID L PRICE, VICE PRESIDENT
LOAN SYNDICATIONS
777 N BROADWAY
LOS ANGELES, CA 90012

**RFSN - SCHEDULE D, ADDITIONAL
NOTICE**
CATHAY BANK
ATTN GREGORY BADURA
ATTN SANDRA SHA KENYON, FIRST VICE
PRESIDENT
9650 FLAIR  DR
EL MONTE, CA 91731

**SCHEDULE D, NOTICE PURPOSES**
CHINATRUST BANK
ATTN MELVIN O. REDFORD, EXECUTIVE
VICE PRESIDENT
22939 HAWTHORNE BLVD
TORRANCE, CA 90505

**PROOF OF CLAIM**
FRIESING INVESTMENTS, INC., DBA
GULF COAST SALES AND MARKETING
ATTN PRESIDENT OR MANAGING AGENT
PO BOX 2767
ADDISON, TX 75001

**RFSN - ATTORNEYS FOR WILLIAM S.
KAY, THE LIQUIDATING TRUSTEE FOR
BFW LIQUIDATION LLC (FKA BRUNO'S
SUPERMARKETS LLC)**
JOHN D. ELROD, ESQ.
GREENBERG TRAURIG LLP
ATTORNEYS FOR WILLIAM S. KAY, THE
LIQUIDATING TRUSTEE FOR BFW
LIQUIDATION LLC (FKA BRUNO'S
SUPERMARKETS LLC)
3290 NORTHSIDE PARKWAY SUITE 400
ATLANTA, GA 30327

**PROOF OF CLAIM**
FANZZ
(JAZZ BASKETBALL INVESTORS, INC., DBA
FANZZ)
ATTN ROBERT D.TINGAY,GENERAL
COUNSEL
301 WEST SOUTH TEMPLE
SALT LAKE CITY, UT 84101

**SCHEDULE F/20 LARGEST**
A TO Z MARKETING VENTURES, LLC.
ATTN ANTHONY ZIENO
17 SIVER STREET
SIDNEY, NY 13838

**SCHEDULE F**
AL ARRANTS
116 COUNTRY OAKS DRIVE
BRISTOL, TN 37620

**SCHEDULE F/20 LARGEST**
BOB KUNICK ASSOC. INC.
ATTN BOB KUNICK
12223 LEE HIGHWAY
FAIRFAX, VA 22030-6341

**SCHEDULE F**
BOTTOMLINE SALES
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 74506
SAN CLEMENTE, CA 92673

**SCHEDULE F/20 LARGEST**
BULLET TRANSPORTATION SERVICES
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 809066
CHICAGO, IL 60680-9066

**COMMITTEE MEMBER - ADDITIONAL
NOTICE - PROOF OF CLAIM ADDRESS**
BULLET TRANSPORTATION SERVICES
ATTN TERRY HANDELAND, COLLECTIONS
MANAGER
4900 S PENNSYLVANIA AVE
CUDAHY, WI 53110

**CLAIM FILED**
CADY'S HALLMARK SHOP
220 LIBERTY STREET
WARREN, PA 16365

**SCHEDULE F**
CALIFORNIA CLUB
ATTN DARLENE VOGELS
606 BLUE OAK COURT
EL DORADO HILLS, CA 95762

**SCHEDULE F/20 LARGEST**
CONTINENTAL AGENCY
ATTN PRESIDENT OR MANAGING AGENT
1400 MONTEFINO AVE. SUITE 200
DIAMOND BAR, CA 91765

**SCHEDULE F/20 LARGEST**
CREATIVE DOCUMENT SOLUTIONS
ATTN PRESIDENT OR MANAGING AGENT
1629 MARION-WALDO ROAD
MARION, OH 43302

**SCHEDULE F/20 LARGEST**
DOUG STEWART
P.O. BOX 5016
ANDERSON, SC 29623

**SCHEDULE F**
E.I.S. GROUP
ATTN TIM DEATON
614 ROGERS ROAD
VILLA HILLS, KY 41017

**ASSIGNEE OF SCHEDULE F CLAIM OF
E.I.S. GROUP**
DACA 2010L LP
ANDREW WHATNALL
1565 HOTEL CIRCLE SOUTH SUITE 310
SAN DIEGO, CA 92108

**PROOF OF CLAIM FILED**
FEDEX NATIONAL LTL
PO BOX 840
HARRISON, AR 72602-0840

**SCHEDULE F/20 LARGEST**
FLORIDA SPORTS NETWORK
ATTN PRESIDENT OR MANAGING AGENT
221 BLUE JUNIPER BLVD.
VENICE, FL 34292

**SCHEDULE F**
FM TURNER
6325 COCHRAN ROAD, UNIT 5
SOLON, OH 44139

**SCHEDULE F**
FOGLEMAN BROS., INC.
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 457
BURLINGTON, NC 27216

**SCHEDULE F**
GARY GENE INGOLDSBY
342 REVOLUTION DRIVE
ST. PETERS, MO 63376

**SCHEDULE F**
GIFT SOURCE, LLC
ATTN LORI J. THOMSEN
14040 HAYES STREET
OVERLAND PARK, KS 66221

**SCHEDULE F/20 LARGEST**
HOLLEY SALES
ATTN SHANE HOLLEY
12205 KIMBERLYN ROAD
OKLAHOMA CITY, OK 73162

**SCHEDULE F**
JEANNE D. ROSEN AKA JDR SALES
422 KINGS HIGHWAY
CARNEGIE, PA 15106

**SCHEDULE F**
JOHN COACH NADELL
2521 REDSTART LANE
BIRMINGHAM, AL 35226

**SCHEDULE F**
L & S SPORTS, INC.
ATTN LARRY ZIENTARSKI
P.O. BOX 530056
LIVONIA, MI 48153

**PROOF OF CLAIM FILED**
LAW OFFICES OF ALLAN P. LEGUAY
ALLAN P. LEGUAY
650 TOWNE CENTER DR, SUITE 1400
COSTA MESA, CA 92626

**SCHEDULE F/20 LARGEST**
LOGO AMERICA, LLC
ATTN PRESIDENT OR MANAGING AGENT
22123 W. 83RD STREET.
SHAWNEE, KS 66227

**COMMITTEE MEMBER - SCHEDULE F**
MACKIE & ASSOCIATES
ATTN NORM MEIDL
2100 NO. SEPULVEDA BLVD, SUITE 18
MANHATTAN BEACH, CA 90266

**SCHEDULE F/20 LARGEST**
MARK WILLIAMS AND COMPANY
ATTN MARK WILLIAMS
4940 BROOKSVIEW CIRCLE
NEW ALBANY, OH 43054

**SCHEDULE F**
MORRISON SALES
MERRIL H. MORRISON
9 MONTROSE LANE
MANCHESTER TOWNSHIP, NJ 8759

**SCHEDULE F**
NATIONAL SPORTS ASSOCIATES
ATTN PRESIDENT OR MANAGING AGENT
9150 KILDARE
SKOKIE, IL 60076

**SCHEDULE F**
NORTHWEST REPS, INC.
ATTN PRESIDENT OR MANAGING AGENT
10 VAN BUREN, SUITE C
EUGENE, OR 97402

**SCHEDULE F/20 LARGEST**
P.T.L. SALES
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 6120
STUART, FL 34997

**SCHEDULE F**
INDIANA UNIVERSITY
IU LICENSING & TRADMARKS
P.O. BOX 6268
INDIANAPOLIS, IN 46206

**SCHEDULE F**
JERRY ELY SALES
5952 ROYAL LANE, SUITE 218A
DALLAS, TX 75230-9950

**SCHEDULE F/20 LARGEST**
JOSEPH K. CLARK DBA ALL SEASONS
MARKETING
237 SOUTH CURTIS RD SUITE 100
WEST ALLIS, WI 53214-1030

**ASSIGNEE OF SCHEDULE F CLAIM OF L &
S SPORTS, INC.**
DACA 2010L LP
ANDREW WHATNALL
1565 HOTEL CIRCLE SOUTH SUITE 310
SAN DIEGO, CA 92108

**SCHEDULE F/20 LARGEST**
LICENSING RESOURCE GROUP LLC
ATTN BETSY FLAMBOE
442 CENTURY LANE, SUITE 100
HOLLAND, MI 49423

**SCHEDULE F/20 LARGEST**
LONG SALES GROUP
ATTN PRESIDENT OR MANAGING AGENT
451 E. 58TH AVENUE #1669
DENVER, CO 80216

**SCHEDULE F**
MAJIC TOUCH
ATTN PRESIDENT OR MANAGING AGENT
230 SPRING STREET STE 1421
ATLANTA, GA 30303

**SCHEDULE F**
MARKET PLACE GIFTS INC.
ATTN PRESIDENT OR MANAGING AGENT
3710 COMMERCIAL AVENUE STE 7
NORTH BROOK, IL 60062

**SCHEDULE F**
MICHIGAN STATE UNIVERSITY
ATTN UNIVERSITY LICENSING PROGRAMS
216 MSU UNION
MICHIGAN STATE UNIVERSITY
EAST LANSING, MI 48824-1029

**SCHEDULE G, NOTICE PURPOSES**
NBA PROPERTIES, INC.
ATTN SALVATORE LAROCCA, EXECUTIVE
V.P.
P.O. BOX 10602
NEWARK, NJ 07193

**SCHEDULE F/20 LARGEST**
OHIO STATE UNIVERSITY
ATTN UNIVERSITY LICENSING PROGRAM
DEPT. 1760
COLUMBUS, OH 43271-1760

**SCHEDULE F/20 LARGEST**
PARTNER'S DELIVERY, INC.
ATTN PRESIDENT OR MANAGING AGENT
1927 A HARBOR BLVD, #151
COSTA MESA, CA 92627

**INDIANA UNIVERSITY**
IU LICENSING & TRADMARKS
400 EAST SEVENTH STREET
PO BOX 4040
BLOOMINGTON, IN 47402

**SCHEDULE F**
JIM & CANDY DAVID
P.O. BOX 548
ZIONSVILLE, IN 46077-0548

**SCHEDULE F**
K.O. SALES, LLC
ATTN SCOTT CONIGLIO
7521 NW 131ST
OKLAHOMA CITY, OK 73142

**SCHEDULE F/20 LARGEST**
L.B. WOOD MARKETING, INC.
ATTN PRESIDENT OR MANAGING AGENT
7121 FISH POND ROAD
WACO, TX 76710

**SCHEDULE F/20 LARGEST**
LIUZHOU WANTEX TRADING CO., LTD.
ATTN PRESIDENT OR MANAGING AGENT
NO.3, THE SECOND YANGHE INDUSTRIAL
PARK
LIUZHOU, GX
CHINA

**SCHEDULE F**
LOUD & ASSOCIATES, LLC
ATTN DAVID LOUD
1319 SWAN DRIVE
ANNAPOLIS, MD 21409

**SCHEDULE G, NOTICE PURPOSES**
MAJOR LEAGUE BASEBALL PROPERTIES
DAVE WEINBERG
245 PARK AVENUE
NEW YORK, NY 10167

**SCHEDULE F**
MEI LIEN CHANG
2819 CRYSTAL RIDGE ROAD
DIAMOND BAR, CA 91765

**SCHEDULE F/20 LARGEST**
NANCY ANDERSEN
37 PATRIOT WAY
PEMBROKE, MA 2359

**SCHEDULE F/20 LARGEST**
NFL PROPERTIES LLC-LICENSING GPO
ATTN PRESIDENT OR MANAGING AGENT
P.O. BOX 27278
NEW YORK, NY 10087-7278

**ADDITIONAL NOTICE**
OHIO STATE UNIVERSITY
ATTN UNIVERSITY LICENSING PROGRAM
1100 KINNEAR ROAD SUITE 210
COLUMBUS, OH 43212-1152

**SCHEDULE F**
PARTY COUNSEL-DAVID TUROCK
ATTN DAVID TUROCK
5 THORNBROOK LANE
SUFFERN, NY 10901

**SCHEDULE F/20 LARGEST**
QUARTZ LOGISTICS INC.
ATTN PRESIDENT OR MANAGING AGENT
731 S. GARFIELD AVE
ALHAMBRA, CA 91801

**SCHEDULE F**
RON GRUBBS
112 WONDER VALLEY ROAD
BRISTOL, TN 37620

**SCHEDULE F**
SPLASH
ATTN KIM RYON
P.O. BOX 247
FACTORYVILLE,, PA 18419

**SCHEDULE F/20 LARGEST**
SUMMIT LOGISTICS INT'L
ATTN PRESIDENT OR MANAGING AGENT
780 NOGALES STREET, BUILDING D
CITY OF INDUSTRY, CA 91748

THE COLLEGIATE LICENSING CO
DAVE KIRKPATRICK
290 INTERSTATE NORTH, SUITE 200
ATLANTA, GA 30339

**SCHEDULE F**
UNIVERSITY OF IOWA
TRADEMARK LICENSING PROGRAM
210 KHF BLDG. 446
IOWA CITY, IA 52242

**PROOF OF CLAIM ADDRESS**
UNITED PARCEL SERVICE (FREIGHT)
C/O RECEIVABLE MANAGEMENT
SERVICES
PO BOX 4396
TIMONIUM, MD 21094

**2/4/11; PER MARY JANE EVANS AT
MINNEAPOLIS MART - CREDITOR HAS
NOT BEEN AT ADDRESS FOR 3+ YEARS
SCHEDULE F/20 LARGEST**
OSTROM'S & ASSOCIATES
ATTN PRESIDENT OR MANAGING AGENT
10301 BREN ROAD WEST, SUITE 340
MINNETONKA, MN 55343

**RETURNED 6/6/2011, UNDELIVERABLE
ADDITIONAL NOTICE**
NBA PROPERTIES, INC.
ATTN SALVATORE LAROCCA,
EXECUTIVE V.P.
645 PARK AVENUE
NEW YORK, NY 10017

**SCHEDULE F**
RICK SALESE
535 WOOD VALLEY TRACE
ROSWELL, GA 30076

**SCHEDULE F/20 LARGEST**
SDJ, LLC
ATTN PRESIDENT OR MANAGING AGENT
14176 HWY 87 N.
EDEN, NC 27288

**SCHEDULE F/20 LARGEST**
SPRINT
ATTN PRESIDENT OR MANAGING AGENT
P O BOX 219100
KANSAS CITY, MO 64121-9100

**SCHEDULE F**
SUPERMARKET REPRESENTATIVES
ATTN PRESIDENT OR MANAGING AGENT
20 E. SUNRISE HIGHWAY, STE 300
VALLEY STREAM, NY 11581

**SCHEDULE F**
TRADE UNION INT'L (TAIWAN) LTD
ATTN PRESIDENT OR MANAGING AGENT
5F-F, NO.58, SHING SHAN RD
TAIPEI,

**SCHEDULE F**
UNIVERSITY OF OREGON
OFFICE OF MARKETING AND BRAND
MANAGEMENT
720 E 13TH SUITE 303
5286 UNIVERSITY OF OREGON
EUGENE, OR 97403-5286

**PROOF OF CLAIM ADDRESS**
WAL-MART STORES, INC.
C/O CHARLES B. HENDRICKS, ESQ
CAVAZOS HENDRICKS POIROT & SMITHAM
P.C.
FOUNDERS SQUARE
SUITE 570
900 JACKSON STREET
DALLAS, TX 75202-4425

**2/23/11; NOT DELIVERABLE AS
ADDRESSED; INSUFFICIENT ADDRESS
SCHEDULE F/20 LARGEST**
TRANSWORLD SYSTEMS, INC.
ATTN PRESIDENT OR MANAGING AGENT
ATTN: TSI COMMERCIAL DIVISION
CHICAGO, IL 60673-1248

**SCHEDULE F/20 LARGEST**
RODOLFO RODRIGUEZ AGUILAR
8430 MISSION BLVD.
RIVERSIDE, CA 92509

SOUTH DAKOTA STATE UNIVERSITY
OFFICEOF LICENSING PROGRAMS
ADMINISTRATION BLDG. 0234
BOX 2201
BROOKINGS, SD 57007-2398

**CLAIM FILED - RELATED TO SPRINT
COMMERCIAL (XXX 8357)**
DILIGENTSIA CAPITAL GROUP LLC
C/O RECOVERY MANAGEMENT SYSTEMS
CORPORATION
RAMESH SINGH
25 SE 2ND AVENUE SUITE 1120
MIAMI, FL 33131-1605

**SCHEDULE F**
TEAM COLORS SPORTS MARKETING &
SALES
SCOTT DEROY
P.O. BOX 93850
PASADENA, CA 91109

**SCHEDULE F/20 LARGEST**
TREASURES
ATTN DAVE MACMILLAN
7014 59TH ST, CT. W
UNIVERSITY PLACE, WA 98467

**SCHEDULE F/20 LARGEST**
UPS FREIGHT
ATTN PRESIDENT OR MANAGING AGENT
28013 NETWORK PLACE
CHICAGO, IL 60673-1280

RETURNED MAIL

**SEE PROOF OF CLAIM ADDRESS (CLAIM
NO. 6**
FEDEX NATIONAL LTL
P.O. BOX 95001
LAKELAND, FL 33804-5001